UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Tony B. Gaskins,

    Petitioner,

v.                                    Civil Action
                                      No. 04-cv-12255 -WGY

Ronald T. Duval,

    Respondent.

PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS 28 U.S.C.
§ 2254

## STANDARD OF EXHAUSTION

The exhaustion doctrine seeks to afford the state courts
a meaningful opportunity to consider allegations of legal
error without interference from the federal judiciary.
Rose v. Lundy, 455 U.S. 509,515 (1982). Under standards
established by this Court, a state prisoner may initiate a
federal habeas petition "[o]nly if the state courts have
had the first opportunity to hear the claim sought to
be vindicated. . . ." Picard v. Connor, 404 U.S. 270,276
(1971). "It follows, of course, that once the federal
claim has been fairly presented to the state courts, the
exhaustion requirement is satisfied." Id., at 275 (quoting
from Vasquez v. Hillery, 106 S.Ct. 617,620 (1986)).

In general, the exhaustion doctrine requires that a
state defendant seeking to overturn his conviction on

federal grounds first must give the State courts "a fair
opportunity" to consider his claims. Lanigan v. Maloney,
853 F.2d 40,42 (1st Cir. 1988)(citations omitted).

## STATEMENT OF THE CASE

On March 28, 2000, Young, C.J. dismissed this petition
without prejudice for the petitioner to return to the
state court on the matter of exhausting the issue of per-
jured testimony and prosecutorial misconduct.

Evidentiary hearings was held in this matter and
it was established that the witness, Leo Womack did per-
jure himself at the petitioner's trial, and that the
prosecutor had knowledge of the perjury but failed to
correct it, but the matter was deemed harmless by the
state courts.

The petitioner now returns to this court and seeks
the appropriate relief the state  courts failed to give him.

## STATEMENT OF THE FACTS

Raymond Coffil, a drug dealer from Lynn, testified that
he purchased his cocaine from a "Coke House" at 342 Boston
Street, Lynn. (Tr. 3:156).  Coffill frequented the Coke
House daily sometimes purchasing up to an eighth of an ounce
of cocaine. (Tr. 3:162).  Coffill testified against Gaskins
because the Commonwealth agreed to reduce his pending murder
charge to manslaughter and recommended 5-7 year Walpole

-2-

sentence. (Tr. 3:154).  Coffill claimed he had no involvement
in the victim's death. (Tr. 2:28).  Coffill admitted, how-
ever, that the drug dealers had "dishonored" him by
"messing" with the quality of the cocaine he was purchasing.
(Tr. 3:162).  About a week before the victim's death,
Coffill had confronted someone at the drug house about
the poor quality of cocaine.  This person threatened Coffill
and caused Coffill to run away. (Tr. 3:166).  Coffill
then began discussions with Codefendant Leo Womack.  Coffill
and Womack discussed ripping off the Coke House that
had "dishonored" Coffill. (Tr. 3:162)[1]/  The two formulated
a plan to rip off the drug house and met on February 15,
1991, the day before the murder to discuss the particulars.
(Tr. 3:95,160).

On February 15,1991, Coffill drove yo Womack's house
and picked him up. (Tr. 3:95).  The two went to the drug
house and purchased twenty dollars worth of cocaine.
Coffill and Womack returned to Womack's house and smoked
the cocaine. (Tr. 3:96).  After a twenty minute high,
Coffill and Womack began their quest for money to purchase
additional cocaine.

Womack asked Coffill for a ride to the police station
where Womack believed he could get some money from Ser-

1/ Coffill claimed the idea of robbing the drug house was
"brought up" by Leo Womack. (Tr. 3:108).

-3-

geant Sirois. (Tr. 3:99).[2/]

Coffill saw Sergeant Sirois give Womack $10.00. (Tr. 3:99). Coffill and Womack then stopped by Womack's house and retrieved a gold charm. (Tr. 3:100). Coffill and Womack then went back to the drug house to attempt to purchase another twenty dollar package of cocaine with the $10.00 and the gold charm. (Tr. 3:102). The drug dealers refused to accept the gold and insisted on cash. As Coffill and Womack were leaving the drug house, they encountered Robert Reid and Tony Gaskins.(Tr. 3:102).

