to confer with his client about his altered testimony. Id.,
at p. 124.

Mr. Whitehead, the prosecuting attorney, even supports
the defendant's argument that perjured testimony was used
to convict him at trial.  In his affidavit submitted at
the evidentiary hearing, Mr. Whitehead states, "I pro-
ceeded to trial on the assumption that aforementioned
account of the conversation was a truthful one, given to
the best of Womack's recollection.  I never advised
him to tailor his testimony in any manner..." Aff. of
Howard Whitehead, at ¶ 8.  Then he goes on to say in
his affidavit, "To the extent that Womack, in his trial
testimony, amplified on the conversation in the automo-
bile by attributing to Gaskins the statement, "[Clark]
never made it to the fence," he did so on his own initi-
ative and contrary to my expectation." Aff. of Howard
Whitehead, at ¶ 9.  Mr. Whitehead further stated that, "
When, in my opening statement, I recited to the jury the
version of the conversation which included Gaskins'
statement, "He never made it to the fence," I did so
based upon the account which Raymond Coffill had given to
me in his pre-trial interview, an account which included
that statement." Aff. of Howard Whitehead, at ¶ 10.

-26-

Here the prosecutor admits that he knew that Mr. Womack's testimony at that particular stage was a lie, and his actions are in violation of Napue v. Illinois, 360 U.S. 264 (1959).

Even at trial there was reason to question the method by which Mr. Womack's statement was obtained.   Mr. Womack testified that he gave various statements to the police on the day that he was taken into custody. (Tr. 3:234-239).  He was in the Police Station, in the company of four police officers. (Tr. 3:234-235).   Mr. Womack described a process whereby one statement was written up over a period of twenty minutes, then it was ripped up in front of him by the police, who evidently were not satisfied with the contents. (Tr. 3:234, 236).   Another statement was given over another twenty minute period, then it too was ripped up in front of him. (Tr. 3:236).

Mr. Womack was repeatedly told that Mr. Clark was in the hospital, and that the "guy is going to die." Mr. Womack was told that he would be charged with murder. (Tr. 3:235).   The earlier statements that were ripped up did not indicate that Mr. Gaskins had a knife. (Tr. 3:237).  Finally, after several attempts, a version of a statement that was inculpatory of Mr. Gaskins, and apparently satisfactory to the police, was reached, and this version was typed and signed. (Tr. 3:237).

-27-

The State cannot now argue successfully, based on the facts elicited from the evidentiary hearing, that Mr. Womack's affidavit should not be credited, because the manner by which his "original" statement was obtained suggests that from the start the Commonwealth sought to eilicit specific statements from Mr. Womack that would be inculpatory of Mr. Gaskins. At trial Mr. Womack did testify to an alleged "admission" by Mr. Gaskins. This testimony did "corroborate" the testimony of Raymond Coffill which was as follows:

ADA: What did he say?

COFFILL: He said he stuck him.

ADA: Were those his exact words?

COFFILL: No. He said: I stuck that nigger. He didn't make the fence.

(Tr. 3:142)

Mr. Womack's words, relating the "admission" of Mr. Gaskins, certainly did "corroborate" the words of Mr. Coffill. Indeed, the quoted language is nearly identical from both witnesses. It appears that this language was not contained in the original statements from Mr. Womack, which were torn up by the Police, and the statement from Mr. Coffill at the time of trial did not match up with his original statement to the effect that Mr. Gaskins stabbed Mr. Clark "in the leg." See Exhibit D.

At trial the statements attributed to Mr. Gaskins were

-28-

so much alike that they have the sound of being scripted
and rehearsed. The "key" words testified to at trial
to secure the conviction is the alleged statement in
the car made by the defendant to the testifying code-
fendants that, "I stuck that nigger. He didn't make the
fence." This statement, as alleged, is the only connection
of the defendant to the crime charged, which makes it
material and subject to impeachment. Without Womack's
and Coffill's perjured testimony, Mr. Gaskins would
most likely not have been convicted. That is why it
became important to the prosecutor that the two codefen-
dants  testimony, in that regard, be the same. Not once
in Womack's out-of-court statement did he allege that
Gaskins stated in the car, "I stuck that nigger. He didn't
make the fence."

