VIII(H).   **DEFENSE COUNSEL WAS INEFFECTIVE WHEN HE FAILED TO MOVE TO STRIKE THE JURY POOL AND VENIRE AND DENIED THE DEFENDANT A SUBSTANTIAL RIGHT GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**

The defendant shows that he was prejudiced by his attorney's ineffectiveness by demonstrating that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Kimmelman v. Morrision, 477 U.S. 366, 381 (1986). A reasonable probability is a probability sufficient to undermine confidence in the outcome. Strickland v. Washington, 466 U.S. 668, 694 (1984). Affirmatively stated, "better work on the part of defense would have accomplished something material for the defense."

In the instant case, the defendant was not tried before a constitutionally selected jury of his peers representing a fair cross-section of the community which denied him his constitutionally protected rights. Prior to trial defense counsel made a motion for an individual voire dire. (Tr. 1:9). The discussion went as follows:

JUDGE: All right, this is a motion for an individual voire dire. What is the reason for that?

DEFENSE COUNSEL: Well, your Honor, my client is a Black gentlemen, the victim was a Black gentleman, but one of the codefendants listed in the case is

a white caucasian, Raymond Coffill. The testimony
will be that he is presently charged with the
crime of murder in may at a later time pleaded
guilty to a manslaughter charge, but I think
there is an issue perhaps with race with regard
to his participation in this case.

JUDGE: Request for voire dire of prospective wit-
nesses -- I don't ask that question: Do you feel
that since the defendant has been arrested that
he is, therefore, probably, guilty ... I am not
going to say anything about a Black man. I will
do it in my own inimitable way, but most of
those things will be covered in fewer words than
the motion.

DEFENSE COUNSEL: There are thirty-eight requests,
your Honor. Is the court denying each one of them?

JUDGE: I am not acting on them. I will do it my
way. I cover the law. The defendant's motion for
additional peremptory challenges, that is denied.

DEFENSE COUNSEL: May I be heard, your Honor, Please?

JUDGE: Sure, go ahead.

DEFENSE COUNSEL: My client, as I stated before, is
Black. I have been coming to Newburyport for many,
many years, and I have never found a Black person
in the venire.

JUDGE: We had one last week.

DEFENSE COUNSEL: I can only say what my experience
has been in the Northern part of this country. He
has serious reservations and questions about
whether he can get a fair trial, based upon what
he has heard in the past year while he has been
in custody, relative to the large segment of the
population showing up for jury duty in the county
of Essex being white jurors. This is a difficult
case that involves violence, overtones of a rob-
bery, it has drugs, cocaine, and the use of
weapons. I think that extra peremptory challenges
could serve him well in terms of selecting a jury
that is as unbiased as we can get it

JUDGE: Motion is still denied.

(Tr. 1:9-12).

Defense counsel had an obligation to assist the defendant in choosing a fair and impartial jury. See Kimmelman v. Morrison, 477 U.S. 365-377 (1986). Once the judge denied his motion for additional peremptory challenges, defense counsel should have moved to strike the venire pursuant to M.G.L.c. 234 § 73. Based on the discussion with the judge, it is evident that the venire contained no Black or Hispanic jurors. (Tr. 1:9-12). It is clear from defense counsel's colloquy with the judge that he was aware of the possible prejudicial harm that could occur if the defendant was tried before an all white jury. (Tr. 1:12). Despite this, counsel never made any challenge to the composition of the venire, and he never moved to strike the venire based on its all white composition. Trial counsel here breached this duty by failing to challenge the all white venire. Had such a motion been made but denied, the defendant would have been entitled to a new trial with a more diverse venire. See Moore v. United States, 432 F.2d 730, 740 (1970)(It is a claim which should be made before trial begins on the merits).

Defense counsel's failure to move to strike the venire had the effect of denying the defendant his Sixth Amendment right to be tried by a jury of his peers representing a

-78-

fair cross-section of the community. Defense counsel
was evidently aware of the potential harm that could result
to his client, yet he failed to take any proper course of
action in response. His incompetency seriously prejudiced
the defendant's right  to a fair trial by an unbiased
and impartial jury. Moore, supra.

The United States Supreme Court has held that "a con-
victed defendant making a claim of ineffective assistance
must identify the acts or omissions of counsel that are
alleged not to have been the result of reasonable, pro-
fessional judgment." Strickland v. Washington, 466 U.S.
668, 690 (1984). The court must then determine whether,
in light of all the circumstances, the identified acts
or omissions were outside the wide range of professionally
competent assistance. Whereas, "the reasonableness of
counsel's perspective at the time of alleged error."
Kimmelman v. Morrison, 477 U.S. at 377.

