Mr. Womack testified at trial that Mr. Gaskins came back
to the car and said, "I stabbed that nigger before he made
the fence," he does not remember Mr. Womack ever saying
that to Mr. Whitehead in the meeting. Id., at p. 122.
He further testified that when he heard Mr. Womack testify
that Mr. Gaskins told him, "I stabbed that nigger before
he made the fence," it did register to him as something
new and something he had not heard from his client before.
Id., at pp. 123, 124.

Mr. McGuire testified that even though he knew that
what Mr. Womack was testifying to was something he never
heard before, he did not make an objection nor did he seek
to confer with his client about his altered testimony.
Id., at p. 124.

Mr. Whitehead, the prosecuting attorney, even supports
the defendant's argument that the perjured testimony was
used to convict him at trial. In his affidavit submitted
at the evidentiary hearing, Mr. Whitehead states, "I pro-
ceeded to trial on the assumption that aforementioned ac-
count of the conversation was a truthful one, given to
the best of Womack's recollection. I never advised him
to tailor his testimony in any manner..." Aff. of Howard
Whitehead, at ¶ 8. Then he goes on to say in his affidavit,
"To the extent that Womack, in his trial testimony, ampli-

-26-

fied on the conversation in the automobile attributing

to Gaskins the statement, "[Clark] never made it to the

fence," he did so on his own initiative and contrary to

my expectation." Aff. of Howard Whitehead, at ¶ 9.  Mr.

White head further stated that, "When, in my opening

statement, I recited to the jury the version of the con-

versation which included Gaskins' statement, "He never

made it to the fence," I did so based upon the account

which Raymond Coffill had given to me in his pre-trial

interview, an account which included that statement." Aff.

of Howard Whitehead, at ¶ 10.  Here, the prosecutor admits

that he knew that Mr. Womack's testimony at that particular

stage was a lie, and his actions in not correcting the

lie is in violation of Napue v. Illinois, 360 U.S. 264

(1959).

Even at trial there was reason to question the method

by which Mr. Womack's statement was obtained.  Mr. Womack

testified that he gave various statements to the police

on the day that he was taken into custody. (Tr. 3:234-239).

He was in the police station, in the company of four police

officers. (Tr. 3:234-235).  Mr. Womack described a process

whereby one statement was written up over a period of

twenty minutes, then it was ripped up in front of him

by the police, who evidently were not satisfied with the

contents. (Tr. 3:234, 236). Another statement was given over another twenty minute period, then it too was ripped up in front of him. (Tr. 3:236).

Mr. Womack was repeatedly told that Mr. Clark was in the hospital, and that the "guy is going to die." Mr. Womack was told that he would be charged with murder. (Tr. 3:235). The earlier statements that were ripped up did not indicate that Mr. Gaskins had a knife. (Tr. 3:237). Finally, after several attempts, a version of a statement that was inculpatory of Mr. Gaskins, and apparently satisfactory to the police, was reached, and this version was typed and signed. (Tr. 3:237).

The Commonwealth has never denied using this technique whereby the police took several statements from Mr. Womack, and then destroyed them, in series, until he finally gave a version of the statement that was accepted as satisfactory by the Commonwealth. All such prior versions of the statement should have been preserved as "prior inconsistent statements" of Mr. Womack, and should have been made available to the defense at the time of trial. See Curran v. Delaware, 259 F.2d 707, 712 (3rd Cir. 1958)("the suppression of evidence by a prosecuting officer is enough to constitute such fundamental unfairness as to amount to a denial of due process of law")(emphasis added)(citations omitted).

-28-

Under Massachusetts law, the Commonwealth has an obligation to retain and preserve exculpatory evidence. See Commonwealth v. Harwood, 432 Mass. 290, 295 (2000); Commonwealth v. Neal, 392 Mass. 1, 10-12 (1984). This duty extends to "material and information in the possession or control of members of [the prosecutor's] staff and of any others who have participated in the investigation or evaluation of the case." Commonwealth v. St. Germain, 381 Mass. 256, 261 n. 8 (1980). In this case such evidence would have been discoverable as exculpatory evidence that would place the credibility of the Commonwealth's witness at issue, and such prior statements should have been produced to the defense, rather than being systematically and ceremoniously destroyed. See Kyles v. Whitley, 514 U.S. 419 (1995); Brady v. Maryland, 373 U.S. 83, 87 (1963); Giglio v. United States, 405 U.S. 150 (1972). The conviction in this case should be overturned by virtue of this failure to preserve exculpatory evidence and to disclose such evidence to the defense in advance at trial. Under State law any alleged prior statement of a defendant or co-defendant is part of the "automatic discovery" required by Rule 14(a)(1)(A), Mass. R. Crim. P. ("Any written or recorded statements, and the substance of any oral statements, made by the defendant or co-defendant").

