mon experience, there was a plain and strong likelihood that
death or grievous bodily harm would follow the defendant's
blow." (Tr. 4:86)(emphasis added).

The instruction here lessened the burden the Common-
wealth was required to establish beyond a reasonable
doubt in violation of In re Winship, 397 U.S. 358 (1970).
The jury instruction had the effect of relieving the
State of the burden of proof enunciated in Winship on
the critical question of state of mind because they were
precluded from assessing the elements required to ef-
fectively determine if they applied to the defendant.

Since the charge "permitted a reasonable juror to
infer malice on less than a plain and strong likelihood
of death[,]" Vizcarrando, 427 Mass., at 392, it was er-
roneous. Id.; Azar, at 769-770, 777-778.  The only issue
that remains is whether the flawed instructions created
a fundamental miscarriage of justice. See Reed v. Ross,
468 U.S. 1 (1984).  A fundamental miscarriage of justice
occurs in this context when the jury could have convicted
based on the erroneous charge, or if "the evidence permit-
ted but did not require the jurors to conclude that there
was a plain and strong likelihood that death would follow
the defendant's actions[.]" Vizcarrando, 427 Mass., at
398; Azar, at 771-772.  Based on the evidence presented
at trial in this case, the risk that the jury relied on

-50-

the erroneous instruction is inescapable because the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).

According to the trial testimony (that we now know to be a lie) of the Commonwealth's witnesses, the incident leading to David Clark's injury occurred after he purchased cocaine from a "drug house" that Tony Gaskins, Leo Womack, Raymond Coffill and Robert Reid allegedly intended to rob. (Tr. 3:95, 111-113, 123; 129-130); (Tr. 4:206-207). Raymond Coffill testified that he drove the group to the prospective robbery site and waited in the car while the others approached the house. (Tr. 3: 118). Womack, Reid and Gaskins allegedly considered their options while waiting on the front porch. (Tr. 3:118-121). According to Coffill's testimony, he was standing in an alleyway, nine or ten feet from the porch, when he saw David Clark emerge from the house. (Tr. 3: 125-126). Coffill testified that Womack asked Clark what he had received, and Clark replied that he had "a twenty." Id. Coffill testified that he heard Womack say to Clark: "You know what happens now," and then he observed Womack knock Clark to the ground with his forearm. (Tr. 3:127). According to Coffill's testimony, he observed Tony Gaskins move closer to Clark, and he

-51-

saw Gaskins point a knife in the direction of Clark's mid-section. (Tr. 3:128).

Coffill testified that after he saw the knife, he walked away from the porch. (Tr. 3:131). Coffill then saw David Clark run, and Womack and Gaskins follow him. Id. According to Coffill's testimony, Womack and Gaskins pursued Clark on foot as Coffill gave chase in the car. (Tr. 3:131-133). After Coffill's second attempt to cut Clark off with the car, he opened the door and invited Clark inside. (Tr. 3:134). Coffill testified that Clark jumped into the car, but recognized him and quickly jumped out. Id. Coffill then observed Clark running, initially with Gaskins and Womack in pursuit. (Tr. 3: 135). Coffill later saw Clark running and jumping over fences, but he did not see anyone in pursuit. (Tr. 3: 136).

Shortly thereafter, Gaskins and Womack appeared on the sidewalk nearby Coffill's car. (Tr. 3:136). When they got into the car, Gaskins said he wanted to continue looking for Clark. (Tr. 3:141). At the same time, however, Gaskins allegedly said: "I stuck that nigger. He didn't make the fence." (Tr. 3:142). This statement is now known to be perjured testimony. Coffill heard Womack or possibly Reid respond that Gaskins should check his knife for blood. Coffill testified that Gaskins retrieved

-52-

a knife, ran his fingers along the blade, and said that there
was no blood. (Tr. 3:142).

Leo Womack testified that after Coffill had cut off
Clark with his car, Womack, Reid and Gaskins continued
the chase. (Tr. 3:209). Womack testified that Clark hid
in a back yard along the route, and Reid and Gaskins
followed. Id. According to Womack's testimony, he heard
Clark say "[D]on't stab me for a twenty, man," and then
he did not see Clark again. (Tr. 3:210). Womack testified
that once they were back in the car with Coffill, Reid
asked Gaskins: "Did you get him?" to which Gaskins allegedly
replied: "I stuck that nigger. He didn't make the fence.
I got him." (Tr. 3:211). This statement was found out
to be perjured testimony.