Reid recognized Coffill as an individual he had done about a year with in D.Y.S. as a juvenile. (Tr. 3:103). Neither Coffill nor Womack knew Tony Gaskins prior to this night. By coincidence, both Reid and Gaskins were also short on money to purchase cocaine. (Tr. 3:104). Coffill testified over objection that Womack, Reid and gaskins agreed to pool their money and purchase a twenty dollar package of cocaine. Id.

Coffill, Womack, Reid and Gaskins got in Coffill's car and drove to raymond Coffill's house to smoke the cocaine. (Tr. 3:106). Coffill testified that he did not get high and that "the stuff was no good." Id.

2/ On February 14,1992, Leo Womack testified on behalf of certain police defendants in a Federal trial. These officers told him if he ever needed anything to just contact them. (Tr. 3:100).

-4-

One of the four individuals suggested returning to the drug house and requested additional cocaine. (Tr. 3:106). Coffill claimed that, as the four were returning to the drug house, Womack brought up the idea of robbing the drug house. (Tr. 3:108). Coffill said there were some discussion of a weapon and that he thought Reid had a gun. (Tr. 3:110). Coffill said Gaskins was present and participated in the discussion, although he did not claim Gaskins made any specific statements. (Tr. 3:108). Coffill testified at some point, Coffill, Womack, Reid and Gaskins agreed to rob the drug house. (Tr. 3:111). After arriving at the drug house, Coffill again claimed that he did not want to be involved. He claimed he was concerned because the drug dealers may recognize his face. Id.

Despite these claims, Coffill said both he and Gaskins went to the drug house and banged on the door. (Tr. 3: 118). Coffill said Gaskins thought it was a good idea as a way to get inside, if they went in and complained about the last package. (Tr. 3:113). Gaskins began kicking the door, but the dealers refused to open. (Tr. 3:114). Someone in the drug house came out with a machete. (Tr. 3:183). Coffill and Gaskins ran away. Id.

Coffill, Womack, Reid and Gaskins rode around for about 10-15 minutes and decided to return to the drug house. (Tr. 3:117).

All four left Coffill's car and went to the porch area of the drug house. (Tr. 3:119).

As the four stood complaining, two other customers approached the drug house. The four were asked to leave the porch before the drug dealers would do business with the two new customers. (Tr. 3:120). After the two customers left, the four returned to the porch, (Tr. 3:120), shouting ensued, and Womack managed to get his foot in the outside door. (Tr. 3:121). As this happened, the victim, David Clark, approached the drug house to purchase cocaine. (Tr. 3:123). As Clark attempted to leave, Womack confronted him. (Tr. 3:126).$\frac{3/}{}$ Womack hit David Clark in the head and said "You know what this is." (Tr. 3:126-127). Womack and Clark begin fighting. (Tr. 3:131). Coffill said he began walking away, but turned, looked over his shoulder, and claimed he saw Gaskins pull a knife and hold it to Clark's abdomen. (Tr. 3:127). On cross examination, however, Coffill twice admitted he never saw Gaskins with a (knife). (Tr. 3:136,151,152). As Womack held Clark's shoulders, Coffill testified that Gaskins said or Womack "kick it in" (meaning give up the cocaine). (Tr. 3:127). Coffill admitted on cross-examination that he had previously

3/ There is no evidence that Clark actually purchased anything from the drug house.

-6-

told police officers that he had the radio on in the car and
could not hear any conversation between anyone on the
porch. (Tr. 3:157).   Coffill also said that he heard Clark
tell Womack and Gaskins that he had swallowed the cocaine.
(Tr. 3:127).

Clark eventually broke free of Womack and began to
run. (Tr. 3:131).  Womack ordered Reid to get in the car
and try to cut Clark off.  Instead, Coffill followed
Clark and cut him off, while Womack, Gaskins and Reid pur-
sued Clark on foot. (tr. 3:133).  Clark saw Coffill's car
and jumped in in an effort to escape. (Tr. 3:134).   As
soon as Clark recognized Coffill, he jumped out of Coffill's
car. (Tr. 3:135).$\underline{4/}$  When Clark was inside Coffill's
car, Coffill said he was not injured and he saw no blood.
Both Womack and Gaskins ran into a parkway after Clark.
(Tr. 3:135).  Neither man had anything in his hands. Id.
Reid traveled in the opposite direction attempting to
cut David Clark off. Id.

Both Womack and Gaskins reappeared from the parkway
still looking for Clark.  Coffill testified that Gaskins
wanted to keep looking for Clark. (Tr. 3:141).