The prosecutor did not solicit from Mr. Womack the
testimony as indicated in his out-of-court statement,
as attested to not only by Mr. Womack, but from Womack's
trial counsel and the trial prosecutor. Moreover, his
testimony cannot be determined as inconsistent testimony
in slight variance to his out-of-court statement. It is
not an inconsistent statement, it is perjured testimony.
There is a big difference from Womack's and Coffill's
out-of-court statements and their trial testimony because
it establishes "when" and "where" the victim was allegedly
stabbed by the defendant. So, the conversation in the
car becomes the "key" evidence in establishing the defen-

-29-

dant's guilt or innocence.  And this is "knowing, wilful and intentional use of perjured testimony to secure a conviction." Burks v. Egeler, 512 F.2d 221, 227 n. 4 (1975).

It is fundamental that the Commonwealth may not base its case upon perjured testimony.  The Massachusetts and Federal Constitutions prohibit a prosecutor from standing mute when a witness gives testimony that the prosecutor knows, or has reason to know, is false. See Mooney v. Holohan, 294 U.S. 103 (1935); Commonwealth v. Collins, 386 Mass. 1, 10, 434 N.E.2d 964  (1982); Napue v. Illinois, 360 U.S. 264, 266 (1959); Alcorta v. Texas, 355 U.S. 28 (1957).  The courts have consistently held that a conviction obtained through false testimony is fundamentally unfair, and must be set aside "if there is any reasonable likelihood that the false testi- mony could have affected the judgment of the jury." See United States v. Agurs, 427 U.S. 97, 104 (1976). Accord Kyles v. Whitley, 514 U.S. 419, & n. 7 (1995). See also United States v. Bagley, 473 U.S. 667, 682 (1985). Denial of due process exists where false testimony goes uncorrected. Napue v. Illinois, 360 U.S. 264, 269 (1959). "Regardless of whether the government has encouraged the false evidence of one of its witnesses, the prosecutor must advise the court of such false testimony." Commonwealth

-30-

v. Hill, 432 Mass. 704, 714, 739 N.E.2d 670 (2000)(ci-
tations omitted); Commonwealth v. Nelson, 3 Mass. App.
Ct. 90, 100-101, 323 N.E.2d 752 (1976).

A conviction based upon false testimony, especially
if such testimony is coerced by the Commonwealth, would
deprive a defendant of a fair trial, the right to confron-
tation, the right to due process of law, and the right
to effective assistance of counsel, all in violation of
the Fifth, Sixth and Fourteenth Amendments to the United
States Constitution.

In this case Mr. Gaskins was deprived of his right to
compulsory process whereas the chief witnesses against
him, Mr. Coffill and Mr. Womack, did not provide to the
jury the full extent of their statements during testimony,
which would have tended to show that the alleged "admission"
was the product of coercion and intentional tailoring
of evidence so as to inculpate Mr. Gaskins. The Con-
frontation Clause is applicable to the States. As the
Supreme Court noted in Pointer v. Texas, 380 U.S. 400,
404 (1965), it "cannot seriously be doubted at this late
date that the right to cross-examination is included
in the right of an accused." See Kirby v. United States,
174 U.S. 47 (1899); Alford v. United States, 282 U.S.
687 (1931); Greene v. McElroy, 360 U.S. 474 (1959);
In re Oliver, 333 U.S. 257 (1948); Turner v. Louisiana,
379 U.S. 466 (1965). The Supreme Court has repeatedly

-31-

expressed the principle that "the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." Pointer,supra, at 405.