In the instant case, defense counsel's failure to
challenge the venire resulted in the defendant's loss
of vital facts and demographic data which would have
specified the exact ethnic make up of the venire and cause
the trial court to enter finding of facts which would
have been available for appellate review. Trial counsel's
error resulted in an incomplete record of the defendant's
petit jury that was not drawn from a source fairly re-

-79-

presentative of the Essex County community. Trial counsel
in his failure to move to strike the venire, forfeited
defendant's substantial and absolute right to be tried
by a fair cross-section of the community and a jury of
his peers as guaranteed by the Sixth and Fourteenth Amend-
ments   to the United States Constitution. Denial of
this substantial right was manifestly unreasonable and
prejudicial to the defendant which resulted in a funda-
mental miscarriage of justice.

IX(I).    **APPELLATE COUNSEL WAS INEFFECTIVE WHEN
          SHE FAILED TO FILE A NEW TRIAL MOTION
          ON THE UNCONSTITUTIONALLY SELECTED JURY
          ISSUE CLARIFYING THE RECORD BEFORE
          ARGUING THE ISSUE BEFORE THE STATE SU-
          PREME JUDICIAL COURT ON DIRECT APPEAL**

     The Fourteenth Amendment guarantees a criminal defendant
pursuing a first appeal as of right certain minimum
safeguards necessary to make that appeal "adequate and
effective." An accused is constitutionally entitled to
the effective assistance of counsel on direct appeal as
of right. Evitts v. Lucey, 105 S.Ct. 830, 834 (1985).

     Here, the proper way to have handled trial counsel's
incompetence by appellate counsel was a new trial motion
filed with the trial judge. This way an evidentiary hear-
ing would have been held on the issue of the trial jurors
not representing a fair cross-section of the Essex Community
as required by the United States and Massachusetts Con-
stitution, and to determine if there was a systematic

-80-

exclusion of Blacks and Hispanic jurors. See Alston v.
Manson, 791 F.2d 255 (2nd Cir. 1986); Castaneda v.
Partida, 97 S.Ct. 1272 (1977); Amadeo v. Zant, 108 S.Ct.
1771 (1988).

Because of appellate counsel's inattention on moving
for a new trial on the issue in the Superior Court
where the case was tried, and moving for direct appeal
on an issue without sufficient "demographic data,"
the Massachusetts Supreme Judicial Court was unable to
render a judgment on such a complex issue.  In
Commonwealth v. Gaskins, 647 N.E.2d at 432, the court stated
"The essential data on which such a claim must be based
do not appear on the record..."  Moreover, the services
of a lawyer will for virtually every layman be necessary
to present an appeal in a form suitable for appellate
consideration on the merits. Evitts v. Lucey, 105 S.Ct.
at 834.

Appellate counsel knew she had a duty to put jury
data in the record before bringing that argument before
the Supreme Judicial Court. See Barnoski v. Commonwealth,
413 Mass. 1007, 603 N.E.2d 915 (1993).  She knew that
filing a new trial motion with the trial **court before**
seeking direct appeal on the issue was the proper way
to have handled such an issue. Accord Commonwealth v.
Barnoski, 418 Mass. 523, 638 N.E.2d 9 (1994).[13]  In Barnoski(II),

13/ Appellate counsel in Gaskins' case also argued the
Barnoski appeal.

a new trial motion was filed in accordance with Barnoski(I)
"because the right to counsel is so fundamental to a
fair trial, the constitution cannot tolerate trials in
which counsel, though present in name, is unable to
assist the defendant to obtain a fair decision on the merits.
See     Evitts v. Lucey, 105 S.Ct. at 836.  A system of
appeal as of right is established precisely to assure
that only those who are validly convicted have their
freedom drastically curtailed.  A state may not extinguish
this right because another right of the appellant---the
right to effective assistance of counsel---has been
violated. Evitts v. Lucey, supra, at 838.  The defendant's
appeal was not adjudicated because of appellate counsel's
ineffectiveness and "a first appeal as of right therefore
is not adjudicated in accordance with due process of law
if the appellant does not have the effective assistance
of an attorney." Id.

     Federal review of this claim is necessary to prevent
a fundamental miscarriage of justice, Reed v. Ross,
468 U.S. 1 (1984), because the defendant's appeal was not
adjudicated because of appellate counsel's ineffectiveness
and resulted in a miscarriage of justice.  Reversal is
required.