-29-

The State cannot now argue successfully, based on the facts elicited from the evidentiary hearing, that Mr. Womack's affidavit should not be credited, because the manner by which his "original" statement was obtained suggests that from the start the Commonwealth sought to elicit specific statements from Mr. Womack that would be inculpatory of Mr. Gaskins. At trial Mr. Womack did testify to an alleged "admission" by Mr. Gaskins. This testimony did "corroborate" the testimony of Raymond Coffill which was as follows:

> ADA: What did he say?
>
> COFFILL: He said he stuck him.
>
> ADA: Were those his exact words?
>
> COFFILL: No. He said: I stuck that nigger. He didn't make the fence.

(Tr. 3:142).

Mr. Womack's words, relating the "admission" of Mr. Gaskins, certainly did "corroborate" the words of Mr. Coffill. Indeed, the quoted language is nearly identical from both witnesses. It appears that this language was not contained in the original statements from Mr. Womack, which were torn up by the Police, and the statement from Mr. Coffill at the time of trial did not match up with his original statement to the effect that Mr. Gaskins stabbed Mr. Clark "in the leg." See Exhibit D.

At trial the statements attributed to Mr. Gaskins were so much alike that they have the sound of being scripted and rehearsed. The testimony about the other events of

-30-

the night, on the other hand, were confused and inconsistent. The alleged statement attributed to Mr. Gaskins was the one point on which the witnesses gave testimony in lock-step.  The "key" words testified to at trial to secure the conviction is the alleged statement in the car made by the defendant to the testifying codefendants that, "I stuck that nigger. He didn't make the fence."  This statement, as alleged, is the only connection of the defendant to the crime charged, which makes it material and subject to impeachment.  Without Womack's and Coffill's perjured testimony, Mr. Gaskins would most likely not have been convicted.  That is why it became important to the prosecutor that the two witnesses testimony, in that regard, be the same.  Not once in Womack's out-of-court statement did he allege that Gaskins stated in the car: "I stuck that nigger. He didn't make the fence."

The prosecutor did not solicit from Mr. Womack the testimony as indicated in his out-of-court statement, as attested to not only by Mr. Womack, but from Womack's trial counsel and the trial prosecutor.  Moreover, his testimony cannot be determined as inconsistent testimony in slight variance to his out-of-court statement -- it is perjured testimony.  There is a big difference from Womack's and Coffill's out-of-court statements and their trial testimony because it establishes "when" and "where" the victim was allegedly stabbed by the defendant.  So the conversation in the car becomes the "key" evidence that establish the defen-

-31-

dant's guilt or innocence.

The record now shows that even Mr. Womack's trial counsel had no recollection of his client ever giving such a statement in writing, or in his trial preparation with the Assistant District Attorney. See Transcript of Testimony of Attorney Lawrence McGuire. (Tr. II, 12/10/2002, at pp.123-124).

> Q. When you heard your client, Mr. Womack, testify at trial, to the effect that Mr. Gaskins told him, "I stabbed the nigger before he made the fence," when you heard that testimony, did it register to you as something that was new to you that you hadn't heard your client testify to before or give information before?

> . . .

A. Yes.

Q. So the answer is that that - -

A. Yes it did register.

Q. It did register as something new to you?

A. Yes.

(Tr. II, 12/10/02, at pp. 123-124). This critical statement made by Mr. Womack at trial was not part of any prior statement of which his counsel was aware, nor was it part of the written statement given by Mr. Womack to the police, but it fit in perfectly to support the Commonwealth's case. The Assistant District Attorney confirms that Mr. Womack

-32-

had not previously given this version of the purported

Gaskins statement prior to trial. "To the extent that

Womack, in his trial testimony, amplified on the conver-

sation in the automobile by attributing to Gaskins the

statement, '[Clark never made it to the fence,' he did

so on his own initiative and <u>contrary to my expectation</u>."