After David Clark was injured, he walked to the home
of his girlfriend, Vivian Avant. (Tr. 2:55-56, 61). When
he arrived at her apartment, which was on the second
floor, he was carrying a stick. Id. The stick was admit-
ted as an exhibit at trial, and it was approximately
thirty-six inches long and three inches wide. (Tr. 2:
72). Ms. Avant testified that after Clark conversed with
her and showed her the injury, she led him back down-
stairs, where some companions walked with him to the Lynn
Hospital. (Tr. 2:47).

Because the Lynn Hospital was not receiving patients

-53-

for emergency care, Clark was transported to the Union
Hospital on the other side of Lynn. Id.; see also
(Tr. 2:131-133)(testimony of Officer Monahan). Officer
Monahan, who transported Clark, testified that Clark
was conscious and talking when Monahan arrived. (Tr.
2:135). Monahan testified that he inspected the wound
closely, and "noticed there was no blood at all and the
wound seemed to be blocked by some internal organ or
something." (Tr. 2:133). Monahan described the injury
as a "puncture wound to the lower left quadrant[,]" to
the left of the naval. (Tr. 2:132). When Clark arrived
at Union Hospital, his condition was stable. Id. He died
in the hospital eight days later.

Dr. Larry Goldberg, a medical examiner, testified
that the injury was caused by a single stab wound. (Tr.
2:38). Complications developed, including a condition
that prevented the blood from clotting. Id.[12] Dr. Goldberg
estimated the wound to be "[a]n inch to a couple of inches"
in length, but testified that he did not take measurements.
(Tr. 2:42). Asked on cross-examination whether the injury
could have been caused by a knife "with a blade of appro-
ximately two and three quarters inches in length," Dr.
Godlberg replied, "Perhaps, yes." Id.

---

12/ A physician testified that Mr. Clark was infected with the AIDS
Virus, but he did not believe that this disease caused the coagu-
lation problems. (Tr. 2:40).

Karolyn LeClaire, a chemist with the Department of
Public Safety, testified that she examined David Clark's
clothing. (Tr. 2:60-63). According to LeClaire, a cut
measuring 5/8" in width was found on his pants. (Tr. 2:
77). There was insufficient quantity of blood on the shirt
for ABO blood typing, and there was also a fairly small
quantity of blood on the pants. (Tr. 2:63).

As in Vizcarrando and Azar, the evidence in the
instant case could have "'warranted a finding of a risk of
harm less than a strong likelihood of death.'" Vizcarrando,
427 Mass., at 397 (citations  omitted). Based on the
testimony of Raymond Coffill, the jury could have concluded
that the blow causing the injury was delivered on the
porch, before the chase during which Mr. Clark out-ran
three men on foot and one in a vehicle. (Tr. 3:128). The
Commonwealth's witnesses agreed that the instrument that
caused the wound was likely less than three inches in
length, and the entrance wound was 5/8" wide. Little, if
any, blood was shed. After the chase, Mr. Gaskins allegedly
told Coffill that he wanted to continue to look for
David Clark. (Tr. 3:141). Mr. Gaskins alleged desire to
continue the search is inconsistent with a belief that
his actions created a plain and strong likelihood of a
fatal injury to David Clark. Looking at the charge as
a whole, created an unconstitutional presumption. See, e.g.,

-55-

Cupp v. Naughten, 414 U.S. 141, 147 (1973).