Womack, Gaskins and Reid got in Coffill's car. (Tr. 3:139).

_____
4/ It is unclear how Clark would recognize Coffill if Coffill
was, as he testified, in  his car and not involved in this
incident.

Coffill testified that Gaskins said, "I stuck that nigger. He didn't make the fence." (Tr. 3:142). Reid told Gaskins he did not believe him. (Tr. 3:143). Someone told Gaskins to check the knife for blood. (Tr. 3:142).

Coffill, although driving, was lucky enough to turn for an instant and see Gaskins wipe the knife with his fingers. (Tr. 3:143). The knife did not have any blood on it. Id.

According to Coffill, the next day, Coffill, Reid and Gaskins met and got high at Reid's house. (Tr. 3:149). While getting high, the police arrived. Id. While Reid spoke to the police, Coffill and Gaskins hid the drug paraphernalia. Id. Coffill claimed that while hiding the cocaine, he saw Gaskins go to the kitchen drawer and put something in it. (Tr. 3:151). He did not know what the object was, but did not believe it was a knife and had not seen Gaskins with a knife that afternoon. (Tr. 3: 152).

Police questioned all the individuals in the house. After Gaskins showed the officer his license, he was ar- rested on an outstanding warrant for trespassing. (Tr. 3: 150). Police questioned Reid and requested he accompany them to the station to give a statement.

Some four hours later Gaskins' arrest and Reid's question- ing, Coffill arrived at the police station and spoke to

Lieutenant Perrlino. (Tr. 3:150).

During questioning, officers removed a knife from Coffill. (Tr. 3:171).[5] Coffill then accompanied officers back to Reid's house, opened a kitchen drawer and pointed to a knife. (Tr. 3:153). Coffill first said he did not know what Gaskins put in the drawer. (Tr. 3:151,153).

Leo Womack gave a similar account of what happened when he testified at trial. According to Womack, when David Clark came out of the house, he hit him. (Tr. 3:207). Womack claimed that he never fought with David Clark, but instead walked off the porch after hitting David Clark in the face and claimed that when he turned around, he witnessed Gaskins with a knife to Clark's throat.[6] Womack, however, in his signed statement to the police, never reported that Gaskins had a knife to Clark's throat. (Tr. 3:234). Womack testified that Tony Gaskins yelled, "He ain't leaving until he gets it, gets mine." (Tr. 3:234). David Clark then ran off the porch and they chased him. Id. At some point, Clark was hiding in the back yard of a barbershop on Boston Street. (Tr. 3:210). Reid and Gaskins went into the yard and Womack heard yelling. Id.[7]

5/ On cross examination, Coffill denied having a knife, then after a lunch break and a consultation with the prosecution, where the pro- secutor showed Coffill a knife, Coffill recalled having a knife when he turned himself in. (Tr. 3:169-172).

6/ Womack's testimony conflicts with Coffill's in that Coffill said Gaskins had the knife to David Clark's abdomen while Womack held him.

7/ Coffill claims it was Womack and Gaskins who chased David Clark into a park. Womack was sure, however, that it was Reid and Gaskins who chased David Clark into a yard.

According to Womack, he heard someone say, "Yo, don't stab me, man. Don't stab me for a twenty, man. Don't stab me." Id. Later, when the men were in the car, Gaskins said, "I stuck that nigger. He didn't make the fence." (Tr. 3:211).$\underline{8/}$ Womack testified that prior to his testimony in court, he never told the police Gaskins had a knife on the porch. (Tr. 3:237). It was not until after Womack entered into plea discussions with the District Attorney that he recalled that Gaskins had a knife on the porch. (Tr. 3:238). Womack also admitted that he also told the police that David Clark had yelled, "Don't stab me for a twenty" on the porch, not in the back yard of the barbershop. (Tr. 3:239).

Ms. Vivian Avant, who is the mother of David Clark's children, in her statement to the police on February 17, 1991, she said that David Clark told her he was jumped by five people. Defense counsel made no effort to intro-duce this statement to the jury.

Lynn police officer Edward Monahan testified that at approximately 1:20 a.m. on February 16,1991, in response to a radio call, he and officer Manning went to Lynn Hospital for an apparent stabbing. (Tr. 2:131). The black male was David Clark, and he was able to briefly speak to the officers. (Tr. 2:134). David Clark told officer Monahan that, "He received his wound when he fell on his

---

8/ Leo Womack's statement as signed never stated that he heard Gaskins say, in the car, "I stuck that nigger. He didn't make the fence." This is perjury and the prosecutor knowingly used this perjured testimony to obtain a conviction.