According to the affidavit of Mr. Womack his testimony was coerced by the Commonwealth, but the Commonwealth never revealed that statements were, in fact, coerced, nor did the Commonwealth reveal that both Coffill and Womack's testimony were in fact false. Evidence relating to the manner in which these new versions of their testimony was obtained was exculpatory, and Mr. Gaskins' jury was entitled to know this fact. See Brady v. Maryland, 373 U.S. 83, 87 (1963); Kyles v. Whitley, 514 U.S. 419 (1995); Commonwealth v. Martin, 427 Mass. 816, 824, 696 N.E.2d 904 (1998).

The evidence from Mr. Womack, which has now been recanted, was in a very real sense the keystone of the government's case. The Commonwealth's case was circumstantial, and was "particularly vulnerable to even slight blows" to the credibility of the witness, or to his motivations in testifying. Without Mr. Womack's testimony, then the testimony of Mr. Coffill becomes not only more critical, but immensely more vulnerable to cross examination and impeachment. The fact that Mr. Womack has recanted this statement, and the fact that Womack's trial counsel

-32-

corroborates Mr. Womack's affidavit; and the fact that
the trial prosecutor "knew" that Womack's and Coffill's
testimony were both altered and false is very much material
and undermines confidence in the verdict. See Kyles v.
Whitley, 514  U.S. 419 (1995); Commonwealth v. Collins,
386 Mass. 1, 10 (1982).  The prosecutor's actions here
"so infect[s] the trial with unfairness as to make the
resulting conviction a denial of due process." Jenkins v.
Artuz, 294 F.3d 284, 292 (2nd Cir. 2002)(quoting Darden
v. Wainwright, 477 U.S. 168 (1986)).  The prosecutor here
clearly misrepresented the facts. See U.S. v. Mason,
293 F.3d 826, 829-830 (5th Cir. 2002)("By failing to
correct the misrepresentation, we find that the government
violated Mason and Smith's rights  to due process under
the Fourteenth Amendment").

Not only did the prosecutor here adopt both Coffill
and Womack's versions at trial, he capitalized on it in
his closing argument. See DeMarco v. U.S., 928 F.3d 1074,
1077 (11th Cir. 1991)("Thus the government not only per-
mitted false testimony of one of its witnesses to go to
the jury, but argued it as a relevant matter for the jury
to consider. Whether either instance alone would merit
reversal, we need not decide, for together they do")(cita-
tion omitted).

-33-

Four times in the prosecution's closing, he stated the defendant, while in the car, said: "I stabbed that nigger. He didn't make the fence." In strong emphasis to the jury, the prosecutor said 1) Tony Gaskins ... got in the car and said: "I stabbed that nigger. He didn't make the fence." (Tr. 4:48), 2) Coffill said -- and I think Womack said the same words -- that Gaskins said to him: "I stabbed that nigger. He didn't make the fence." (Tr. 4:53), 3) Raymond Coffill said that Tony Gaskins had come to the car and said: "I stabbed that nigger. He didn't make the fence." (Tr. 4:57-58), and 4) And when he emerged, he apparently had accomplished his pur-pose, because he said: "I stabbed that nigger. He didn't make the fence." (Tr. 4:65-66). How crucial was this evidence? This evidence was the case and Coffill's and Womack's altered testimony was the linchpin to the defen-dant's conviction -- and no other reason.

First, Womack's original statement does not have the defendant allegedly stabbing Mr. Clark near a fence. Womack's statement says that Mr. Gaskins said he stuck him and "he [Mr. Gaskins] think" it was in the stomach. This version of Mr. Womack's statement could not be relayed to the jury because it is hearsay and cannot even come in as an exception to the hearsay rule, because a person cannot "think" he did something, he must be sure. The prosecutor knowing this, had allowed Mr. Womack to

-34-

intentionally tailor his testimony to match Mr. Coffill's
to an extent. Because if Mr. Womack was allowed to
testify to his actual statement, he would only have been
allowed to say that all he heard was Mr. Gaskins say
that he had stabbed him, and that is all. On the other
hand, if the prosecutor allowed Mr. Coffill to tell the
jury that Mr. Gaskins said that he stabbed Mr. Clark
"in the leg," this would seriously damage the prosecution's
case, whereas the prosecution's theory was that Clark's
cause of death was a stab wound to the abdomen. If the
juror's would have heard these facts, it would have
seriously impeached the witnesses theory of the alleged
"admission" and resulted in the acquittal of the defen-
dant. The entire case was about credibility and nothing
else. Without Mr. Coffill's and Womack's testimony,
the prosecution had no case against the defendant. The
defendant was not tried under a joint venture theory.
He was tried as being the actual killer or not.