**X(J).   DEFENSE COUNSEL'S FAILURE TO INVESTIGATE, INTERVIEW AND CALL WITNESSES EXCULPATING DEFENDANT DENIED HIM EFFECTIVE ASSISTANCE OF COUNSEL AS REQUIRED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**

Here trial counsel put up a lack luster fight for the defendant whereas the defendant was facing a first degree murder charge and faced life in prison without the possibility of parole. There was exculpatory evidence available in "five" possibly "six" witnesses who were told by David Clark how he received his wound to the abdomen by "falling on a broken bed." Out of these six potential witnesses, two were his cousins; two police officers; a registered nurse at the hospital, and possibly the mother of his children. Trial counsel never made an attempt to investigate or interview these witnesses, who, if interviewed and subsequently subpoenaed, would have testified at trial contradicting the Commonwealth's theory of defense casting more doubt on the Commonwealth's case than what was already in doubt of the defendant's guilt. See Strickland v. Washington, 466 U.S. 668 (1984); Montgomery v. Peterson, 846 F.2d 407 (7th Cir. 1988); Sullivan v. Fairman, 819 F.2d 1382 (7th Cir. 1987). These witnesses were related in blood or friendship to David Clark and unrelated  in blood relationship or friendship to the defendant, and therefore had "an interest in seeing

-83-

his alleged murderer punished." Sullivan, 819 F.2d at 1389.

At trial the Commonwealth introduced a significant amount of evidence trying to establish a connection of the defendant with the crime. The Commonwealth relied heavily on the testimony of two confessed accomplices. The Commonwealth's theory was that the defendant stabbed David Clark during an attempted robbery. Trial counsel's defense was that the defendant was at the scene but he was not the killer. David Clark, before his death, made a statement on how his injury was received, which must be given some consideration, to five, possibly six, witnesses.[14]

His statement, if believed, would have exculpated the defendant. It contradicts the Commonwealth's theory of the crime and alleged murder and make valid the defense theory that Gaskins "was not" the killer. Trial counsel's failure to procure these exculpatory witnesses rendered that his "performance fell below competency standard" where he failed to interview any of the named available witnesses. See Code v. Montgomery, 799 F.2d 1481, 1483 (11th Cir. 1986). At a minimum, counsel has the duty to interview potential witnesses: two were his cousins, two were police officers, a registered nurse at the hospital,

---

14/ If the statement on how Mr. Clark received his wound was favorable to the prosecution, he would have been given broad discretion to use it at trial. Since justice is the seeker of truth, Mr. Clark's statement, through the testimony of these witnesses exculpating the defendant, should have been presented at trial.

the doctor who performed the surgery on Mr. Clark, and
possibly the mother of his children. The Sixth Amendment
guarantees criminal defendants the effective assistance
of counsel. That right is denied when a defense attorney's
performance falls below an objective standard of reasonable-
ness and thereby prejudices the defense. See Wiggins
v. Smith, 123 S.Ct. 2527, 2529 (2003). If a state
court has already rejected an ineffective-assistance
claim, a federal court may grant habeas relief if the
decision was "contrary to, or involved an unreasonable
application of, clearly established Federal law, as
determined by the Supreme Court of the United States."
28 U.S.C. § 2254(d)(1).

Trial counsel, here, was well aware of these witnesses
because their names and addresses were in the police
report or hospital records. These witnesse could have
been located quite easily and subpoenaed. Trial counsel
put up an argument at trial indicating that David Clark
may have been telling the truth. So he [counsel] should
have sought to introduce these witnesses who could have
helped his client's defense. Their testimony would have
all corroborated one another. Moreover, "the record
establishes that counsel had reason to know, from an
objective standpoint, that a possible defense. . .[was]

-85-

available." Sullivan v. Fairman, 819 F.2d 1389.  See also

Nealy v. Cabana, 764 F.2d 1173 (5th Cir. 1985); Crisp

v. Duckworth, 743 F.2d 580 (7th cir. 1984), cert. denied,

469 U.S. 1226 (1985).

Trial tactics only become a factor when there has

been a reasonably thorough investigation of the evidence.

Here is what the defense counsel for the defendant missed:

1. The existence of six potentially available
   witnesses whose identities were known well
   before trial through the state's response
   to discovery and through police reports.

2. These known witnesses were neither friends
   nor relatives to Gaskins and were therefore
   disinterested.

3. The testimony of these disinterested witnesses
   was potentially the strongest and most impres-
   sive proof at trial. Their testimony was not
   repetitive and each witness's testimony tended
   to corroborate that of the others. Further,
   the testimony of the six disinterested wit-
   nesses was exculpatory.