See Affidavit of Howard Whitehead, attached hereto as

Exhibit G.  In short, the record in this case shows

that the statement of Mr. Womack evolved over time, com-

mencing with the now-destroyed versions of his statements

made to the police, continuing to his being questioned

by the Assistant District Attorney in the presence of his

attorney Mr. McGuire, and ultimately, to the version of

testimony given at the time of trial.  That final version

was most supportive of the Commonwealth's position, to

the degree that it supported the statements of Mr. Coffill

and notably, that version contained a purported direct

quote from Mr. Gaskins that counsel for Mr. Womack, and

the Assiatnt District Attorney state they had not heard

Mr. Womack give on any prior occasion.

      While the Assistant District Attorney noted in his

affidavit that this statement by Mr. Womack was "contrary

to my expexctation" the statement was nevertheless used

-33-

to its maximum advantage at trial. <u>See</u> Exhibit G.  In its opening statement the Commonwealth argued that there would be testimony that once Tony Gaskins got in the car he said: "I got that nigger. I stabbed him. I think in the stomach. He didn't make the fence." (Tr. 2:27).  As noted above the written statement of Mr. Coffill suggested that the statement would be that Mr. Clark was stabbed "in the leg," not "in the stomach" as suggested by the opening statement, and there was no acknowledged pre-trial statement from Mr. Womack regarding this quoted state-ment.*/  In the closing argument the parallel testimony of Coffill and Womack was highlighted by the Commonwealth.

> So the question isn't whether you like Raymond Coffill and Leo Womack. The question is whether Raymond Coffill and Leo Womack are telling the truth when they say that it was Tony Gaskins who pulled the knife on David Clark during the early morning of February 16th, 1991, and who after chasing David Clark down Boston Street and into a driveway, got into the car and said: "I stabbed that nigger. He didn't even make the fence."

(Tr. 4:48).

> Now, they drove around for awhile. Then, at that point, Coffill said -- and I think Womack said the same words -- that Gaskins said to him: "I stabbed that nigger. He didn't make the fence."

(Tr. 4:53).

---

\*/ While Mr. Coffill did testify that he saw Mr. Gaskins and Mr. Womack chase Mr. Clark following a confrontation in front of the crack house, Mr. Coffill testified that he saw Mr. Clark climb over a fence when the pursuit had

. . . Raymond Coffill said that Tony Gaskins
had come to the car and said: "I stabbed that
nigger. He didn't make the fence."

(Tr. 4:57-58).

And when he emerged, he apparently had accom-
plished his purpose, because he said "I stabbed
that nigger. He didn't make the fence."

(Tr. 4:65-66).

The record thus shows that the Commonwealth relied

heavily upon this alleged admission of Mr. Gaskins, to

the point that it became the cornerstone of the Common-

wealth's theory of the case, and was mentioned four times

in the closing argument.  A case should not be allowed

to rest upon false or perjured testimony, especially if

the testimony is material, and if the Commonwealth relies

upon, and exploits such testimony in its closing argument.

See, e.g., Mesarosh v. United States, 352 U.S. 1 (1956)

("The dignity of the United States Government will not

permit conviction of any person on tainted testimony");

U.S. v. Mason, 293 F.3d 826, 829-830 (5th Cir. 2002)("By

failing to correct the misrepresentation, we find that

the government violated Mason and Smith's rights to due

process under the Fourteenth Amendment"); DeMarco v. U.S.,

928 F.3d 1074, 1077 (11th Cir. 1991)("Thus the government

not only permitted false testimony of one of its witnesses

to go to the jury, but argued it as a relevant matter

---

stopped. (Tr. 3:136-137). Since Mr. Coffill saw Mr.
Clark get over the fence, the statement, later attributed
to Mr. Gaskins, that Mr. Clark "didn't make the fence"
would appear to be contrary to Mr. Coffill's own personal
observations. Id.

-35-

for the jury to consider. Whether either instance alone
would merit reversal, we need not decide, for together
they do"). The prosecutor's actions here "so infect[s]
the trial with unfairness as to make the resulting con-
viction a denial of due process." Jenkins v. Artuz, 294
F.3d 284, 292 (2nd Cir. 2002)(quoting Darden v. Wainwright,
477 U.S. 168 (1986)). There is no question that the testi-
mony in this case was material, and indeed central, to
this case. The false testimony of Leo Womack at trial
was highly prejudicial to the defense, and in the absence
of such testimony the result of the trial would in all
likelihood have been different.