In the hours after he was injured, Clark was ambulatory
and conversant.  When he was transported to the hospital,
his condition was stable.  Under these circumstances,
a reasonable juror might well have believed that the blow
allegedly administered by Tony Gaskins created a plain
and strong likelihood of grievous bodily injury, but
not necessarily death.  Accordingly, this case is governed
by Azar and Vizcarrando, in which the erroneous third-
prong malice instructions were held to be prejudicial.
See also Commonwealth v. Williams, 428 Mass. 383, 389,
701 N.E.2d 945 (1998)(holding that erroneous charge was
prejudicial where victim died of crushed throat after
beating -- "Given the obvious risk of grievous bodily
injury caused by repeated blows with a fist, [the jurors]
were presented with no need to decide the more difficult
question whether those blows were likely to cause death").
Given that the instrument causing the injury was estimated
to be less than two and a half inches in length and there
was no visible bloodshed upon impact, this case is
distinguishable from those in which the erroneous charge
was deemed non-prejudicial because a "deadly weapon" was
utilized.  See Commonwealth v. Solomonsen, 50 Mass. App.
Ct. 122, 125, 735 N.E.2d 411 (2000)(shooting at close
range); Commonwealth v. Freeman, 430 Mass. 111, 123, 712
N.E.2d 1135 (1999)(victim stabbed at least twenty-three

-56-

times in the head, chest, and neck); <u>Commonwealth</u> v.
<u>Fryar</u>, 425 Mass. 237, 248, 680 N.E.2d 901 (1997)(stabbing
in the chest); <u>Commonwealth</u> v. <u>Morgan</u>, 422 Mass. 373,
382, 633 N.E.2d 247 (1996)(stabbing with a knife having
a six-inch blade). See Cf. <u>Commonwealth</u> v. <u>Johnson</u>,
435 Mass. 113, 122, 745 N.E.2d 685 (2001)(in gunshot case
in which three people were shot and one died,the errant
third-prong malice charge "relieved the Commonwealth of
its burden to prove deliberate premeditation beyond a
reasonable doubt").

It is anticipated that the Commonwealth will argue
that no risk of a fundamental miscarriage of justice
would flow from an erroneous malice instruction because
Mr. Gaskins was prosecuted under a felony murder theory
as well.  However, the felony murder charge had its own
infirmities.

In his direct appeal to the Supreme Judicial Court
Mr. Gaskins argued that the felony murder instructions
were improper.  It was argued, inter alia, that the jury
was likely to be confused and misled by the felony murder
instruction.  The trial court advised the jury on one
hand that they were to determine the degree of murder,
and on the other advised the jury that there was no basis
to find second degree murder based upon felony murder.
In effect, the instruction deprived Mr. Gaskins of his
right to have the jury determine the degree of murder, as

-57-

required by M.G.L.c. 265 § 1.  The Supreme Judicial Court
acknowledged this issue, but indicated that any problems
with the instruction were mitigated by the fact that there
was an alternative theory of conviction based upon deliberate
premeditation. See Commonwealth v. Gaskins, 419 Mass. 809,
813 & n. 4, 647 N.E.2d 429 (1995).  In more recent
years, the Supreme Judicial Court has specifically recog-
nized that only the jury should decide the degree of mur-
der pursuant to M.G.L.c. 265 § 1. Commonwealth v. Vinnie,
428 Mass. 161, 180, 698 N.E.2d 896 (1998).

The fact that Mr. Gaskins was prosecuted upon two
separate theories does not diminish the fact that there
is a fundamental miscarriage of justice arising from the
jury instructions.  Indeed where the instructions on
each of these two theories was flawed there was a synergy
that actually enhanced the likelihood of a fundamental
miscarriage of justice. See Schad v. Arizona, 501 U.S.
624, 632 (1991); Yates v. United States, 354 U.S. 298,
312 (1957); Carella v. California, 491 U.S. 263, 269
(1989)("[T]he question is not whether guilt may be spelt
out of a record, but whether guilt has been found by a
jury according to the procedure and standards appropriate
for criminal trials")(Scalia, J., Concurring), quoting
Bollenbach v. United States, 326 U.S. 607, 614 (1946).

As the Supreme Judicial Court stated in Commonwealth
v. Plunkett, 422 Mass. 634, 640, 664 N.E.2d 833 (1996),

"[i]f a person is to be incarcerated for life without parole, in fairness there must be evidentiary support for each theory on which the judge tells the jury they may find the defendant guilty." See also Commonwealth v. Accetta, 422 Mass. 642, 646-647, 664 N.E.2d 830 (1996).