-10-

broken bed." Defense counsel made no attempt to introduce Clark's statement to the jury.

Lieutenant Perrlino testified that they went to 127 Washington Street because they were looking for someone named Romeo. (Tr. 2:92). Lieutenant Perrlino testified that when Gaskins was cuffed, he saw an empty knife sheath attached to his belt. (Tr. 2:101). However, at an earlier proceeding in July, 1991, Lieutenant Perrlino had said that he did not see any knife sheath on Gaskins when he was arrested.[9/]

Lieutenant Flynn testified that Gaskins was placed under arrest for an outstanding default warrant for trespassing. Lieutenant Flynn explained that Gaskins was not a suspect at this time in Clark's stabbing and that Gaskins in no way tried to conceal his identity. (Tr. 2: 167). Lieutenant Flynn claimed he observed that Gaskins was wearing an empty buck knife case on his belt, but made no note of it and did not ask any questions relative to the alleged knife. (Tr. 2:148). Gaskins' Booking Sheet does not indicate he had a sheath at the time of his arrest. (See Exhibit #15 of the evidence presented at trial). The next time Lieutenant Flynn saw Gaskins was at the police

---

9/ The knife sheath was tested for fingerprints matching Gaskins, but none identifiable to Gaskins could be found.

station where he was being booked. (Tr. 2:150). Although Gask-
ins was not a suspect in Clark's stabbing, according to
Lieutenant Flynn's story, he observed the empty sheath on
the booking desk and took it. (Tr. 2:150,176).  Lieutenant
Flynn Did not notify the booking officer that he was
taking the sheath and did not correct the Book Sheet
when he added the assault with intent charge. (Tr. 2:
184,193).

Lieutenant Flynn testified that at some point, Coffill
showed up at the police station and he was interviewed.
Coffill brought a knife to the station and turned it over
to Lieutenant Flynn. (Tr. 2:76).  Coffill told investi-
gators that he saw Tony Gaskins put a knife in the drawer
at Reid's house. (Tr. 2:117).$\frac{10}{}$

At around 9:20 a.m., Mr. Gaskins was charged with assault
with intent to murder. Id.  At some point after this, a
chemist was brought to the station to test for occult blood.
Id.  The only person tested was Gaskins.  Neither Coffill
or Reid's clothing was tested.  The police officer never
tested Womack's hands or clothing for blood. (Tr. 3:14).
Lieutenant Flynn explained that he had seen blood on Mr.
Gaskins shirt, so Gaskins was singled out to be tested. (Tr.

10/  Prior to his statement to police, Coffill admitted that he never
saw what Gaskins put in the drawer and that he did not see Gaskins
with a knife. (Tr. 3:151-153).

2:191). Contrary to Lieutenant Flynn's claim, chemist LeClaire did not observe any visible or non-visible bloodstains on Gaskins' shirt. (Tr. 3:88).

Corporal Dennis Marks testified that on the evening of February 16, 1991, he went with Coffill to 127 Washington Street. (Tr. 2:212). When he arrived, Coffill told him that the knife was in a drawer in the kitchen. (Tr. 2: 213; Tr. 3:28). It was Keisha Reid who brought him over to a sink drawer where a buck knife was located. (Tr. 2: 213). She told the officers that the reason she knew the knife was there was because Coffill had told her it was. (Tr. 3:31). The officers seized the knife and it was brought to the station to be analyzed by the chemist. (Tr. 2:214); (Tr. 3:4). No officer took any precaution to preserve any fingerprints on the knife or in the drawer handle. The police officer never dusted any of Reid's apartment for fingerprints. (Tr. 3:27).

Corporal Marks further testified that on February 18, 1991, Womack called the police station and offered to turn himself in. (Tr. 3:5). Corporal Marks and Lieutenant Flynn interviewed Womack. Id. The police officer never tested Womack's clothing for blood. (Tr. 3:14).

Joseph Capillo of the Massachusetts State Police testi-fied that it is his job to go to crime scenes and take photographs and try to get fingerprints. (Tr. 3:33).