Now the question for this court is that, why would
Womack and Coffill alter their testimony and testify
falsely and, did the prosecutor know this testimony to
be false? The answers are obvious under the circumstances
of this case.

By failing to inform the court and correct the inten-
tional tailored false testimony of Coffill and Womack,

-35-

the prosecutor violated the duty to inform the defense of material exculpatory evidence. Brady v. Maryland, 373 U.S. 83, 87 (1963).

By allowing the witnesses, Raymond Coffill and Leo Womack to testify under false pretenses, he violated the duty to correct false evidence when it is offered. See, e.g., Napue v. Illinois, 360 U.S. 264, 269 (1959); Benn v. Lambert, 283 F.3d 1040, 1059 (9th Cir. 2002); Shih Wei Su v. Filion, 335 F.3d 119, 126-127 (2d Cir. 2003). Finally, by arguing to the jury, **"Now the Commonwealth contends that whatever their liabilities, Raymond Coffill and Leo Womack are telling the truth when they tell you that,"** (Tr. 4:48-49), and **"He wouldn't be able to tell you a lie without letting on,"** violated the duty not to argue false or inadmissible evidence to the jury. See, e.g., Miller v. Pate, 386 U.S. 1 (1967); Jenkins v. Artuz, 294 F.3d 284 (2d Cir. 2002); Brown v. Borg, 951 F.2d 1011 (9th Cir. 1991); U.S. v. Mason, 293 F.3d 826 (5th Cir. 2002); DeMarco v. U.S., 928 F.2d 1074 (11th Cir. 1991).

The proper role of the criminal prosecutor is not simply to obtain a conviction, but to obtain a fair conviction. The prejudice to the defendant's right to a fair trial is even more palpable when the prosecutor has not only withheld exculpatory evidence, but has knowingly

introduced and argued it false. Federal review of this
claim is necessary to prevent a fundamental miscarriage
of justice because the fact that Womack has recanted
and the fact revealed that both Coffill's and Womack's
testimony was intentionally tailored, is very much
material and undermines confidence in the verdict. Reversal
of conviction is required because the State court's
ruling was contrary to, and involved an unreasonable
application of clearly established federal law as de-
termined by the United States Supreme Court.

**II(B).   THE PROSECUTOR IMPROPERLY VOUCHED FOR THE
TESTIMONY OF LEO WOMACK AND RAYMOND COFFILL
AND DENIED THE DEFENDANT A FAIR TRIAL AND
DUE PROCESS OF LAW AS GUARANTEED BY THE
FIFTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION**

A prosecutor in closing argument may restate the Govern-
ment's agreement with the witness and may argue reasonable
inferences from the plea agreement's requirement of
truthful testimony. See United States v. Martin, 815
F.2d 818, 822-823 (1st Cir.), cert. denied, 401 U.S. 1039
(1987). A prosecutor may neither inject his personal
opinion on credibility into the proceedings nor should the
jury be led to believe that the prosecutor has other
information not presented at trial which leads him to
believe the witness is telling the truth. United States
v. Creamer, 553 F.2d 612, 617 (7th Cir. 1977); Accord
Lawn v. United States, 78 S.Ct. 311 (1958).

-37-

In his closing, the prosecutor said: **"Now, the Com-
monwealth contends that whatever their liabilities, Raymond
Coffill and Leo Womack are telling you the truth when they
tell you that,"** (Tr. 4:48-49), and **"He wouldn't be able
to tell you a lie without letting on."** (Tr. 4:56).