4. Trial counsel had at his disposal a means of
   contacting the witnesses because their addresses
   and phone numbers were listed in the police
   reports.

5. The defendant was incarcerated and therefore
   could not be expected to help his defense.

6. A paid investigator could have been procured
   through request for funds from the court to
   locate, interview and subpoenae witnesses.
   Such services had been used by trial counsel
   in other cases.

[A]n attorney who fails even to interview a readily

available witness whose non-cumulative testimony may

-86-

potentially aid the defense should not be allowed automati-
cally to defend his omission simply by raising the shield
of 'trial strategy and tactics.' Crisp v. Duckworth,
743 F.2d at 584.

These witnesses were very important to the defendant
because with the evidence already in doubt, and with
their exculpatory testimony, would have been material and
favorable to the defense.  If believed, "the testimony
of (sic) witnesses would have been completely exculpatory."
Sullivan v. Fairman, 819 F.2d at 1387.  Moreover, eyewitnesses
identification evidence, uncorroborated by a fingerprint,
gun, confession, or co-conspirator testimony, is a thin
thread to shackle a man for forty years. Griffin v.
Warden, Md. Corr. Adjustment Center, 970 F.2d 1355, 1359
(4th Cir. 1992)(citing Harris v. Reed, 894 F.2d 871, 878
(7th Cir. 1990)).  The Supreme Court has held that the
Sixth Amendment guarantees to all criminal defendants
the right to effective assistance of counsel. Strickland
v. Washington, 466 U.S. 668, 686 (1984).  In this case
the defendant was denied that right.

Trial counsel's performance was deficient and it seri-
ously prejudiced the defense and denied the defendant a
fair trial which resulted in a misccariage of justice.
Federal review of this claim is necessary to prevent a
fundamental miscarriage of justice, and after upon such
examination, the defendant's conviction should be reversed.

-87-

XI(K).    **DEFENSE COUNSEL WAS INEFFECTIVE WHEN HE
          FAILED TO EITHER MOVE FOR A MISTRIAL OR
          MOVE TO STRIKE OR REQUEST LIMITING
          INSTRUCTIONS WHEN THE JURY WAS ALLOWED
          TO CONSIDER NUMEROUS INADMISSIBLE AND
          PREJUDICIAL HEARSAY STATEMENTS**

    In Massachusetts, a joint venturer is "'one who aids,
commands, counsels, or encourages commission of a crime
while sharing with the principal the mental state re-
quired for the crime.'" Stewart v. Coalter, 855 F.Supp.
464, 468 (D.Mass. 1994), rev'd on other grounds, Stewart
v. Coalter, 48 F.3d 610 (1st Cir. 1995).

    In this case, the Commonwealth proceeded on a joint
venture theory.  However, the Commonwealth failed to
prove beyond a reasonable doubt that a joint venture
existed.  Accordingly, the trial judge did not allow this
case to be submitted to the jury on a joint venture theory.
Despite this, however, the jury was allowed to hear and
consider numerous prejudicial hearsay statements that
were testified to by the codefendants which were admissible
"only" on the basis of their being made in furtherance
of a joint venture or conspiracy.  The jury should not
have been allowed to consider any of these statements
in reaching its verdict. See United States v. Olano,
113 S.Ct. 1770, 1778 (1993)(If the Government fails to
show the absence of prejudice, the reviewing court must
automatically reverse the conviction)(Stevens, J., dissenting).

    In Massachusetts, statements that are made by a co-

-88-

conspirator or participant in a joint venture are admissible against the other conspirators or participants if the statements are made during the conspiracy or joint venture and in furtherance of that conspiracy or joint venture. See Liacos, Handbook Mass. Evid., 475 (1994 ed.) citing Commonwealth v. Colon-Cruz, 408 Mass. 533, 543, 562 N.E.2d 797 (1990); Commonwealth v. Borans, 379 Mass. 117, 145-148, 393 N.E.2d 911 (1979); Commonwealth v. Beckett, 373 Mass. 329, 366 N.E.2d 1252 (1977).

Further:

> [T]he existence of the conspiracy or joint
> venture must be proved by means other than
> the extrajudicial statement in question,
> as a condition of the statments admissibility
> . . . .[H]owever, the judge need not make
> a preliminary finding that the joint crimi-
> nal enterprise existed before admitting the
> evidence; it may be admitted subject to a
> later motion  to strike if the prosecution
> fails to prove the defendant was part of a
> conspiracy. [W]hen statements of a conspirator
> have been admitted, the court should instruct
> the jury that they can consider the statement
> against the defendant only if they determine
> on the basis of other evidence that a con-
> spiracy or joint venture existed and the
> defendant was a member of it." (emphasis added).