The Affidavit of Leo Womack explains the evolution
of his statement in terms of being pressured to provide
a version of testimony that the Commonwealth sought to
support their case. See Exhibit A, at 21. At trial the
statements attributed to Mr. Gaskins by Mr. Womack and
Mr. Coffill were so much alike that they have the sound
of being scripted and rehearsed.

It is fundamental that the Commonwealth may not base
its case upon perjured testimony. The Massachusetts and
Federal Constitutions prohibit a prosecutor from standing
mute when a witness gives testimony that the prosecutor
knows, or has reason to know, is false. See Mooney v.

-36-

Holohan, 294 U.S. 103 (1935); Napue v. Illinois, 360 U.S.
264, 266 (1959); Alcorta v. Texas, 355 U.S. 28 (1957);
Commonwealth v. Collins, 386 Mass. 1, 10, 434 N.E.2d
964 (1982).  The courts have consistently held that a
conviction obtained through false testimony is fundamen-
tally unfair, and must be set aside "if there is any
reasonable likelihood that the false testimony could have
affected the judgment of the jury." See United States v.
Agurs, 427 U.S. 97, 104 (1976).  Accord Kyles v. Whitley,
514 U.S. 419, & n. 7 (1995).  See also United States v.
Bagley, 473 U.S. 667, 682 (1985).  Denial of due process
exists where false testimony goes uncorrected. Napue v.
Illinois, 360 U.S. at 269. "Regardless of whether the
government has encouraged the false evidence of one of
its witnesses, the prosecutor must advise the court of
such false testimony." Commonwealth v. Hill, 432 Mass.
704, 714, 739 N.E.2d 670 (2000)(citations omitted).

    A conviction based upon false testimony, especially
if such testimony is coerced by the Commonwealth, would
deprive a defendant of a fair trial, the right to confron-
tation, the right to due process of law, all in viola-
tion of the Fifth and Fourteenth Amendments to the United
States Constitution.

    In this case Mr. Gaskins was deprived of his right
to compulsory process whereas the chief witnesses against

-37-

him, Mr. Coffill and Mr. Womack, did not provide to the
jury the full extent of their statements during testi-
mony, which would have tended to show that the alleged
"admission" was the product of coercion and intentional
tailoring of evidence so as to inculpate Mr. Gaskins.
The Confrontation Clause is applicable to the States.
As the Supreme Court noted in Pointer v. Texas, 380 U.S.
400, 404 (1965), it "cannot seriously be doubted at this
late date that the right ot cross-examination is included
in the right of the accused." See Kirby v. United States,
174 U.S. 47 (1899); Alford v. United States, 282 U.S.
687 (1931); Green v. McElroy, 360 U.S. 474 (1959);
In re Oliver, 333 U.S. 257 (1948); Turner v. Louisiana,
379 U.S. 466 (1965).  The Supreme Court has repeatedly
expressed the principle that "the right of confrontation
and cross-examination is an essential and fundamental
requirement for the kind of fair trial which is this
country's constitutional goal." Pointer, supra, at 405.
See also Crawford v. Washington, 541 U.S. 36 (2004).

     According to the affidavit of Mr. Womack his testi-
mony was coerced by the Commonwealth, but the Commonwealth
never revealed that statements were obtained in a coercive
manner.  Notably, the Commonwealth does not deny that the
police engaged in the practice of repeatedly tearing up

-38-

the initial statements of Mr. Womack until they were
satisfied with a particular version.  If such statements
were, in fact, coerced, evidence relating to the manner
in which statements were obtained from these witnesses
was exculpatory, and Mr. Gaskins was unconstitutionally
denied access to this exculpatory evidence. <u>See</u> <u>Brady</u>
<u>v. Maryland</u>, 373 U.S. 83, 87; <u>Kyles v. Whitley</u>, 514
U.S. 419 (1995).  In addition, by destroying these pre-
vious versions of Mr. Womack's statements the Common-
wealth has denied the defendant access to such exculpatory
evidence.  These were statements of an alleged witness
and participant in a murder, and the various versions
of his statement should have been preserved as part of
the investigation rather than being destroyed as a police
technique of getting a version of evidence that was
satisfactory to them.  The Commonwealth had a duty to
preserve exculpatory evidence.  The failure to preserve
the earlier versions of Mr. Womack's statements are at
the very core of the category of evidence that must be
preserved.  In this case Mr. Womack was called as the
Commonwealth's witness, and he frankly testified about
the Commonwealth's systematic destruction of the state-
ments that he prepared, but which were not satisfactory

-39-

in content to the police investigators.  It may be in-
ferred that Mr. Womack learned that his fate was linked
to his ability to provide the Commonwealth with the
evidence that the Commonwealth wanted to hear.  While
he provided such evidence at trial, the record now shows
that he knowingly, willingly and voluntarily retracted
that testimony through his affidavit.