Federal review of this claim is necessary to prevent a fundamental miscarriage of justice, Reed v. Ross, 468 U.S. 1 (1984), whereas in this case it appears that the jury found Mr. Gaskins guilty based upon these two theories. The instruction for the "deliberate premeditation" theory are clearly incorrect, as argued above. To the degree that the jury may have relied upon the felony murder theory, a separate set of problems is presented. Where the accuracy of the instructions, and the intent of the jury is in question, it would be in the interest of justice to order a new trial because the State Court's ruling involved an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding, 28 U.S.C. § 2254(d), and was contrary to clearly established law as determined by the United States Supreme Court.

IV(D).  **THE TRIAL JUDGE ERRED IN REFUSING TO INSTRUCT THE JURY ON SECOND DEGREE MURDER AS IT RELATES TO THE FELONY MURDER RULE DIRECTING A VERDICT IN FAVOR OF CONVICTING THE DEFENDANT OF FIRST DEGREE MURDER DENYING DEFENDANT'S 5th, 6th AND 14th AMENDMENT RIGHTS TO A FAIR TRIAL**

A necessary aspect of the right to a jury trial is that

-59-

every fact essential to the conviction of an individual
must be proved beyond the jury's reasonable doubt. In re
Winship, 397 U.S. 358, 363 (1970)(quoting Davis v.
United States, 160 U.S. 469, 484, 493 (1895)).  A judge
commits error when he instructs the jury as a matter of
law that a fact essential to conviction has been established
by the evidence, thus depriving the jury of the opportunity
to make this finding. United States v. Voss, 787 F.2d
393, 398 (6th Cir. 1986)(citing Sandstrom v. Montana,
442 U.S. 510 (1979)).  It makes no difference that the
evidence supporting proof of that element is "overwhelming,"
id., 787 F.2d at 399, for it is the jury's role, not
the judge's, to find the facts essential to a criminal
conviction. United States v. Martin Linen  Supply Co.,
430 U.S. 564, 572-73 (1977).

Under Massachusetts law, M.G.L.c. 265 § 1 provides
that "[T]he degree of murder shall be found by the jury."
This statute requires an instruction on murder in the
second degree even if the evidence provides no support
for such a verdict. Sandstrom v. Montana, 442 U.S. 510
(1979); See also Cola v. Reardon, 787 F.2d 681 (1st Cir.
1986); Murray v. Carrier, 477 U.S. 478 (1986).

Here, the trial judge instructed the jury as follows:

"If you find the defendant guilty of murder by
reason of the felony murder rule, there still

-60-

remains the question of the degree of murder
because under the statute, it says that the
jury will determine the degree of murder.
Under the statute, murder committed during
the commission or attempted commission of
a felony punishable by life imprisonment is
murder in the first degree. You have a duty
if you find the defendant is guilty to re-
turn a verdict of guilty of the highest crime
which has been proven beyond a reasonable
doubt.

**Let me tell you that there is also a second
degree murder by reason of the felony murder
rule, but I am not going to instruct you on
this because the evidence does not warrant
it. That is just for your information."**
(Tr. 4:92-93).

Here, the statute, provided the jury with the option

to convict Gaskins of felony murder in the second degree

even if the evidence here only supported a finding that

the murder was committed during the commission of an

attempted armed robbery, a crime punishable by life im-

prisonment.

The trial judge violated the defendant's due process

rights under the 14th Amendment to the United States

Constitution when it instructed the jury to disregard the

"possibility" of returning a verdict of second degree murder

based on felony murder. See (Tr. 4:93).

The Supreme Judicial Court's ruling involved an un-

reasonable determination of the facts in light of the evi-

dence presented in the State Court proceeding because the

defendant's case is strikingly similar to Commonwealth

v. Brown, 392 Mass. 632, 467 N.E.2d 188 (1984), where the

Massachusetts Supreme Judicial Court held an instruction

-61-

on second degree murder is required.  The only difference between the two is that the defendant's attorney failed to object to the court's erroneous charge.  See Reed v. Ross, 104 S.Ct. 2901 (1984); Francis v. Henderson, 96 S.Ct. 1708, 1715 n. 2 (1976)("it would seem that counsel must be shown to have knowingly and  intelligently acted on his client's behalf")(Brennan, J., dissenting).

Federal review of this claim is necessary to pre-vent a fundamental miscarriage of justice because, here, the petitioner's right to a fair trial encompasses his right to have his jury instructed in accordance with the law.  The trial judge violated the defendant's rights to a fair trial by erroneously failing to instruct the jury as to the "possibility" of returning a verdict of second degree murder by reason of felony murder.