-13-

Trooper Capillo went to 127 Washington Street and took some photographs. (Tr. 3:34). He tried to get some fingerprints from the knife, but were unable to establish any with sufficient clarity. (Tr. 3:41). Trooper Capillo only took a photo of the kitchen drawer. (Tr. 3:45). He was not asked to lift any fingerprints at 127 Washington Street, and he was not asked to take any photos of any other area. Id. Trooper Capillo was the individual who brought the knife to the station to be analyzed by the chemist. (Tr. 3:39).

Karolyn LeClaire, a chemist with the Massachusetts Department of Public Safety Crime Laboratory, testified that on February 16, 1991, she arrived at the Lynn Police Department at approximately 8:10 p.m. (Tr. 3:49). Ms. LeClaire tested a knife given to her by Lieutenant Marks and an officer and Trooper Capillo. (Tr. 3:59). The test for blood was positive. Id. However, there was an in-sufficient amount of blood on the knife, and she was unable to determine whether the blood on the knife was from human or animal origin. Id. Ms. LeClaire also tested Gaskins' hands. (Tr. 3:55). She tested both of Gaskins' hands for blood and received a positive result. (Tr. 3: 55-57). Ms. LeClaire further testified that she tested and found a non-visible substance what appeared to be blood

-14-

of either human or animal origin or various pieces of
clothing, a wooden stick, and a knife sheath. (Tr. 3:57-
60). She never tested Gaskins' belt or pants for blood.
(Tr. 3:90). Ms. LeClaire explained that she did not do
any blood tests on Womack, Coffill, Reid or the interior
of Mr. Coffill's car. (Tr. 3:83-84).

## EVIDENTIARY HEARING EVIDENCE

Lawrence McGuire testified that back in 1991, he assigned
himself to represent Leo Womack on his murder charge.
(Hearing Transcripts, December 10, 2002, at pp. 86-87).
He discontinued representing Mr. Womack after Womack had
pled guilty to manslaughter. Id, at p. 87. Mr. McGuire
testified that it was his practice to be present at all times
when his client, Leo Womack, was being interviewed by any
member of law enforcement. (Hearing Transcripts, December
10, 2002, at p. 89).

Before the trial of Tony Gaskins, he and Mr. Womack
had a meeting with Howard Whitehead, ADA, and Detective
Dennis Flynn at the Essex Superior Courthouse in Salem,
Massachusetts. Id., at p. 91. Mr. Womack discussed the events
that took place on the night of the homicide. Id. at p. 92.
Prior to that meeting, he does not believe that Womack had
any meetings with any member of law enforcement. Id., at p.
95. At the meeting he recall introducing Mr. Womack to
Mr. Whitehead and Whitehead explained the offer from the

Commonwealth. (Hearing Transcripts, December 10, 2002, at
p. 96).

Based on his preparations for the meeting and meeting
with Mr. Womack, he had a good sense of what the expected
testimony would be. Id., at p. 101. At that particular
moment, during the interview he had a more clear memory
of exactly what Mr. Womack had said at various times to
Mr. Whitehead. Id., at p. 104.

On cross examination, Mr. McGuire testified that he was
present for the entire testimony in Gaskins' trial. Id.,
at p. 120. He sat on the opposite side of the courtroom
from Mr. Womack when he testified. Id., at p. 121. At
no point did he interrupt the testimony of Mr. Womack. Id.
When Mr. Womack testifed at trial that Mr. Gaskins came
back to the car and said, "I stabbed that nigger before he
made the fence," he does not remember Mr. Womack ever
saying that to Mr. Whitehead in the meeting. (Hearing
Transcripts, December 10, 2002, at p. 122). He also recall
that Mr. Coffill testified before Mr. Womack, but he did
not pay too much attention to what Coffill had to say. Id.,
at p. 123.

When he heard Mr. Womack testify that Mr. Gaskins told
him, "I stabbed that nigger before he made the fence," it
did register to him as something new and something he had
not heard from his client before. Id., at pp. 123,124.

Even though he knew that what Mr. Womack was testifying to was something he never heard before, he did not make an objection nor did he seek to confer with his client about his altered testimony. Id., at p. 124.