Now it is known that Mr. Coffill and Mr. Womack both
were lying at the trial, and that their testimony was
intentionally altered and the prosecutor knew this and
failed to correct it.  Also, when the prosecutor states,
"He wouldn't be able to tell you a lie without letting on,"
he clearly put the prestige of the sovereign behind his
support of a known lie.  Because both witnesses were
lying and "letting on" the jury through the blessings
and backing of the prosecutor.  Here the prosecutor did
manipulate and misstate the evidence, and his actions
"so infected the trial with unfairness as to make the
resulting conviction a denial of due process." Darden
v. Wainwright, 477 U.S. 168, 181 (1986)(quoting Donnelly
v. DeChristoforo, 416 U.S. 637 (1974)).

Looking at the phrasing "the Government was not
providing information that the jury needed to evaluate
the credibility of these witnesses; it was purely and
simply, bolstering that credibility." United States v.
LeFevour, 798 F.2d 977, 984 (7th Cir. 1986). See also
United States v. Wallace, 840 F.2d 1464, 1474 (9th Cir.

-38-

1980)("that would have not been the truth," and "she told
the truth" were improper vouching); United States v.
Martin, 815 F.2d, at 822 ("they told you the truth,"
disapproved).

The error in the prosecutor's remarks cannot be deemed
as harmless. As Judge Frank stated:

> If we continue to do nothing practical to
> prevent such conduct, we should cease to
> disapprove it. For otherwise, it will be
> as if we declare in effect, Government at-
> torneys, without fear of reversal, may
> say just about what they please in addres-
> sing juries, for our rules on the subject
> are pretend rules. If prosecutors win
> verdicts as a result of "disapproved" re-
> marks, we will not deprive them of their
> victories; we will merely go through the
> form of expressing displeasure. The de-
> precatory words we use in our opinions
> on such occasions are purely ceremonial.

United States v. Antonelli Fireworks Co., 155 F.2d 631,
661 (2d Cir.)(Frank J., dissenting), cert. denied, 329
U.S. 742 (1946).

Federal review of this claim is necessary to prevent a
fundamental miscarriage of justice because the prosecutor
clearly vouched for the credibility of the witnesses know-
ing that they were telling a lie, and bolstered their
testimony by placing his prestige behind it. The State
court's ruling was contrary to clearly established
federal law as determined by the United States Supreme
Court, and involved an unreasonable determination of
the facts in light of the evidence presented in the State
Court proceeding. Reversal of conviction is required.

-39-

III(C).    THE JURY INSTRUCTIONS PERMITTED AN INFERENCE
           OF MALICE ON LESS THAN A PLAIN AND STRONG
           LIKELIHOOD OF DEATH IN VIOLATION OF THE
           FOURTEENTH AMENDMENT TO THE UNITED STATES
           CONSTITUTION

The Due Process Clause of the Fourteenth Amendment
"protects the accused against conviction except upon
proof beyond a reasonable doubt of every fact necessary
to constitute the crime with which he is charged."
Francis v. Franklin, 471 U.S. 307, 311 (1985)(citations
omitted). This "bedrock, 'axiomatic and elementary'
[constitutiona] principle," prohibits the State from using
evidentiary presumptions in a jury charge that have the
effect of relieving the State of its burden of persuasion
beyond a reasonable doubt of every essential element of
a crime. Id.

Here the defendant contends that the State Court's
denial of this issue involved an unreasonable determination
of the facts in light of the evidence presented in the
State Court proceeding. 28 U.S.C. § 2254(d). The Massachu-
setts Appeals Court reversed a second-degree murder
conviction in Commonwealth v. Azar, 50 Mass. App. Ct.
767, 742 N.E.2d 1083 (2001), further review denied,
412 Mass. 1105, 595 N.E.2d 326 (2001), because the jury
instructions permitted an inference of malice on less than
a plain and strong likelihood of death. Since the issue
was raised for the first time in a motion for a new trial,

-40-

the trial judge ruled that it was waived. Id., at 767-768.