Liacos, Handbook on Evidence, supra at 476.

The record in the instant case clearly indicates that the Commonwealth did not meet its burden of proving that a joint venture existed. (Tr. 4:16-17). Accordingly, the jurors should not have been allowed to hear and consider any of the statements made by the codefendants, which were admissible only if a joint venture had been proven

to exist. See, e.g., United States v. Ellis, 547 F.2d 863 (1977); United States v. Hedman, 630 F.2d 1184 (1980); United States v. Creamer, 555 F.2d 612 (1977); United States v. LeFevour, 798 F.2d 977 (7th Cir. 1986); Commonwealth v. Podlaski, 377 Mass. 339, 385 N.E.2d 1379 (1979); Commonwealth v. Salemme, 395 Mass. 594, 481 N.E.2d 471 (1985); Commonwealth v. Funches, 379 Mass. 283, 295, 397 N.E.2d 1097 (1979). Defense counsel should have moved for a mistrial on the basis that his client's rights were substantially prejudiced when the jurors were allowed to hear and consider these numerous prejudicial and inadmissible hearsay statements. Because no instruction was requested, the jury was free to infer that Gaskins shared the same mental state as codefendants Womack and Coffill. This inference is constitutionally impermissible. Id.

In the alternative, defense counsel should have moved to strike the statements so that the jury would not have been able to consider them in reaching a fair and just verdict. Failure to move for a mistrial, or alternatively, to strike the statements rendered defense attorney's performance deficient because "the record establishes that counsel had reason to know, from an objective standpoint, that a possible defense...[was] available." Sullivan v. Fairman, 819 F.2d at 1389. The hearsay testimony

$-90-$

that the jurors were allowed to consider was extremely prejudicial to Mr. Gaskins' interests. Specifically, the defendant was convicted of felony murder because the statement allowed the jury to infer that Gaskins shared the same mental state as his codefendants with respect to the underlining attempted robbery as well as the murder. This inference is constitutionally impermissible. See United States v. Creamer, 555 F.2d 612 (1972); United States v. Ellis, 547 F.2d 863 (1977), and cases cited therein.

The underlying felony to be proven by the Commonwealth was attempted armed robbery. In its case in chief, the Commonwealth presented the two codefendants as its primary witnesses. The Commonwealth used a substantial portion of the testimony provided by each of these witnesses to establish that there was an attempted armed robbery and that it was committed as a joint venture by each of the coparticipants. This was supported by numerous hearsay statements which were admissible only if made during the joint venture and in furtherance of its goal. However, the Commonwealth never proved that a joint venture existed. Specifically, codefendant Coffill testified 1) That Coffill and Womack had planned to rob the drug house prior to meeting Gaskins; 2) That Coffill and Womack, along with Gaskins and Reid agreed to pool their money to buy cocaine (Tr. 3:104); 3) That Coffill, Womack,

-91-

Reid and Gaskins smoked the cocaine (Tr. 3:104);  4)
That Coffill, Womack, Reid and Gaskins decided to return
to the drug house and rob it (Tr. 3:113);  5) That Reid
may have had a gun;  6) That Womack hit the victim and
fought with the victim (Tr. 3:127);  7) That Womack
ordered the victim to "kick it in." Id.

Further, codefendant Womack testified that 1) He hit
Clark in  the face (Tr. 3:209);  2) That "they" planned
to rob the drug house;  3) That "they" returned with the
intent of robbing the drug house (Tr. 3:206).

Here it is apparent that the jurors were allowed to
consider these statements and view the defendant as a
joint venturer in the attempted armed robbery and sub-
sequent murder even though the Commonwealth never proved
a joint venture existed.  Clearly, defense counsel
should have either moved for a mistrial or moved to strike
this inadmissible testimony on the basis that these wit-
nesses statements were highly prejudicial to the defendant.
Failure to do so deprived him of his right to a fair
trial as guaranteed by the Sixth and Fourteenth Amendments
to the United States Constitution. See, e.g., McGarty
v. O'Brien, 188 F.2d 151, 96 F.Supp. 704 (Mass. 1951);
Moore v. United states, 432 F.2d 730 (1970).