The evidence from Mr. Womack, which has now been
recanted, was in a very real sense the keystone of the
government's case.  The Commonwealth's case was circum-
stantial, and was "particularly vulnerable to even slight
blows" to the credibility of the witness, or to his
motivations in testifying.  Without Mr. Womack's testi-
mony, then the testimony of Mr. Coffill becomes not
only more critical, but immensely more vulnerable to
cross examination and impeachment.  The fact that Mr.
Womack has recanted this statement, and the fact that
Womack's trial counsel corroborates Mr. Womack's af-
fidavit; and the fact that the trial prosecutor "knew"
that Womack and Coffil's testimony were both altered
and false is very much material and undermines confi-
dence in the verdict.  Federal law does not permit such
conduct, nor does state law.  See Kyles v. Whitley, 514
U.S. 419 (1995); Commonwealth v. Collins, 386 Mass. 1,
10 (1982).

-40-

Four times in the prosecution's closing, he stated the defendant, while in the car, said: "I stabbed that nigger. He didn't make the fence." In strong emphasis to the jury, the prosecutor said 1) Tony Gaskins ... got in the car and said: "I stabbed that nigger. He didn't make the fence." (Tr. 4:48), 2) Coffill said -- and I think Womack said the same words -- that Gaskins said to him: "I stabbed that nigger. He didn't make the fence." (Tr. 4:53), 3) Raymond Coffill said that Tony Gaskins had come to the car and said: "I stabbed that nigger. He didn't make the fence." (Tr. 4:57-58), and 4) And when he emerged, he apparently had accomplished his pur-pose, because he said: "I stabbed that nigger. He didn't make the fence." (Tr. 4:65-66). How crucial was this evidence? This evidence was the case and Coffill's and Womack's altered testimony was the linchpin to the defen-dant's conviction -- and no other reason.

First, Womack's original statement does not have the defendant allegedly stabbing Mr. Clark near a fence. Womack's statement says that Mr. Gaskins said he stuck him and "he [Mr. Gaskins] think" it was in the stomach. This version of Mr. Womack's statement could not be relayed to the jury because it is hearsay and cannot even come in as an exception to the hearsay rule, because a person cannot "think" he did something, he must be sure. The prosecutor knowing this, had allowed Mr. Womack to

-41-

intentionally tailor his testimony to match Mr. Coffill's
to an extent.  Because if Mr. Womack was allowed to
testify to his actual statement, he would only have been
allowed to say that all he heard was Mr. Gaskins say
that he had stabbed him, and that is all.  On the other
hand, if the prosecutor allowed Mr. Coffill to tell the
jury that Mr. Gaskins said that he stabbed Mr. Clark
"in the leg," this would seriously damage the prosecution's
case, whereas the prosecution's theory was that  Clark's
cause of death was a stab wound to the abdomen.  If the
juror's would have heard these facts, it would have
seriously impeached the witnesses theory of the alleged
"admission" and resulted in the acquittal of the defen-
dant.  The entire case was about credibility and nothing
else.  Without Mr. Coffill's and Womack's testimony,
the prosecution had no case against the defendant.  The
defendant was not tried under a joint venture theory.
He was tried as being the actual killer or not.

Now the question for this court is that, why would
Womack and Coffill alter their testimony and testify
falsely and, did the prosecutor know this testimony to
be false?  The answers are obvious under the circumstances
of this case.

By failing to inform the court and correct the inten-
tional tailored false testimony of Coffill and Womack,

-42-

the prosecutor violated the duty to inform the defense of material exculpatory evidence. Brady v. Maryland, 373 U.S. 83, 87 (1963).