As this court has repeatedly recognized, "harmless error analysis presumably would not apply if a court directed a verdict for the prosecution in a criminal trial by jury." Rose v. Clark, 106 S.Ct. 3103, 3106 (1986); Chapman v. California, 87 S.Ct. 824 (1967); Yates v. Evatt, 111 S.Ct. 1884 (1991).  The State Court's ruling here was contrary to, and involved an unreasonable deter-mination of the facts in light of the evidence presented in the State Court proceeding.  The defendant's rights to a fair trial necessarily encompasses the right to lawful

-62-

instructions to the jury.  The court's violation of the defendant's due process rights to a fair trial requires reversal of his conviction.

**V(E).**    **THE MASSACHUSETTS SUPREME JUDICIAL COURT RELIEVED THE TRIAL COURT'S MISDIRECTION ON THE QUESTION OF SECOND-DEGREE FELONY MURDER BY IMPLICATING THE ALTERNATIVE THEORY OF DELIBERATE PREMEDITATION FOR WHICH THERE WAS INSUFFICIENT EVIDENCE**

The present case involves a general verdict predicated on the possibility of combining findings of what can be best described as alternative mental states, the one being premeditation, the other the intent required for murder combined with the commission of an independently culpable felony.  Schad v. Arizona, 501 U.S. 624, 632 (1991). If, then, two mental states are supposed to be equivalent means to satisfy mens rea element of a single offense, they must reasonably reflect notions of equivalent blameworthiness or, culpability, whereas a difference in their perceived degrees of culpability would be a reason to conclude that they identified different  offenses altogether. Id. at 643.  No person may be punished criminally save upon proof of some specific illegal conduct. Id. at 633.

In determining why the trial judge's error in his remarks and refusal to give second degree felony-murder instructions, the SJC reasoned that "The fact that the jury's verdict was also based on a finding of deliberate premeditation greatly reduces the possibility of any pre-

-63-

judicial error in the charge on felony-murder." <u>Commonwealth</u>

v. <u>Gaskins</u>, 647 N.E.2d 429, 432 n. 4 (Mass. 1995).  There

was insufficient evidence of premeditation.  The prosecu-

tion's entire case was premised on felony-murder where

the crime alleged occurred during the attempted commission

of a felonious act.  Never was there evidence presented

to suggest that the defendant "specifically" intended

to kill the alleged victim.  The record does not reveal

any plan or scheme by the petitioner for the killing.

There was testimony by the testifying codefendants that

earlier before meeting the defendant, that they (Leo

and Ray) planned on robbing a fast food restaurant.  Also,

they testified that they was also planning on robbing

the drug house because Mr. Coffill was "dishonored" by

the drug dealers when he purchased some bad quality

cocaine earlier that day from the drug house and he was

chased away by the dealers.  The  testifying accomplices

also testified that after their attempt to rob the drug

house and the alleged victim, the defendant returned

to the car and said, "I stuck that nigger.  He didn't

make the fence."  This statement has now been rebuffed by

Mr. Womack in his affidavit, and confirmed at an evidentiary

hearing to be a lie.  Also, the alleged victim made a

dying declaration stating how he received his wound to

the abdomen by "falling on a broken bed."

-64-

In the instant case, Officer Manning filled out a
Lynn Police Incident Report dated February 16, 1991.
Officer Manning reported that on that date, at approximately
1:23 a.m., he and Officer Monahan were dispatched to Lynn
Hospital to investigate an "apparent stabbing." When
the officers arrived at the Lynn Hospital Emergency Room
on Boston Street, the victim was being treated inside a
Lifeline Ambulance. Officer Manning observed that the
victim had a "puncture wound to his left quadrant and
a contusion to his left eye area." The victim was trans-
ported in the ambulance to Union Hospital on Lynnfield
Street.

Officer Manning reported that the victim spoke with
them while in the ambulance. The victim told Officer
Monahan that he received the wound to his abdomen when
he fell on his broken bed. Officer Manning observed that
the victim had difficulty conversing because of "pain
and/or language barrier."