Howard Whitehead submitted an affidavit at the defendant's motion for new trial hearing in opposition to the defendant's argument of his knowing use of perjured testimony as was relayed through the affidavit of Leo Womack. In his affidavit, Howard Whitehead stated,"I then asked Womack to relate to me, in his own words, the truthful account of the events which surrounded the killing of David Clark." Aff. of Whitehead at ¶6. Mr. Whitehead then stated,"In the course of reciting those events, Womack stated, among other things, that after Clark had been stabbed, Womack, Robert Reid, Tony Gaskins and Raymond Coffill assembled in an automobile. Inside the automobile, Gaskins said that he had stabbed David Clark. Specifically he stated, "I got that nigger." Robert Reid did not believe Gaskins. Gaskins took a knife from his pocket and wiped his hand along the blade. There was no blood visible. Reid then said, "You didn't stab him." Gaskins replied, "Yeah. I did. I got that nigger."" Aff. of Whitehead at ¶7.

Mr. Whitehead then stated that, "I proceeded to trial on the assumption that the aforementioned account of the conversation was a truthful one, given to the best of Womack's recollection. I never advised him to tailor his testimony in

-17-

any manner. In fact, I do not recall ever meeting with him
again after the interview of February 12, 1992." Aff. of
Whitehead at ¶8. Then he goes on to say in his affidavit,
"To the extent that Womack, in his trial testimony,
amplified on the conversation in the automobile by attri-
buting to Gaskins the statement, "[Clark] never made it to
the fence," he did so on his own initiative and contrary
to my expectation." Aff. of Whitehead at ¶9. He stated
that, "When, in my opening statement, I recited to the jury
the version of the conversation which included Gaskins'
statement, "He never made it to the fence," I did so based
upon the account which Raymond Coffill had given to me
in his pre-trial interview, an account which included that
statement." Aff. of Whitehead at ¶10.

Sindey Hayes testified that she was the older sister
of Tony Gaskins. (Hearing Transcripts, December 10, 2002,
at p. 136). Mrs. Hayes met with Leo Womack some time in
the Fall of 1999 at the Concord Farm. (Hearing Transcripts,
December 10, 2002, at pp. 136-140). Mrs. Hayes went to
the corrections facility, filled out a visitor's form,
and a guard told her which person was Leo Womack. Id.,
at 140. When Mrs. Hayes met Mr. Womack he told her that
"he feels bad about what he did" and that he was going
to make it right." Id. at 142. Mr. Womack told Mrs. Hayes
"he was sorry for lying on Tony and saying what he said.
And that he was going to fix it, to make it right. He

-18-

was going to write it down on paper and send it to me."
Id., at 143.  Mrs. Hayes testified that at some point
she received a signed and notarized document in the mail
in an envelope that appeared to be from Mr. Womack.
Id., at 144.  Mrs. Hayes did not convey any threats
to Mr. Womack. Id.  Mrs. Hayes described Mr. Womack
as being "open, nice and very humble, you know, and caring
like he felt, he had that look like he was really sorry."
Id., at 145.  From the perspective of Mrs. Hayes, Mr.
Womack did not appear to be threatened by her, or by
her appearing unannounced to apeak with him. Id.

Susan Manning testified that she first met Leo Womack
when he was an inmate at the South East Correctional
Center ("S.E.C.C.").  (Hearing Transcripts, December 9,
2002, at p. 80).  Ms. Manning knew Mr. Gaskins, had read
the transcripts of his trial, and was interested to
speak to Mr. Womack about his testimony. Id. at, pp.
80-81.  Ms. Manning asked Mr. Womack if the things he said
in the affidavit were true, and Mr. Womack "took a long
deep gulp and exhaled, looked me straight in the eyes
and he said absolutely one hundred percent true. . ."
Id., at 86.  Mr. Womack told Ms. Manning about the circum-
stances of his testifying in the case.  Mr. Womack told
Ms. Manning that he was nineteen years old when this hap-
pened, and he was "scared." Id.  Ms. Manning testified

-19-

that Mr. Womack told her "I have cried many a night over
the consequences, the results of what I have done to
that man." Id., at 87.  Ms. Manning testified that Mr.
Womack told her "he was scared and he was coerced into
lying, and led to believe that if he told that lie he was
going home that day." Id., at 88.  Ms. Manning testified
that Mr. Womack told her he was scared and he was coerced
into lying, and led to believe that if he told that lie
he was going home that day. Id., at 88.  Ms. Manning
testified that in the two meetings that she had with Mr.
Womack in April and June of 2000, they discussed the con-
tents of Mr. Womack's affidavit.  She said,

> Mr. Womack continuously said to me about his awesome
> guilt that he had felt about putting Mr. Gaskins
> away for life.  And he made references to all the
> time that he has done unnecessarily along the terms
> of his life sentence.  And that he was now in the
> position and he felt it was time to make it right.