The Massachusetts Court of Appeals reversed, holding

that the jury instruction was flawed and that the defective

charge created a substantial risk of a miscarriage of

justice. Id., at 769-770.

At the conclusion of the trial in Azar, the jury was
instructed:

> "To prove malice, the government must prove
> beyond a reasonable doubt one of three things:
> either, that [the defendant] acted intending
> to kill [his daughter]; or that he acted
> intending to cause her grievous, that is
> serious, bodily harm; or, that he intended
> to do an act creating a strong and plain
> likelihood, in light of normal human experi-
> ence, that death or grievous, that is, serious,
> bodily harm would result to [his daughter]"
> (emphasis added)

Id., at 768.

According to the Appeals Court, the underlined portion

of the instruction (referred to as "third prong malice")

was indisputably erroneous because "'[t]he third prong

of the malice definition can only be satisfied by proof

that 'there was a plain and strong likelihood of death.'"

Id., at 768-769. (citations omitted). As the Court of

Appeals explained: "Intending to do an act creating a

strong likelihood of grievous bodily harm does not con-

stitute malice." Id. (emphasis added). Absent malice,

"'an unlawful killing can be no more than manslaughter.'"

Id. (citation omitted).

The Massachusetts Supreme Judicial Court has held that

-41-

a murder conviction "founded on a state of mind sufficient
only to support a manslaughter conviction violates
due process." Commonwealth v. Vizcarrando, 427 Mass. 392,
396-397, 693 N.E.2d 677 (1998).  Such a conviction
also violates the constitutional mandate of administering
punishment in proportion to an individual's moral
culpability. Id., at 397. See also Carella v. California,
109 S.Ct. 2419 (1989).

        As in Azar, Mr. Gaskins' jury was instructed that it
could return a murder conviction based on a plain and
strong likelihood of grievous bodily harm, and not neces-
sarily death.  The charge includes the following defini-
tion of malice:

> Malice aforethought includes any unexcused
> specific intent to kill or any unexcused
> specific intent to do grievous bodily harm
> or any unexcused specific intent to do an
> act creating a plain and strong likelihood
> that death or grievous bodily injury would
> follow.

> Malice aforethought may be inferred if, in
> the circumstances known to the defendant,
> a reasonably prudent person would have
> known that according to common experience
> there was a plain and strong likelihood
> that death or grievous bodily injury would
> follow the contemplated act.

(Tr. 4:84-85)(emphasis added).

        The trial judge also charged that an inference of malice
was permissible based on the use of a dangerous weapon
"if the defendant used such force that, according to com-

                            -42-

mon experience, there was a plain and strong likelihood that
death or grievous bodily harm would follow the defendant's
blow." (Tr. 4:86)(emphasis added).

The instruction here lessened the burden the Common-
wealth was required to establish beyond a reasonable
doubt in violation of In re Winship, 397 U.S. 358 (1970).
The jury instruction had the effect of relieving the
State of the burden of proof enunciated in Winship on
the critical question of state of mind because they were
precluded from assessing the elements required to ef-
fectively determine if they applied to the defendant.

Since the charge "permitted a reasonable juror to
infer malice on less than a plain and strong likelihood
of death[,]" Vizcarrando, 427 Mass., at 392, it was er-
roneous. Id.; Azar, at 769-770, 777-778. The only issue
that remains is whether the flawed instructions created
a fundamental miscarriage of justice. See Reed v. Ross,
468 U.S. 1 (1984). A fundamental miscarriage of justice
occurs in this context when the jury could have convicted
based on the erroneous charge, or if "the evidence permit-
ted but did not require the jurors to conclude that there
was a plain and strong likelihood that death would follow
the defendant's actions[.]" Vizcarrando, 427 Mass., at
398; Azar, at 771-772. Based on the evidence presented
at trial in this case, the risk that the jury relied on

-43-

the erroneous instruction is inescapable because the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).