Further, there could have been no tactical advantage
to defense counsel's failure to move to either strike the
testimony or move for a mistrial, or request limiting

-92-

instructions. A significant part of Mr. Gaskins' defense
was that he was not engaged in a joint venture with the
other participants in this incident. In fact, trial
counsel recognized this continued problem of the joint
venture and possible inference from codefendants state-
ments when he requested that the court instruct the jury
to exclude the possibility of a joint venture. Trial
counsel commented after the judge's charge:

> MR. HICKEY: Was the court going to mention some-
> thing about the acts of this gentleman in terms
> of excluding a joint venture theory? In other
> words, it is alleged that he is the one that
> inflicted the wound.
>
> THE COURT: No. I said to them that we are only
> concerned about the indictment for murder against
> him. I am not going to talk about joint venture
> because they will be talking about that for two
> hours and then we will get a question, what the
> heck is joint venture?
>
> MR. HICKEY: I didn't want you to instruct on
> joint venture, but that they have to find from
> the Government's theory that he was the one,
> actually the one.
>
> THE COURT: That is very clear. Anything else?

(Tr. 4:99)

Defense counsel allowed the jurors to infer from the
inadmissible testimony of the codefendants that the defen-
dant was, in fact, a joint venturer. This completely
contradicted the defendant's theory of defense and sub-
stantially affected his right to a fair trial and deprived
him of an otherwise substantial ground of defense. See,
e.g, Kimmelman v. Morrison, 477 U.S. 366 (1986); Strickland

v. Washington, 466 U.S. 668 (1984); Sullivan v. Fairman,
849 F.2d 580 (7th Cir. 1987); Crisp v. Duckworth, 743
F.2d  580 (7th Cir. 1984), cert. denied, 469 U.S. 1226
(1985); Murray v. Carrier, 106 S.Ct. 2639, 2644 (1986).
This was "plain error" on attorney's part and requires
reversal. See, e.g., United States v. Houser, 804 F.2d
565, 570 (9th Cir. 1986); United States v. Hurt, 795
F.2d 765, 773 (9th Cir. 1986); United States v. Rogers,
769 F.2d 1418, 1426 (9th Cir. 1985); Reed v. Ross,
468 U.S. 1 (1984).

The admission of this evidence violated Gaskins'
right to due process and a fair opportunity to meet the
charges against him pursuant to the Sixth and Fourteenth
Amendments to the United States Constitution and requires
reversal of his conviction. McGarty v. O'Brien, 96
F.Supp. 704, affirmed, 188 F.2d 151 (Mass. 1951);
United States v. Apollo, 476 F.2d 156 (1973).

## XII(L).   THE DEFENDANT WAS DENIED A FAIR TRIAL IN THE SYSTEMATIC EXCLUSION AND UNDERREPRESENTATION OF BLACKS AND HISPANICS IN THE ESSEX COUNTY JURY POOL AND VENIRE

Historically all white juries in this country have been devastating when it comes to deciding the fates of racial and sthnic minorities, and the same problem exists in Massachusetts Courts.  If this was not the case, the "Commission to Study Racial and Ethnic Bias in Massachusetts Courts" would have never have been formulated by Chief Justice Paul Liacos to investigate discrimination in the courts amongst racial and ethnic minorities, and their findings would have been different.  However, their report concluded that "there is sufficient data to indicate that communites with large numbers of ethnic and racial minorities are experiencing low rates of participation in the perspective jury pools."

Justice Lynch filed his report in which  he further stated, "I regret to report that it is the perception of many lawyers, community members, judges, and focus groups that disparate treatment towards racial and ethnic minorities exists within courts of the commonwealth."  Based on these findings, can one honestly say that this all white jury, who tried and convicted the defendant for first degree murder, did not harbor "any" bias or prejudices against the defendant because of his race in rendering their verdict? See Peters v. Kiff, 407 U.S. 493, 501 (1972)(the Due Process Clause protects a defendant from jurors who are actually incapable of rendering an impartial verdict).

The evidence presented in this case was far from overwhelm-
ing. As a matter of fact,the evidence was suspect at best. The
defendant proclaimed his innocence throughout the entire trial
process---and still does. That means it was entirely upon the
prosecution to prove guilt beyond a reasonable doubt. <u>In re
Winship</u>,397 U.S. 358 (1970). Any reasonable juror who was
thinking clearly,and their minds free from harboring prejudic-
es,may have seen the evidence for what it was,and may have vot-
ed to acquit. In this case,"justice may have not been done"
because the jury was not impartial. And the defendant "does
possess the right to have his petit jury selected by proced-
ures that are impartial." <u>Teague</u> v. <u>Lane</u>,109 S.Ct.1079 at n.1
(1989)(Stevens,J. concurring).