By allowing the witnesses, Raymond Coffill and Leo Womack to testify under false pretenses, he violated the duty to correct false evidence when it is offered. See, e.g., Napue v. Illinois, 360 U.S. 264, 269 (1959); Benn v. Lambert, 283 F.3d 1040, 1059 (9th Cir. 2002); Shih Wei Su v. Filion, 335 F.3d 119, 126-127 (2d Cir. 2003). Finally, by arguing to the jury, **"Now the Commonwealth contends that whatever their liabilities, Raymond Coffill and Leo Womack are telling the truth when they tell you that,"** (Tr. 4:48-49), and **"He wouldn't be able to tell you a lie without letting on,"** violated the duty not to argue false or inadmissible evidence to the jury. See, e.g., Miller v. Pate, 386 U.S. 1 (1967); Jenkins v. Artuz, 294 F.3d 284 (2d Cir. 2002); Brown v. Borg, 951 F.2d 1011 (9th Cir. 1991); U.S. v. Mason, 293 F.3d 826 (5th Cir. 2002); DeMarco v. U.S., 928 F.2d 1074 (11th Cir. 1991).

The proper role of the criminal prosecutor is not simply to obtain a conviction, but to obtain a fair conviction. The prejudice to the defendant's right to a fair trial is even more palpable when the prosecutor has not only withheld exculpatory evidence, but has knowingly

-43-

introduced and argued it false.  Federal review of this

claim is necessary to prevent a fundamental miscarriage

of justice because the fact that Womack has recanted

and the fact revealed that both Coffill's and Womack's

testimony was intentionally tailored, is very much

material and undermines confidence in the verdict.  Reversal

of conviction is required because the State court's

ruling was contrary to, and involved an unreasonable

application of clearly established federal law as de-

termined by the United States Supreme Court.

**II(B).    THE PROSECUTOR IMPROPERLY VOUCHED FOR THE
TESTIMONY OF LEO WOMACK AND RAYMOND COFFILL
AND DENIED THE DEFENDANT A FAIR TRIAL AND
DUE PROCESS OF LAW AS GUARANTEED BY THE
FIFTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION**

A prosecutor in closing argument may restate the Govern-

ment's agreement with the witness and may argue reasonable

inferences from the plea agreement's requirement of

truthful testimony. See United States v. Martin, 815

F.2d 818, 822-823 (1st Cir.), cert. denied, 401 U.S. 1039

(1987).  A prosecutor may neither inject his personal

opinion on credibility into the proceedings nor should the

jury be led to believe that the prosecutor has other

information not presented at trial which leads him to

believe the witness is telling the truth. United States

v. Creamer, 553 F.2d 612, 617 (7th Cir. 1977); Accord

Lawn v. United States, 78 S.Ct. 311 (1958).

-44-

In his closing, the prosecutor said: **"Now, the Com-- monwealth contends that whatever their liabilities, Raymond Coffill and Leo Womack are telling you the truth when they tell you that,"** (Tr. 4:48-49), and **"He wouldn't be able to tell you a lie without letting on."** (Tr. 4:56).

Now it is known that Mr. Coffill and Mr. Womack both were lying at the trial, and that their testimony was intentionally altered and the prosecutor knew this and failed to correct it. Also, when the prosecutor states, "He wouldn't be able to tell you a lie without letting on," he clearly put the prestige of the sovereign behind his support of a known lie. Because both witnesses were lying and "letting on" the jury through the blessings and backing of the prosecutor. Here the prosecutor did manipulate and misstate the evidence, and his actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986)(quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)).

Looking at the phrasing "the Government was not providing information that the jury needed to evaluate the credibility of these witnesses; it was purely and simply, bolstering that credibility." United States v. LeFevour, 798 F.2d 977, 984 (7th Cir. 1986). See also United States v. Wallace, 840 F.2d 1464, 1474 (9th Cir.

-45-

1980)("that would have not been the truth," and "she told
the truth" were improper vouching); <u>United States</u> v.
<u>Martin</u>, 815 F.2d, at 822 ("they told you the truth,"
disapproved).

The error in the prosecutor's remarks cannot be deemed
as harmless.  As Judge Frank stated:

> If we continue to do nothing practical to
> prevent such conduct, we should cease to
> disapprove it. For otherwise, it will be
> as if we declare in effect, Government at-
> torneys, without fear of reversal, may
> say just about what they please in addres-
> sing juries, for our rules on the subject
> are pretend rules. If prosecutors win
> verdicts as a result of "disapproved" re-
> marks, we will not deprive them of their
> victories; we will merely go through the
> form of expressing displeasure. The de-
> precatory words we use in our opinions
> on such occasions are purely ceremonial.

<u>United States</u> v. <u>Antonelli Fireworks Co.</u>, 155 F.2d 631,
661 (2d Cir.)(Frank J., dissenting), cert. denied, 329
U.S. 742 (1946).