Officer Manning further reported that while investi-
gating this incident, he and Officer Monahan spoke with
a D. Harper and a B. Byrd who were with the victim at
the hospital. D. Harper told the Officers that Mr. Clark
told him that "he fell on the bed." B. Byrd indicated
that he did not know what happened to David Clark.
Here the defendant maintained that he did not stab David

-65-

Clark.  David Clark's own statement would have corroborated
the defendant's theory of the case.

It is clear that David Clark's statement constituted
a dying declaration and would have been admissible as
an exception to the hearsay rule.  In Massachusetts,
the common law provides that:

> (1) in a prosecution for homicide (2) committed
> upon the declarant,(3) declarant's statement in
> regard to the manner in which he met his death
> is admissible (4) provided he believes at the
> time of the statement that he is to die imme-
> diately and (5) provided he does die within a
> very short time.

Liacos, Handbook of Mass. evid., 454 (1994 ed.).

It is clear from the record that the injury to Mr.
Clark's abdomen was a single puncture wound and that his
statement was in regard to the manner in which he met his
death.  The remaining question is whether the victim believed
that death was imminent at the time that he made the state-
ment.  In the instant case, there was sufficient evidence
for both the judge intitially and then the jury to find
by a preponderance of the evidence that the statement was
admissible as a dying declaration.  The statement was
made by the alleged victim to his friend/cousins, while
taken to the emergency room, and then once again tc a
police officer, while he lie bleeding in the ambulance at
the emergency room, and to the intake nurse and doctor
at Union Hospital.  As reported by the officer, David

-66-

Clark was in "pain and had difficulty conversing." The
record indicates that David Clark was "alert, oriented, and
rational, and could see for himself the full extent
of his injuries." See Commonwealth v. Key, 381 Mass.
19, 25, 407 N.E.2d 327 (1980). Based on the nature
of the injury, and the circumstances surrounding it all
hope of recovery had gone from [the victim's] mind and
he [spoke] under a sense of impending death." Key,
supra, at 25. (emphasis added).

The defendant's defense was based on the theory that
he did not inflict any injury upon the victim and that
the victim was injured by another party or in another
manner than that which the Commonwealth alleged. The
statement which the victim made to both his cousins, the
intake nurse, the doctor and the two police officers
that he had "fallen on a broken bed" was highly relevant
and supported the defendant's theory of defense. David
Clark's statement is highly significant in this case
considering that the issue the jurors had to decide was
whether or not they believed that the defendant was the
person who had fatally injured the victim. The record
indicates that David Clark first told his cousins/friends
and then the police officer that he had injured himself
on a broken bed. If defense counsel had admitted the

-67-

victim's dying declaration and it had gone to the jury,
then the jurors could have determined whether or not they
believed the victim was truthful with his friends/cousins
and the police officers about the origin of his wound.
If the jurors believed what David Clark said, the defen-
dant would have necessarily been found guilty on the
charge of felony murder.  This was highly relevant infor-
mation for the jury to consider and it supported the
defendant's claim that he was not responsible for the
victim's death.

In Massachusetts, felony murder and deliberate premedi-
tation are two separate theories and the moral disparity
between the theories bar treating them as alternative
means to satisfy mental element of single offense.
"Deliberate premeditation requires specific intent ---
that the defendant act with the intent that his actions
will cause death..." Commonwealth v. Judge, 420 Mass.
433, 441, 650 N.E.2d 1242 (1995).  The evidence based
upon the verdict is supportable on one ground, but not
on another, Yates v. United States, 354 U.S. 298, 312
(1957), and deliberate premdition is clearly not one of
them.  The reasoning of the SJC in Gaskins at footnote
4, in excusing the judge's error on the felony murder
charge was an unreasonable application of law because
the deliberate premeditation verdict the jury found the
defendant guilty of also, the evidence does not support

-68-

such a finding.

Here the defendant's right to "jury consensus as to [his] course of action" was violated where the error in respect to the felony murder charge undermined the rest of the verdict. The instruction given by the judge could well have been interpreted as a conclusive direction by him to find murder in the first degree by reason of felony-murder once the jurors were convinced of the facts raising the presumption. "[T]he question is not whether guilt may be spelt out of a record, but whether guilt has been found by a jury according to the procedure and standards appropriate for criminal trials." Carella v. California, 491 U.S. 263, 269 (1989)(Scalia, J., concurring), quoting Bollenbach v. United States, 326 U.S. 607, 614 (1946). At no point in the trial did the defendant concede (nor could have logically done so, given the alleged victim's explanation to the nurse, doctor, girlfriend, two cousins and the two police officers on how his wound was received) the issue of premeditation.