(Hearing Transcripts, December 9, 2002, at p. 89).

**I(A).   THE PROSECUTION KNOWINGLY AND INTENTIONALLY USED
PERJURED TESTIMONY OF BOTH LEO WOMACK AND RAY-
MOND COFFILL TO PROCURE A CONVICTION AND DEFENSE
COUNSEL WAS INEFFECTIVE FOR ALLOWING THE PERJURY
TO STAND UNCHALLENGED WHICH DENIED PETITIONER
A FAIR TRIAL AS GUARANTEED BY THE FIFTH, SIXTH
AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION**

It is well settled that to obtain a conviction by the
use of testimony known to the prosecution to be perjured
offends due process. Durley v. Mayo, 351 U.S. 277 (1956).
"[A] conviction obtained by the knowing use of perjured
testimony is fundamentally unfair, and must be set aside
if there is any reasonable likelihood that the false testimony

-20-

could have affected the judgment of the jury." U.S. V. Tavares,
93 F.3d 10 (1st Cir. 1996). Under federal law, perjury
occurs when a "witness testifying under oath or affirmation
... gives false testimony, rather as a result of confusion,
mistake, or faulty memory." U.S. V. Tavares, 93 F.3d at 14
(citations omitted).

The perjured testimony, in pertinent part:

### Prosecutor's Opening in pertinent part:

> "They got inside the car.  Once inside the car,
> Tony Gaskins said: I stuck that nigger.  I stabbed
> him.  I think in the stomach.  He didn't make
> that fence." (Tr. 2:27).

### Direct Examination of Coffill, in part:

Q. Now, while you were in the car, was there any
   conversation, specifically on Tony's part, as
   to what had happened during the chase?

A. Yes.

Q. What did he say?

A. He said he stuck him.

Q. Were those his exact words?

A. No. He said: I stuck that nigger. He didn't
   make the fence. (Tr. 3:142)

### Direct Examination of Womack, in part:

Q. Was there any conversation in the car while you
   were driving?

A. Not at that point. He was driving around looking
   for the guy. At that point we had a conversation.
   The conversation was Reid asked Gaskins, did you
   get him? His exact words were quote-unquote "I
   stuck that nigger. He didn't make the fence. I
   got him." (Tr. 3:211).

**Prosecutor's Closing Argument, in part:**

> So, the question isn't whether you like Raymond
> Coffill and Leo Womack. The question is whether
> Raymond Coffill and Leo Womack are telling the
> truth when they say that it was Tony Gaskins
> who pulled a knife on David Clark during the
> early morning of February 16th, 1991, and who,
> after chasing David Clark down Boston Street and
> into a driveway on Congress Street, emerged from
> the driveway, got in the car and said: "I stabbed
> that nigger. He didn't even make the fence."
> (Tr. 4:48)

> Now, they drove around for awhile. Then, at that
> point, Coffil said -- and I think Womack said the
> same words -- that Gaskins said to him: "I stabbed
> that nigger. He didn't make the fence." (Tr. 4:53).

> ...Raymond Coffill said that Tony Gaskins had come
> to the car and said: "I stabbed that nigger. He
> didn't make the fence." (Tr. 4:57-58).

> And when he emerged, he apparently had accomplished
> his purpose, because he said: "I stabbed that
> nigger. He didn't make the fence." (Tr. 4:65-66).

At the core of this issue is the showing that a witness
whose testimony was central and critical to this case, has
now recanted, and states that he was coerced into providing
such testimony at the time of trial. This testimony, and
the fact that the testimony has now been recanted is of
great significance to this case.

This was a case, which was based largely upon "circum-
stantial evidence." There was no witness who claimed to
have seen Mr. Gaskins stab Mr. Clark. There was no com-
pelling forensic evidence linking Mr. Gaskins to the stab-
bing of Mr. Clark. [11] Without the testimony of Mr. Coffill

---

[11] The forensic evidence in this case was both weak and inconclusive.
There was no testimony that Mr. Gaskins had the blood of Mr. Clark on
him. While there was testimony that Mr. Gaskins was exposed to some
kind of blood product, there was no testimony that it was of human blood,

-22-

and Mr. Womack it is highly unlikely that Mr. Gaskins would
have ever been required to stand trial, let alone be con-
victed.