According to the trial testimony (that we now know to be a lie) of the Commonwealth's witnesses, the incident leading to David Clark's injury occurred after he purchased cocaine from a "drug house" that Tony Gaskins, Leo Womack, Raymond Coffill and Robert Reid allegedly intended to rob. (Tr. 3:95, 111-113, 123; 129-130); (Tr. 4:206-207). Raymond Coffill testified that he drove the group to the prospective robbery site and waited in the car while the others approached the house. (Tr. 3: 118). Womack, Reid and Gaskins allegedly considered their options while waiting on the front porch. (Tr. 3:118-121). According to Coffill's testimony, he was standing in an alleyway, nine or ten feet from the porch, when he saw David Clark emerge from the house. (Tr. 3: 125-126). Coffill testified that Womack asked Clark what he had received, and Clark replied that he had "a twenty." Id. Coffill testified that he heard Womack say to Clark: "You know what happens now," and then he observed Womack knock Clark to the ground with his forearm. (Tr. 3:127). According to Coffill's testimony, he observed Tony Gaskins move closer to Clark, and he

-44-

saw Gaskins point a knife in the direction of Clark's mid-section. (Tr. 3:128).

Coffill testified that after he saw the knife, he walked away from the porch. (Tr. 3:131). Coffill then saw David Clark run, and Womack and Gaskins follow him. Id. According to Coffill's testimony, Womack and Gaskins pursued Clark on foot as Coffill gave chase in the car. (Tr. 3:131-133). After Coffill's second attempt to cut Clark off with the car, he opened the door and invited Clark inside. (Tr. 3:134). Coffill testified that Clark jumped into the car, but recognized him and quickly jumped out. Id. Coffill then observed Clark running, initially with Gaskins and Womack in pursuit. (Tr. 3: 135). Coffill later saw Clark running and jumping over fences, but he did not see anyone in pursuit. (Tr. 3: 136).

Shortly thereafter, Gaskins and Womack appeared on the sidewalk nearby Coffill's car. (Tr. 3:136). When they got into the car, Gaskins said he wanted to continue looking for Clark. (Tr. 3:141). At the same time, however, Gaskins allegedly said: "I stuck that nigger. He didn't make the fence." (Tr. 3:142). This statement is now known to be perjured testimony. Coffill heard Womack or possibly Reid respond that Gaskins should check his knife for blood. Coffill testified that Gaskins retrieved

-45-

a knife, ran his fingers along the blade, and said that there was no blood. (Tr. 3:142).

Leo Womack testified that after Coffill had cut off Clark with his car, Womack, Reid and Gaskins continued the chase. (Tr. 3:209). Womack testified that Clark hid in a back yard along the route, and Reid and Gaskins followed. Id. According to Womack's testimony, he heard Clark say "[D]on't stab me for a twenty, man," and then he did not see Clark again. (Tr. 3:210). Womack testified that once they were back in the car with Coffill, Reid asked Gaskins: "Did you get him?" to which Gaskins allegedly replied: "I stuck that nigger. He didn't make the fence. I got him." (Tr. 3:211). This statement was found out to be perjured testimony.

After David Clark was injured, he walked to the home of his girlfriend, Vivian Avant. (Tr. 2:55-56, 61). When he arrived at her apartment, which was on the second floor, he was carrying a stick. Id. The stick was admitted as an exhibit at trial, and it was approximately thirty-six inches long and three inches wide. (Tr. 2: 72). Ms. Avant testified that after Clark conversed with her and showed her the injury, she led him back downstairs, where some companions walked with him to the Lynn Hospital. (Tr. 2:47).