It is of known and established fact that in this country
exists a great racial divide. Whites and Blacks have differ-
ent perspectives and perceptions on how life is perceived.
This cannot be denied.[15]   In this case,the defendant was faced
with the dilemma of being tried for first degree murder with
basically no physical evidence whatsoever linking him to the
crime alleged. The state relied heavily upon the testimony
of Raymond Coffill,who is caucasian,and Leo Womack,who is
Black. Raymond Coffill was the prosecution's "star witness"
who had received the least amount of time to serve for his

15/ For instance,the acquittal of the police by an all white
jury in the beating of Rodney King that caused riots in 1992,
and the O.J. Simpson trial which brought about new laws·and
legislation and has basically polarized the country. This is
something that has existed and still remains to exist today.
That is why the Equal Protection Clause is so important. See
<u>United States</u> v. <u>Price</u>,86 S.Ct. 1152,1163-1170 (1966).

-96-

cooperation. Based upon this,the perception of the jurors
could have been as such believing that,"Raymond Coffill may
have been influenced by them Black guys to get into trouble
because he looks like a good kid. And besides,he received
the least amount of time. He must be telling the truth."
Another way to look at it is that Blacks are stereotyped
everyday in the media to be bad people always involved in
some type of gang activity or trouble with the law.

> "As a matter of first impression,
> therefore,I would conclude that
> a guilty verdict delivered by a
> jury whose impartiality might
> have been eroded by racial prejudice
> is fundamentally unfair."
> Teague v. Lane,109 S.Ct. at 1081.

The all white jury who resided over the defendant's trial
were told to bring their personal life experience into the
deliberating room. According to the jury list,all of the as-
signed jurors came from the "white suburban" area of Essex
County. Meaning,their lifestyle and experiences were contrary
to the defendant's. There is no way of knowing if this consti-
tutionally composed jury could be fair in deciding the defend-
ant's case. It is,however,clear by their questions presented
to the judge that they were very unsure of the case and who
actually,if anybody,could have been the murderer. Their que-
stions were as follows:

> What was the angle of the cut?
> Was it an upward thrust?
> They are all playing murder she wrote
> Was it straight in ?
> Was it downward?
> Could blood have been washed off Coffill's knife?

-97-

Why is Leo looking at a longer sentence than Ray for his crime? How far into the abdomen must the knife go to cause the intestine to come out? (Tr.4:104).

These questions presented by the jurors show that they were unsure and that reasonable doubt existed in their minds as to the defendant's actual guilt. And that doubt was to be given to the defendant. In re Winship,397 U.S. 358. To allow this conviction to stand based upon a verdict that may be questionable will cause a "grave injury" to the fabric of our judicial system. And,the injury is not limited to the defendant --there is injury to the jury system,to the community at large, and to the democratic ideal reflected in the process of our courts. Teague,supra,109 S.Ct. at 1093. The trial jury hears the evidence of both sides and chooses what it will believe. In so deciding,it is influenced by imponderables--unconscious and conscious prejudices and prefernces--a thousand things we cannot weigh. Id.

Here,the record shows that the defendant was prejudiced when he was denied his Sixth and Fourteenth Amendment rights to be tried by a jury representative of a fair cross-section of the community. To prove a jury selection process infringes upon this constitutionally protected right,the defendant must show (1) The group allegedly discriminated against is a "distinctive group" in the community; (2) The group is not fairly and reasonably represented in the venire in relation to its proportion of the community,and (3) That underrepresentation is due to the systematic exclusion of the group in the jury process. Duren v. Missouri,434 U.S. 357,365 (1979).

-98-

First,the defendant is Black and a minority,and Hispanics are minorities. They are clearly part of a "distinctive group" in the community.

Second,the groups were not fairly and reasonably represented in the venire in relation to its proportion of the community.

As indicated by the discussion between the judge and defense counsel,there were no Black or Hispanic in the venire. (Tr. 1:9-12). Furthermore,there were seemingly no minorities represented in the venire at all.

The trial took place in Essex County. At the time of trial there were approximately 670,080 persons in that county. Approximately 15,809(2.4%) of those persons were Black and 69, 562(10.04%) were minorities.[16]

The voter-age population consisted of 511,503 persons in Essex County. Approximately 10,049( 1.9% ) of those persons were Black and 28,047( 5.8% ) of those persons were of Hispanic origin.[17] Despite these percentages of Blacks and Hispanics in the community at large and,in the voter-age population,these "distinctive groups" were "non-existent" in the venire. Minorities as a whole made up 7.7% of the Essex County voter-age population.