Federal review of this claim is necessary to prevent a
fundamental miscarriage of justice because the prosecutor
clearly vouched for the credibility of the witnesses know-
ing that they were telling a lie, and bolstered their
testimony by placing his prestige behind it.  The State
court's ruling was contrary to clearly established
federal law as determined by the United States Supreme
Court, and involved an unreasonable determination of
the facts in light of the evidence presented in the State
Court proceeding.  Reversal of conviction is required.

-46-

**III(C).    THE JURY INSTRUCTIONS PERMITTED AN INFERENCE
OF MALICE ON LESS THAN A PLAIN AND STRONG
LIKELIHOOD OF DEATH IN VIOLATION OF THE
FOURTEENTH AMENDMENT TO THE UNITED STATES
CONSTITUTION**

The Due Process Clause of the Fourteenth Amendment
"protects the accused against conviction except upon
proof beyond a reasonable doubt of every fact necessary
to constitute the crime with which he is charged."
Francis v. Franklin, 471 U.S. 307, 311 (1985)(citations
omitted).  This "bedrock, 'axiomatic and elementary'
[constitutiona] principle," prohibits the State from using
evidentiary presumptions in a jury charge that have the
effect of relieving the State of its burden of persuasion
beyond a reasonable doubt of every essential element of
a crime. Id.

Here the defendant contends that the State Court's
denial of this issue involved an unreasonable determination
of the facts in light of the evidence presented in the
State Court proceeding. 28 U.S.C. § 2254(d).  The Massachu-
setts Appeals Court reversed a second-degree murder
conviction in Commonwealth v. Azar, 50 Mass. App. Ct.
767, 742 N.E.2d 1083  (2001), further review denied,
412 Mass. 1105, 595 N.E.2d 326 (2001), because the jury
instructions permitted an inference of malice on less than
a plain and strong likelihood of death.  Since the issue
was raised for the first time in a motion for a new trial,

-47-

the trial judge ruled that it was waived. Id., at 767-768.
The Massachusetts Court of Appeals reversed, holding
that the jury instruction was flawed and that the defective
charge created a substantial risk of a miscarriage of
justice. Id., at 769-770.

At the conclusion of the trial in <u>Azar</u>, the jury was
instructed:

> "To prove malice, the government must prove
> beyond a reasonable doubt one of three things:
> either, that [the defendant] acted intending
> to kill [his daughter]; or that he acted
> intending to cause her grievous, that is
> serious, bodily harm; or, that he intended
> to do an act creating a strong and plain
> likelihood, in light of normal human experi-
> ence, that death <u>or grievous, that is, serious,</u>
> <u>bodily harm would result</u> to [his daughter]"
> (emphasis added)

Id., at 768.

According to the Appeals Court, the underlined portion
of the instruction (referred to as "third prong malice")
was indisputably erroneous because "'[t]he third prong
of the malice definition can only be satisfied by proof
that 'there was a plain and strong likelihood of death.'"
Id., at 768-769. (citations omitted). As the Court of
Appeals explained: "Intending to do an act creating a
strong likelihood of <u>grievous bodily harm</u> does not con-
stitute malice." Id. (emphasis added). Absent malice,
"'an unlawful killing can be no more than manslaughter.'"
Id. (citation omitted).

The Massachusetts Supreme Judicial Court has held that

-48-

a murder conviction "founded on a state of mind sufficient only to support a manslaughter conviction violates due process." Commonwealth v. Vizcarrando, 427 Mass. 392, 396-397, 693 N.E.2d 677 (1998).  Such a conviction also violates the constitutional mandate of administering punishment in proportion to an individual's moral culpability. Id., at 397. See also Carella v. California, 109 S.Ct. 2419 (1989).

As in Azar, Mr. Gaskins' jury was instructed that it could return a murder conviction based on a plain and strong likelihood of grievous bodily harm, and not necessarily death.  The charge includes the following definition of malice:

> Malice aforethought includes any unexcused specific intent to kill or any unexcused specific intent to do grievous bodily harm or any unexcused specific intent to do an act creating a plain and strong likelihood that death or grievous bodily injury would follow.

> Malice aforethought may be inferred if, in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death or grievous bodily injury would follow the contemplated act.

(Tr. 4:84-85)(emphasis added).

The trial judge also charged that an inference of malice was permissible based on the use of a dangerous weapon "if the defendant used such force that, according to com-

-49-