It is clear that under Massachusetts law premeditation and the commission of a felony is formally an independent element of first-degree murder. Moreover, each of these ... must be treated as an independent element as to which the jury must agree, because premeditation murder and felony murder

-69-

are inherently separate offenses. See Schad v. Arizona,
501 U.S. at 639. As In re Winship, 397 U.S. 358 (1970),
makes clear, due process mandates "proof beyond a reason-
able doubt of every fact necessary to constitute the crime
with which [the defendant] is charged." Id. at 364,
quoting from Schad v. Arizona, 501 U,S. 652 (Dissenting
opinion)(emphasis added). To establish the crime of
first degree murder in the state court, Massachusetts
would have had to prove premeditation and deliberation.
No such elements were required under the felony-murder
comprised of M.G.L.c. 265 § 1. Unlike premeditated murder,
felony murder does not require that the petitioner
commit the killing or even intend to kill, so long as the
defendant is involved in the underlying felony. Felony
murder -- but not premeditated murder -- requires proof
that the defendant had requisite intent to commit and
did commit the underlying felony. Premeditated murder,
however, demands an intent to kill as well as premeditation,
neither of which is required to prove felony murder.
Schad, 501 U.S. at 654 (internal citation omitted).

        Looking at the scenario as given at trial, the alleged
victim comes out of the drug house onto the porch and
Leo Womack punches him in the face stating, "You know what
this is?" The alleged victim looks at Robert Reid and
Reid says, "Just kick it in." Out of nowhere the defendant

-70-

puts a knife to David Clark's throat but never indicates
his intentions but the victim says that he does not have
anything.  In arguendo, lets say the defendant did put
a knife to his throat.  His intention would not be much
if the victim stated that he has nothing on him and
nothing was ever proving to be taken from him.  There
can never be a robbery nor an attempt because the man
says he has nothing and nothing was ever attempted
physically to be taken from him.  Moreover, the defendant
was never indicted for attempted armed robbery. See
Stirone v. United States, 361 U.S. 212 (1960). See also
United States v. Miller, 471 U.S. 130, 136 (1985)("Con-
victions generally have been sustained as long as the
proof upon which they are based corresponds to an offense
that was clearly set out in the indictment").  "An in-
dictment is amended when it is so altered as to charge
a different offense from that found by the grand jury."
Ex parte Bain, 121 U.S. 1 (1887).

There is nothing in the evidence suggesting that the
defendant was bent on "killing" David Clark or doing
bodily harm to him except for the testimony given by Mr.
Coffill and Mr. Womack that upon returning to the car
Mr. Gaskins said, "I stuck that nigger. He didn't make
the fence," now known to be a lie.  There was evidence
presented that David Clark possessed a two-by-four which
had bloodstains on it.  The jurors could have reasonably
determined that the defendant was defendaning himself,
however, he does not concede now and did not during trial,
that this was a fact.

-71-

David Clark stated how he was wounded and it was not
by the hands of the defendant.  He was in pain and hard
of breathing while in the ambulance, and was told that
his chances of living was not great and he [David Clark]
told the two police officers that he received his wound
by "falling off a broken bed."  This information was told
to four other people, 1) intake nurse, 2) the doctor
(which is on record in the medical report), 3) his two
cousins/friends, and 4) possibly his girlfriend.  But this
avenue of defense was blocked by the trial judge when
defense counsel tried to offer it into evidence through
David Clark's girlfriend.  More importantly, defense
counsel never sought to truly reveal this crucial infor-
mation to the jury in an exculpatory nature through the
other witnesses who were told by David Clark how he received
his wound.

Even though the evidence presented against the defendant
was entirely premised on the felony-murder theory and
not premeditation, the jury's finding of premedation
to cure the prejudicial impact of the judge's erroneous
felony-murder charge was an unreasonable application
of the law, and is contrary to clearly established federal
law as determined by the United States Supreme Court.