The testimony that was so critical in this case as
pointed out infra at pp. 21-22, was the supposed "admission"
by Mr. Gaskins that he had "stuck" Mr. Clark.  This alleged
statement by Mr. Gaskins was first noted by the Police in
a report of a "statement" by Mr. Coffill, who was also
being held by the Police in connection with the same
homicide.  See Exhibit D, Police Report dated 2/16/91.
According to police reports, Mr. Coffill told the police
that Mr. Gaskins got into Mr. Coffill's car and stated,
"I got that nigger, he didn't make the fence.  I stabbed
him in the leg."  In a later version of a statement by Mr.
Coffill, the last phrase, indicating that Mr. Clark was
"stabbed" "in the leg" was not mentioned.  Obviously,
stabbing someone in the "leg" is very different from a
wound to the abdomen.  At trial the Commonwealth's theory
was that a wound to the abdomen was the cause of death.
Inexplicably, this report that Mr. Clark was stabbed "in the
leg" did not make it into the version of testimony that
was ultimately introduced into trial.

Even more inexplicably, Mr. Gaskins' counsel never
cross examined Mr. Coffill on the alleged statement about
being stabbed "in the leg," but allowed his statement that

_____
or that it was of the same type as Mr. Clark. No knife was found in
the possession of Mr. Gaskins. A knife that was later found in a kitchen
drawer in Mr. Reid's home was found to have blood on it, but once again,
there was no evidence that the blood was of the type of Mr. Clark, or
that it was of human origin.

-23-

Mr. Gaskins "admitted" to stabbing Mr. Clark to stand
unchallenged. (Tr. 3:155-191). Counsel for Mr. Gaskins
was ineffective in failing to cross examine on this cri-
tical point, especially where the first version of a
statement from Mr. Coffill has the language that Mr. Clark
was stabbed "in the leg." See Strickland v. Washington,
466 U.S. 668, 690 (1984)("a convicted defendant making
a claim of ineffective assistance must identify the acts
or omissions of counsel that are alleged not to have
been the result of reasonable, professional judgment").
Mr. Coffill, who left out the portion of Mr. Gaskins
alleged statement about being stabbed "in the leg," had
his charges reduced to manslaughter, and he was sentenced
to 5-7 Walpole. Here, defense counsel's failure to attack
Mr. Coffill's intentional "altered" testimony was outside
the wide range of professionally competent assistance.

According to Womack, he was told that in order to
obtain a "deal" whereby the charges against him would be
reduced to manslaughter, he would have to "corroborate"
the statement of Mr. Coffill. As Mr. Womack states in
his Affidavit:

5.) The prosecutor specifically told me that
I must corroborate Raymond Coffill's
testimony and statement by saying Tony
Gaskins said, when he returned to the
car: "I stuck that nigger. He didn't
make the fence."

Exhibit A, at 21.  Mr. Womack goes on to say that he "really

-24-

didn't want to lie like this but If I didn't I wouldn't have gotten the deal I did." Exhibit A, at 21. Mr. Womack states that his testimony was "coerced" by the prosecutor. Exhibit A, at 21. See also Exhibit A, at 26. The facts as recited in the Womack affidavit is further supported by Womack's trial attorney, Lawrence McGuire. Mr. McGuire testified at the evidentiary hearing that he was present for the entire testimony of Gaskins' trial. (Hearing Transcripts, December 10, 2002, at p. 120). He testified that he sat on the opposite side of the courtroom from Mr. Womack when he testified. Id., at p. 121. At no point did he interrupt the testimony of Mr. Womack. Id. When Mr. Womack testified at trial that Mr. Gaskins came back to the car and said, "I stabbed that nigger before he made the fence," he does not remember Mr. Womack ever saying that to Mr. Whitehead in the meeting. Id., at p. 122. He further testifed that when he heard Mr. Womack testify that Mr. Gaskins told him, "I stabbed that nigger before he made the fence," it did register to him as something new and something he had not heard from his client before. Id., at pp. 123, 124.

Mr. McGuire testifed that even though he knew that what Mr. Womack was testifying to was something he never heard before, he did not make an objection nor did he seek

-25-