Because the Lynn Hospital was not receiving patients

-46-

for emergency care, Clark was transported to the Union
Hospital on the other side of Lynn. Id.; see also
(Tr. 2:131-133)(testimony of Officer Monahan).  Officer
Monahan, who transported Clark, testified that Clark
was conscious and talking when Monahan arrived. (Tr.
2:135).  Monahan testified that he inspected the wound
closely, and "noticed there was no blood at all and the
wound seemed to be blocked by some internal organ or
something." (Tr. 2:133).  Monahan described the injury
as a "puncture wound to the lower left quadrant[,]" to
the left of the naval. (Tr. 2:132).  When Clark arrived
at Union Hospital, his condition was stable. Id.  He died
in the hospital eight days later.

Dr. Larry Goldberg, a medical examiner, testified
that the injury was caused by a single stab wound. (Tr.
2:38).  Complications developed, including a condition
that prevented the blood from clotting. Id.[12]  Dr. Goldberg
estimated the wound to be "[a]n inch to a couple of inches"
in length, but testified that he did not take measurements.
(Tr. 2:42).  Asked on cross-examination whether the injury
could have been caused by a knife "with a blade of appro-
ximately two and three quarters inches in length,"  Dr.
Godlberg replied, "Perhaps, yes." Id.

12/ A physician testified that Mr. Clark was infected with the AIDS
Virus, but he did not believe that this disease caused the coagu-
lation problems. (Tr. 2:40).

-47-

Karolyn LeClaire, a chemist with the Department of
Public Safety, testified that she examined David Clark's
clothing. (Tr. 2:60-63). According to LeClaire, a cut
measuring 5/8" in width was found on his pants. (Tr. 2:
77). There was insufficient quantity of blood on the shirt
for ABO blood typing, and there was also a fairly small
quantity of blood on the pants. (Tr. 2:63).

As in Vizcarrando and Azar, the evidence in the
instant case could have "'warranted a finding of a risk of
harm less than a strong likelihood of death.'" Vizcarrando,
427 Mass., at 397 (citations  omitted). Based on the
testimony of Raymond Coffill, the jury could have concluded
that the blow causing the injury was delivered on the
porch, before the chase during which Mr. Clark out-ran
three men on foot and one in a vehicle. (Tr. 3:128). The
Commonwealth's witnesses agreed that the instrument that
caused the wound was likely less than three inches in
length, and the entrance wound was 5/8" wide. Little, if
any, blood was shed. After the chase, Mr. Gaskins allegedly
told Coffill that he wanted to continue to look for
David Clark. (Tr. 3:141). Mr. Gaskins alleged desire to
continue the search is inconsistent with a belief that
his actions created a plain and strong likelihood of a
fatal injury to David Clark. Looking at the charge as
a whole, created an unconstitutional presumption. See, e.g.,

-48-

Cupp v. Naughten, 414 U.S. 141, 147 (1973).

In the hours after he was injured, Clark was ambulatory and conversant. When he was transported to the hospital, his condition was stable. Under these circumstances, a reasonable juror might well have believed that the blow allegedly administered by Tony Gaskins created a plain and strong likelihood of grievous bodily injury, but not necessarily death. Accordingly, this case is governed by Azar and Vizcarrando, in which the erroneous third-prong malice instructions were held to be prejudicial. See also Commonwealth v. Williams, 428 Mass. 383, 389, 701 N.E.2d 945 (1998)(holding that erroneous charge was prejudicial where victim died of crushed throat after beating -- "Given the obvious risk of grievous bodily injury caused by repeated blows with a fist, [the jurors] were presented with no need to decide the more difficult question whether those blows were likely to cause death"). Given that the instrument causing the injury was estimated to be less than two and a half inches in length and there was no visible bloodshed upon impact, this case is distinguishable from those in which the erroneous charge was deemed non-prejudicial because a "deadly weapon" was utilized. See Commonwealth v. Solomonsen, 50 Mass. App. Ct. 122, 125, 735 N.E.2d 411 (2000)(shooting at close range); Commonwealth v. Freeman, 430 Mass. 111, 123, 712 N.E.2d 1135 (1999)(victim stabbed at least twenty-three