---

16/ All figures are taken from the 1990 Census of Population and Housing for Massachusetts,U.S. Department of Commerce,Economics and Statistics Administration,Bureau of the Census (Issued August,1991). This figure includes Blacks,American Indians,Asians of Pacific Islanders,persons of Hispanic origin and those persons of "other" race.

17/ All figures are taken from the 1990 Census of Population and General Population Characteristics of Massachusetts. Voter-age is from 18 years thru 65 years and over.

-99-

Individually,Blacks constituted a 1.9% underrepresenta-
tion,and Hispanics 5.8% underrepresentation. Together this
population of an all white jury venire constituted an imper-
missible 7.7% underrepresentation of minorities. Clearly,
these distinctive groups were not fairly and reasonably repre-
sented in the venire in relation to its proportion of the
community and voter-age population. The defendant similarly
meets the third prong of Duren test regarding systematic un-
derrepresentation. "[T]he Sixth Amendment requires a showing
that the underrepresentation is due to systematic exclusion
in the selection process" Duncan v. Louisiana,88 S.Ct. 1444,
1451 (1968) (Providing an accused with the right to be tried
by a jury of his peers gave him an inestimable safeguard against
the corrupt or overzealous prosecutor and against the complaint,
biased or eccentric judge.) (Emphasis in original).

Here,it is evident that Blacks and Hispanics are system-
atically underrepresented in Essex County and the City of New-
buryport,in particular. Defense counsel indicated to the judge
that "[h]e had been coming to Newburyport for many,many years
and he has never even found a Black person in the venire" (Tr.
1:11).[18]   To this,the judge responded,"[W]e had one last week"
Id. It is clear from defense counsel's statement,and more im-
portantly,from the judge's response on the record,that Black
persons are systematically underrepresented in the venire. It
also evident that there is an impermissible and systematic

---

[18]/ Attorney,Hugh Samson,in a letter,told the defendant that he
would give testimony at his evidentiary hearing on the issue of
Blacks being excluded in the jury selection process in Newbury-
port. See Exhibit E, at p. 60.

7.7% underrepresentation of minorties that is "contrary
to clearly established federal law" as determined by the
United States Supreme Court and which violates the Sixth
and Fourteenth Amendments to the United States Constitution.
Accord: Preston v. Manderville,  428 F.2d 1392, 1393-
94 (5th Cir. 1970)(13.3% underrepresentation of minorities
constitutes a prima facie case); Amadeo v. Zant, 108
S.Ct. 171, 174 (1980)(A systematic underrepresentation
ranging from 5% to 11% sufficient to sustain relief).
Compare: Commonwealth v. Fryar, 414 Mass. 732, 741, 610
N.E.2d 903 (1993), appeal after remand, 680 N.E.2d
901, cert. denied, 118 S.Ct. 636 (1997)("diffuse imparti-
ality" that comes from a diverse jury is invaluable").
Id. 414 Mass. at 741.

The discriminatory petit jury venire selection pro-
cess is a constant in Newburyport. See Letter of Hugh
Samson, Esq., and the conversation of trial counsel.
(Tr. 1:9-12). Attorney Samson's letter speaks on how
Blacks never make it to be actual jurors in the selection
process.  The defendant has shown on the record that
Blacks were 1.9% of the voter-age population pertaining
to their number; and that Hispanics were 5.8% of the
voter-age population pertaining to their number. See
U.S. v. Osorio, 801 F.Supp. 966 (D.Conn 1992)(explaining
what must be done to bring forth proper systematic
exclusion argument).  This establishes a 7.7% underrepre-
sentation as a whole and should not be accepted by this

-101-

court.   The facts are clear and the numbers do not lie.

Federal review of this claim is necessary to prevent a fundamental miscarriage of justice, Reed v. Ross, 468 U.S. 1 (1984), by the defendant being tried by this unconstitutionally selected jury denied him equal protection of the law and constitutes reversible error.

The defendant asks of this court nothing more than what he believes he is constitutionally entitled to, and that is to be tried by a fair and impartial jury. He has demonstrated that "justice was not done," and the only remedy is to order that the writ be granted.

## CONCLUSION

The defendant request that the judgment affirming his conviction be reversed and that this court grant the writ requiring a new trial or release from unlawful restraint.

Respectfully Submitted,

Tony B. Gaskins, Pro se
MCI-Cedar Junction
P.O. Box 100
South Walpole, Ma. 02071

Dated: 12/18/05