Since there was no evidence of premeditation, the felony-
murder error cannot be excused where the verdict is sup-
portable on one ground, but not on another.  Under the
felony-murde rule, the prosecutor was not required to
establish premeditation and deliberation in defendant's

-72-

state prosecution.  The SJC was in error to excuse the

felony murder error of the trial judge where premedita-

tion was never an issue at trial nor was there evidence

presented to that effect.

**VI(F).  THE PETITIONER PROCLAIMS "ACTUAL INNOCENCE"
OF THE MURDER OF DAVID CLARK WHEREAS HE
RECEIVED NEWLY DISCOVERED EVIDENCE IN THE
AFFIDAVIT OF LEO WOMACK, AND, IN LIGHT OF
THE NEW EVIDENCE, IT IS MORE LIKELY THAN
NOT THAT NO REASONABLE JUROR WOULD HAVE
FOUND HIM GUILTY BEYOND A REASONABLE DOUBT**

To satisfy Carrier's "actual innocence" standard,

a petitioner must show that,in light of the new evidence,

it is more likely than not that no reasonable juror would

have found him guilty beyond a reasonable doubt. Schlup

v. Delo, 513 U.S. 298, 299 (1995).  The focus on actual

innocence means that a district court is not bound by the

admissibility rules that would govern at trial, but may

consider the probative force of relevant evidence that

either wrongly excluded or unavailable at trial. Id.

The case against the defendant relied  heavily on

the testimony of two men: Leo Womack and Raymond Coffill.

The physical evidence presented at trial against the de-

fendant were 1) a buck knife that was said to have belonged

to the defendant but was found in Robert Reid's house,

2) fingerprints that were found on the knife but none that

belonged to the defendant, 3) a buck knife sheath that

was said to have beloneged to the defendant, however, at

trial, Lt. Rocco Perrlino stated that he saw a knife sheath on

-73-

the defendant's belt. (Tr. 2:103). He was impeached at
trial because  at an earlier suppression hearing on
July 31, 1991, at Essex Superior Court in Salem, Massa-
chusetts he stated he never saw the defendant with a
knife sheath. (Tr. 2:104-105), 4) the jacket of the defendant
indicating the presence of what appeared to be non-visible
human or animal blood, or a false positive reading on
the "T" zipper pull of the jacket, 5) one of the defendant's
sneakers indicating the presence of what appeared to be
non-visible human or animal blood, or a false positive
reading on the bottom of the sole (where? is actually
unknown).

The listed evidence is not overwhelming physical
evidence against the defendant.  And they are crucial pieces
of evidence because the Commonwealth's major contention
was that the defendant stabbed David Clark and not any
of the testifying codefendants.  Trial counsel's defense
was that the defendant was at the scene but was not the
killer.  At all times the defendant proclaimed his innocence
of murder or attemtped armed robbery of David Clark.
It was on the prosecution to prove that the defendant com-
mitted felony murder and murder by deliberate premeditation
beyond a reasonable doubt. In re Winship, 397 U.S. 358
(1970).  He did not prove this here.

The defendant received a signed and sworn affidavit

-74-

from Leo Womack stating that he gave false testimony at
trial implicating the defendant by stating that the defen-
dant told him, "I stuck that nigger. He didn't make
the fence." Affidavit of Womack at ¶ 5.  This testimony,
now known to be a lie, along with Raymond Coffill's
intentionally tailored testimony, was the key evidence
at trial that convicted the defendant.  Without it, the
jurors would have acquitted the defendant.  This new evi-
dence, supported by Attorney Lawrence McGuire and by
Judge Howard Whitehead, former trial prosecutor, coupled
with the questionable physical evidence presented at
trial, establishes sufficient doubt about his guilt and
justifies the conclusion that his continued incarceration
on the murder charge would be a miscarriage of justice,
Schlup v. Delo, 513 U.S. at 316, unless his conviction
was the product of a fair trial.  In this case, the defen-
dant did not receive a fair trial in many factions.

   The only evidence to procure a conviction was the
testimony of Leo Womack and Raymond Coffill.  Their
testimony was material and went to the "heart" of the case
because it establishes "where" and "when" the defendant
allegedly stabbed David Clark.  Now, it has been proven
that Womack and Coffill lied at Gaskins trial to convict
him.  This is the appropriate case where comity and finality

-75-