"must yield to the imperative of correcting a fundamentally unjust incarceration." Schlup, 513 U.S. at 320, 321.

The affidavit is quite disturbing because Mr. Womack not only admit that he gave false testimony, but that it was proven that the prosecutor also used the intentionally tailored testimony of Mr. Coffill to convict the defendant. Moreover, the prosecutor admits that he was aware that Mr. Womack was lying but that his [Leo's testimony] "was contrary to what [he] expected." And Mr. Womack's trial counsel admits that his client was being "untruthful" when testifying to "key" events. If this information would have been available during the defendant's trial, there is a "'fair probability,'" that "'the trier of the facts would have entertained a reasonable doubt of his guilt.'" Schlup, supra at 322, quoting Murray v. Carrier, 417 U.S., at 454, 455, n. 17.

There was no physical evidence or forensic evidence connecting the defendant to the crime with which he was charged. The only evidence was through two confessed accomplices, now known to be liars. The defendant satisfy the Carrier and Schlup criteria of actual innocence. Based on the facts now proved, it is more likely than not that "no reasonable juror" would have convicted him. He should be released from custody. He has shown on the record that he is entitled to that relief.

-76-

**VII(G).       THE TRIAL JUDGE ERRED IN ADMITTING INTO
               EVIDENCE TESTIFYING CODEFENDANTS PLEA
               AGREEMENT WITHOUT GIVING CURATIVE IN-
               STRUCTIONS DENYING THE DEFENDANT'S FIFTH
               AND FOURTEENTH AMENDMENT RIGHTS TO DUE
               PROCESS OF LAW AND A FAIR TRIAL**

In this case, the prosecution entered into a plea agreement with Leo Womack and Raymond Coffill, for their testimony. Leo Womack's plea agreement recommended a reduced charge of murder to manslaughter, and to receive a sentence of for fifteen to twenty years for his testimony. Raymond Coffill, on the other hand, for his cooperation and testimony was to receive a manslaughter charge and a sentence of five to seven years.

**Prosecutor's Opening, in part:**

> With respect to Coffill, the Commonwealth has agreed to reduce the charge of murder to manslaughter and to recommend for him a sentence of five to seven years at MCI-Walpole.

> With respect to Womack, whose involvement, as you can see, was greater, the Commonwealth has agreed to drop an unrelated charge of unarmed robbery -- which was accompanied by a charge of assault and battery -- and to reduce the murder charge to manslaughter but to recommend a sentence of fifteen to twenty years at MCI-Walpole. (Tr. 2:28).

**Direct Examination of Raymond Coffill, in part:**

> Q. And you have entered into an agreement with the Commonwealth in exchange for your testimony today. Is that correct?

> A. Yes, I have.

> Q. And that the Commonwealth would recommend a five to seven year sentence to MCI-Walpole?

-77-

A. Yes.

**Direct Examination of Leo Womack, in part:**

Q. Mr. Womack, have you entered into an agreement
with the Commonwealth concerning the giving
of testimony here today?

A. I have.

Q. That would be fifteen to twenty years at MCI-Walpole?

A. Correct.

**Prosecutor's Closing, in part:**

So, the question isn't whether you like Raymond
Coffill and Leo Womack. The question is whether
Raymond Coffill and Leo Womack are telling the
truth...

Now, the Commonwealth contends that whatever their
liabilities, Raymond Coffill and Leo Womack are
telling you the truth when they tell you that.

(Tr. 4:48-49).

The admission of the agreements in evidence can be looked

upon as a representation by the prosecutor that Womack

and Coffill's testimony were credible, a form of vouching

by the prosecutor who was not subject to cross examination.

Moreover, "a prosecutor may neither inject his personal

opinion on crediblity into the proceedings, nor should

the jury be led to believe that the prosecutor has other

information not presented at trial which leads him to

believe the witness is telling the truth." United States

v. Creamer, 555 F.2d 612, 617 (7th Cir. (1977)(Quoting

Lawn v. United states, 355 U.S. 339. 359-360 n. 15).  In

-78-

his closing, the prosecutor said: "Now, the Commonwealth contends that whatever their liabilities, Raymond Coffill and Leo Womack are telling you the truth when they tell you that" (Tr. 4:48-49), and "He wouldn't be able to tell you a lie without letting on." (Tr. 4:56). Here, the prosecutor vouched for Womack's and Coffill's veracity bolstering their credibility. This behavior has been condemned by the courts. See United States v. Borello, 766 F.2d 46, 57 (1985)("The agreement, when introduced by the Government, is used primarily to bolster the credibility of a witness"); United States v. LeFevour, 798 F.2d 977, 984 (7th Cir. 1986)("It was, purely and simply, bolstering that credibility"). The prosecutor's comments here "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974).

Also, such an agreement, without curative instructions as recognized by the Massachusetts Supreme Judicial Court, "present the possibility that the jury will believe that the witness is telling the truth, thinking that, because of the agreement's truthful requirement, the Commonwealth knows or can discover whether the witness is telling the truth." Commonwealth v. Ciampa, 406 Mass. 257, 260, 547 N.E.2d 314 (1989). Testimony pursuant to a plea

-79-

agreement made contingent on obtaining an indictment or a conviction, as a result of the witness's testimony, would presumably present too great an inducement to lie, would not meet the test of fundamental fairness, and would not be admitted. Ciampa, 406 Mass. at 262 n. 5.  The language was unfairly prejudicial, confusing or misleading matters. See United States v. Constentino, 844 F.2d 30, 34-35 (2d Cir.), cert. denied, 109 S.Ct. 303 (1988).

The plea agreement by itself could be viewed as an implied representation by the Government that the witness's testimony will be truthful.  The implied representation or credibility far exceeds any implication of credibility arising from simply calling a witness to testify for the Commonwealth under oath.  The judge in this case, after hearing testimony as to the plea agreements in the opening, upon direct examination, and, in the prosecution's closing, failed to "forcefully tell the jury to study the witness's credibility with particular care." Ciampa, 406 Mass. at 266.  See (Tr. 4:70-75)(Judge's charge to the jury).

The judge's error in failing to give curative in-structions to cure the prejudicial affect of the plea agreements, coupled with the codefendants testimony, along with the prosecutor's closing argument stating: "Now, the Commonwealth contends that whatever their liabilities,

-80-

<u>Raymond Coffill and Leo Womack are telling you the truth</u>

<u>when they tell you that" and "He wouldn't be able to</u>

<u>tell you a lie without letting on</u>," was so prejudicial

that it rendered the trial fundamentally unfair.

The charge failed adequately to direct the jury's

attention to the potential influences of the plea agreement

on Coffill and Womack's credibility and failed as well

to dispel any implication inherent in the plea agreement,

and in the presentation of Coffill and Womack as a

Government witness, that the Government knew or was war-

ranting that Coffill and Womack was telling the truth.

The charge did not tell the jury to weigh Coffill's and

Womack's testimony with care and not consider Coffill's

and Womack's testimony.  It did not warn the jury that,

in entering into the agreement and presenting them as

a witness, the Government did not know whether Coffill

or Womack was telling the truth (in which we now know

they both were lying).  And "only by a cautionary in-

struction covering these points could the jury have been

in a position to evaluate the impact of the plea agreement

and testimony presented to it." <u>Ciampa</u>, 406 Mass. at 257,

263-264 (emphasis added).

The State Court's ruling was an unreasonable determination

of the facts in light of the evidence presented at trial,

28 U.S.C. § 2254(d), and federal review of this claim is

-81-

necessary to prevent a fundamental miscarriage of justice because the Fifth Amendment to the United States Constitution and the Fourteenth Amendment to the United States Constitution guarantees a criminal defendant due process of law in a court of law. In this case, the defendant was denied that right. If but for the error, the defendant may not have been convicted. And its because of this his conviction should be reversed.

-82-

**VIII(H).    DEFENSE COUNSEL WAS INEFFECTIVE WHEN HE
FAILED TO MOVE TO STRIKE THE JURY POOL
AND VENIRE AND DENIED THE DEFENDANT A
SUBSTANTIAL RIGHT GUARANTEED BY THE SIXTH·
AND FOURTEENTH AMENDMENTS TO THE UNITED
STATES CONSTITUTION**

The defendant shows that he was prejudiced by his at-
torney's ineffectiveness by demonstrating that there
is a reasonable probability that, but for counsel's un-
professional errors, the result of the proceeding would
have been different. Kimmelman v. Morrison, 477 U.S.
366, 381 (1986). A reasonable probability is a probability
sufficient to undermine confidence in the outcome.
Strickland v. Washington, 466 U.S. 668, 694 (1984).
Affirmatively stated, "better work on the part of defense
would have accomplished something material for the
defense."

In the instant case, the defendant was not tried
before a constitutionally selected jury of his peers re-
presenting a fair cross-section of the community which
denied him his constitutionally protected rights. Prior
to trial defense counsel made a motion for an individual
voire dire. (Tr. 1:9). The discussion went as follows:

> JUDGE: All right, this is a motion for an individual
> voire dire. What is the reason for that?
>
> DEFENSE COUNSEL: Well, your Honor, my client is a
> Black gentlemen, the victim was a Black gentleman,
> but one of the codefendants listed in the case is

-83-

a white caucasian, Raymond Coffill. The testimony
will be that he is presently charged with the
crime of murder in may at a later time pleaded
guilty to a manslaughter charge, but I think
there is an issue perhaps with race with regard
to his participation in this case.

JUDGE: Request for voire dire of prospective wit-
nesses -- I don't ask that question: Do you feel
that since the defendant has been arrested that
he is, therefore, probably, guilty ... I am not
going to say anything about a Black man. I will
do it in my own inimitable way, but most of
those things will be covered in fewer words than
the motion.

DEFENSE COUNSEL: There are thirty-eight requests,
your Honor. Is the court denying each one of them?

JUDGE: I am not acting on them. I will do it my
way. I cover the law. The defendant's motion for
additional peremptory challenges, that is denied.

DEFENSE COUNSEL: May I be heard, your Honor, Please?

JUDGE: Sure, go ahead.

DEFENSE COUNSEL: My client, as I stated before, is
Black. I have been coming to Newburyport for many,
many years, and I have never found a Black person
in the venire.

JUDGE: We had one last week.

DEFENSE COUNSEL: I can only say what my experience
has been in the Northern part of this country. He
has serious reservations and questions about
whether he can get a fair trial, based upon what
he has heard in the past year while he has been
in custody, relative to the large segment of the
population showing up for jury duty in the county
of Essex being white jurors. This is a difficult
case that involves violence, overtones of a rob-
bery, it has drugs, cocaine, and the use of
weapons. I think that extra peremptory challenges
could serve him well in terms of selecting a jury
that is as unbiased as we can get it

JUDGE: Motion is still denied.

(Tr. 1:9-12).

Defense counsel had an obligation to assist the defendant in choosing a fair and impartial jury. See Kimmelman v. Morrison, 477 U.S. 365-377 (1986).  Once the judge denied his motion for additional peremptory challenges, defense counsel should have moved to strike the venire pursuant to M.G.L.c. 234 § 73.  Based on the discussion with the judge, it is evident that the venire contained no Black or Hispanic jurors. (Tr. 1:9-12).  It is clear from defense counsel's colloquy with the judge that he was aware of the possible prejudicial harm that could occur if the defendant was tried before an all white jury. (Tr. 1:12). Despite this, counsel never made any challenge to the composition of the venire, and he never moved to strike the venire based on its all white composition.  Trial counsel here breached this duty by failing to challenge the all white venire.  Had such a motion been made but denied, the defendant would have been entitled to a new trial with a more diverse venire. See Moore v. United States, 432 F.2d 730, 740 (1970)(It is a claim which should be made before trial begins on the merits).

Defense counsel's failure to move to strike the venire had the effect of denying the defendant his Sixth Amendment right to be tried by a jury of his peers representing a

-85-

fair cross-section of the community.  Defense counsel
was evidently aware of the potential harm that could result
to his client, yet he failed to take any proper course of
action in response.  His incompetency seriously prejudiced
the defendant's right  to a fair trial by an unbiased
and impartial jury. Moore, supra.

The United States Supreme Court has held that "a con-
victed defendant making a claim of ineffective assistance
must identify the acts or omissions of counsel that are
alleged not to have been the result of reasonable, pro-
fessional judgment." Strickland v. Washington, 466 U.S.
668, 690 (1984).  The court must then determine whether,
in light of all the circumstances, the identified acts
or omissions were outside the wide range of professionally
competent assistance.  Whereas, "the reasonableness of
counsel's perspective at the time of alleged error."
Kimmelman v. Morrison, 477 U.S. at 377.

In the instant case, defense counsel's failure to
challenge the venire resulted in the defendant's loss
of vital facts and demographic data which would have
specified the exact ethnic make up of the venire and cause
the trial court to enter finding of facts which would
have been available for appellate review.  Trial counsel's
error resulted in an incomplete record of the defendant's
petit jury that was not drawn from a source fairly re-

-86-

presentative of the Essex County community.  Trial counsel

in his failure to move to strike the venire, forfeited

defendant's substantial and absolute right to be tried

by a fair cross-section of the community and a jury of

his peers as guaranteed by the Sixth and Fourteenth Amend-

ments   to the United States Constitution.  Denial of

this substantial right was manifestly unreasonable and

prejudicial to the defendant which resulted in a funda-

mental miscarriage of justice.

**IX(I).    APPELLATE COUNSEL WAS INEFFECTIVE WHEN
         SHE FAILED TO FILE A NEW TRIAL MOTION
         ON THE UNCONSTITUTIONALLY SELECTED JURY
         ISSUE CLARIFYING THE RECORD BEFORE
         ARGUING THE ISSUE BEFORE THE STATE SU-
         PREME JUDICIAL COURT ON DIRECT APPEAL**

The Fourteenth Amendment guarantees a criminal defendant

pursuing a first appeal as of right certain minimum

safeguards necessary to make that appeal "adequate and

effective."  An accused is constitutionally entitled to

the effective assistance of counsel on direct appeal as

of right. Evitts v. Lucey, 105 S.Ct. 830, 834 (1985).

Here, the proper way to have handled trial counsel's

incompetence by appellate counsel was a new trial motion

filed with the trial judge.  This way an evidentiary hear-

ing would have been held on the issue of the trial jurors

not representing a fair cross-section of the Essex Community

as required by the United States and Massachusetts Con-

stitution, and to determine if there was a systematic

-87-

exclusion of Blacks and Hispanic jurors. See Alston v.
Manson, 791 F.2d 255 (2nd Cir. 1986); Castaneda v.
Partida, 97 S.Ct. 1272 (1977); Amadeo v. Zant, 108 S.Ct.
1771 (1988).

Because of appellate counsel's inattention on moving
for a new trial on the issue in the Superior Court
where the case was tried, and moving for direct appeal
on an issue without sufficient "demographic data,"
the Massachusetts Supreme Judicial Court was unable to
render a judgment on such a complex issue.  In
Commonwealth v. Gaskins, 647 N.E.2d at 432, the court stated
"The essential data on which such a claim must be based
do not appear on the record..."  Moreover, the services
of a lawyer will for virtually every layman be necessary
to present an appeal in a form suitable for appellate
consideration on the merits. Evitts v. Lucey, 105 S.Ct.
at 834.

Appellate counsel knew she had a duty to put jury
data in the record before bringing that argument before
the Supreme Judicial Court. See Barnoski v. Commonwealth,
413 Mass. 1007, 603 N.E.2d 915 (1993).  She knew that
filing a new trial motion with the trial **court before**
seeking direct appeal on the issue was the proper way
to have handled such an issue. Accord Commonwealth v.
Barnoski, 418 Mass. 523, 638 N.E.2d 9 (1994).[13]  In Barnoski(II),

13/ Appellate counsel in Gaskins' case also argued the
Barnoski appeal.

-88-

a new trial motion was filed in accordance with Barnoski(I)
"because the right to counsel is so fundamental to a
fair trial, the constitution cannot tolerate trials in
which counsel, though present in name, is unable to
assist the defendant to obtain a fair decision on the merits.
See    Evitts v. Lucey, 105 S.Ct. at 836.  A system of
appeal as of right is established precisely to assure
that only those who are validly convicted have their
freedom drastically curtailed.  A state may not extinguish
this right because another right of the appellant---the
right to effective assistance of counsel---has been
violated. Evitts v. Lucey, supra, at 838.  The defendant's
appeal was not adjudicated because of appellate counsel's
ineffectiveness and "a first appeal as of right therefore
is not adjudicated in accordance with due process of law
if the appellant does not have the effective assistance
of an attorney." Id.

        Federal review of this claim is necessary to prevent
a fundamental miscarriage of justice, Reed v. Ross,
468 U.S. 1 (1984), because the defendant's appeal was not
adjudicated because of appellate counsel's ineffectiveness
and resulted in a miscarriage of justice.  Reversal is
required.

X(J).    **DEFENSE COUNSEL'S FAILURE TO INVESTIGATE, INTERVIEW AND CALL WITNESSES EXCULPATING DEFENDANT DENIED HIM EFFECTIVE ASSISTANCE OF COUNSEL AS REQUIRED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**

Here trial counsel put up a lack luster fight for the defendant whereas the defendant was facing a first degree murder charge and faced life in prison without the possibility of parole. There was exculpatory evidence available in "five" possibly "six" witnesses who were told by David Clark how he received his wound to the abdomen by "falling on a broken bed." Out of these six potential witnesses, two were his cousins; two police officers; a registered nurse at the hospital, and possibly the mother of his children. Trial counsel never made an attempt to investigate or interview these witnesses, who, if interviewed and subsequently subpoenaed, would have testified at trial contradicting the Commonwealth's theory of defense casting more doubt on the Commonwealth's case than what was already in doubt of the defendant's guilt. See Strickland v. Washington, 466 U.S. 668 (1984); Montgomery v. Peterson, 846 F.2d 407 (7th Cir. 1988); Sullivan v. Fairman, 819 F.2d 1382 (7th Cir. 1987). These witnesses were related in blood or friendship to David Clark and unrelated in blood relationship or friendship to the defendant, and therefore had "an interest in seeing

-90-

his alleged murderer punished." <u>Sullivan</u>, 819 F.2d at 1389.

At trial the Commonwealth introduced a significant amount of evidence trying to establish a connection of the defendant with the crime.  The Commonwealth relied heavily on the testimony of two confessed accomplices. The Commonwealth's theory was that the defendant stabbed David Clark during an attempted robbery.  Trial counsel's defense was that the defendant was at the scene but he was not the killer.  David Clark, before his death, made a statement on how his injury was received, which must be given some consideration, to five, possibly six, witnesses.[14]

His statement, if believed, would have exculpated the defendant.  It contradicts the Commonwealth's theory of the crime and alleged murder and make valid the defense theory that Gaskins "was not" the killer.  Trial counsel's failure to procure these exculpatory witnesses rendered that his "performance fell below competency standard" where he failed to interview any of the named available witnesses. See <u>Code</u> v. <u>Montgomery</u>, 799 F.2d 1481, 1483 (11th Cir. 1986).  At a minimum, counsel has the duty to interview potential witnesses: two were his cousins, two were police officers, a registered nurse at the hospital,

---

[14] If the statement on how Mr. Clark received his wound was favorable to the prosecution, he would have been given broad discretion to use it at trial. Since justice is the seeker of truth, Mr. Clark's statement, through the testimony of these witnesses exculpating the defendant, should have been presented at trial.

the doctor who performed the surgery on Mr. Clark, and possibly the mother of his children.  The Sixth Amendment guarantees criminal defendants the effective assistance of counsel.  That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense.  See Wiggins v. Smith, 123 S.Ct.  2527, 2529 (2003).  If a state court has already rejected an ineffective-assistance claim, a federal court may grant habeas relief if the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Trial counsel, here, was well aware of these witnesses because their names and addresses were in the police report or hospital records.  These witnesse could have been located quite easily and subpoenaed.  Trial  counsel put up an argument at trial indicating that David Clark may have been telling the truth.  So he [counsel] should have sought to introduce these witnesses who could have helped his client's defense.  Their testimony would have all corroborated one another.  Moreover, "the record establishes that counsel had reason to know, from an objective standpoint, that a possible defense. . .[was]

-92-

available." <u>Sullivan</u> v. <u>Fairman</u>, 819 F.2d 1389.  <u>See also</u>

<u>Nealy</u> v. <u>Cabana</u>, 764 F.2d 1173 (5th Cir. 1985); <u>Crisp</u>

v. <u>Duckworth</u>, 743 F.2d 580 (7th cir. 1984), cert. denied,

469 U.S. 1226 (1985).

Trial tactics only become a factor when there has

been a reasonably thorough investigation of the evidence.

Here is what the defense counsel for the defendant missed:

1. The existence of six potentially available
   witnesses whose identities were known well
   before trial through the state's response
   to discovery and through police reports.

2. These known witnesses were neither friends
   nor relatives to Gaskins and were therefore
   disinterested.

3. The testimony of these disinterested witnesses
   was potentially the strongest and most impres-
   sive proof at trial. Their testimony was not
   repetitive and each witness's testimony tended
   to corroborate that of the others. Further,
   the testimony of the six disinterested wit-
   nesses was exculpatory.

4. Trial counsel had at his disposal a means of
   contacting the witnesses because their addresses
   and phone numbers were listed in the police
   reports.

5. The defendant was incarcerated and therefore
   could not be expected to help his defense.

6. A paid investigator could have been procured
   through request for funds from the court to
   locate, interview and subpoenae witnesses.
   Such services had been used by trial counsel
   in other cases.

[A]n attorney who fails even to interview a readily

available witness whose non-cumulative testimony may

-93-

potentially aid the defense should not be allowed automati-
cally to defend his omission simply by raising the shield
of 'trial strategy and tactics.' Crisp v. Duckworth,
743 F.2d at 584.

These witnesses were very important to the defendant
because with the evidence already in doubt, and with
their exculpatory testimony, would have been material and
favorable to the defense.  If believed, "the testimony
of (sic) witnesses would have been completely exculpatory."
Sullivan v. Fairman, 819 F.2d at 1387.  Moreover, eyewitnesses
identification evidence, uncorroborated by a fingerprint,
gun, confession, or co-conspirator testimony, is a thin
thread to shackle a man for forty years. Griffin v.
Warden, Md. Corr. Adjustment Center, 970 F.2d 1355, 1359
(4th Cir. 1992)(citing Harris v. Reed, 894 F.2d 871, 878
(7th Cir. 1990)).  The Supreme Court has held that the
Sixth Amendment guarantees to all criminal defendants
the right to effective assistance of counsel. Strickland
v. Washington, 466 U.S. 668, 686 (1984).  In this case
the defendant was denied that right.

Trial counsel's performance was deficient and it seri-
ously prejudiced the defense and denied the defendant a
fair trial which resulted in a misccariage of justice.
Federal review of this claim is necessary to prevent a
fundamental miscarriage of justice, and after upon such
examination, the defendant's conviction should be reversed.

-94-

**XI(K).**     **DEFENSE COUNSEL WAS INEFFECTIVE WHEN HE**
**FAILED TO EITHER MOVE FOR A MISTRIAL OR**
**MOVE TO STRIKE OR REQUEST LIMITING**
**INSTRUCTIONS WHEN THE JURY WAS ALLOWED**
**TO CONSIDER NUMEROUS INADMISSIBLE AND**
**PREJUDICIAL HEARSAY STATEMENTS**

In Massachusetts, a joint venturer is "'one who aids, commands, counsels, or encourages commission of a crime while sharing with the principal the mental state required for the crime.'" Stewart v. Coalter, 855 F.Supp. 464, 468 (D.Mass. 1994), rev'd on other grounds, Stewart v. Coalter, 48 F.3d 610 (1st Cir. 1995).

In this case, the Commonwealth proceeded on a joint venture theory. However, the Commonwealth failed to prove beyond a reasonable doubt that a joint venture existed. Accordingly, the trial judge did not allow this case to be submitted to the jury on a joint venture theory. Despite this, however, the jury was allowed to hear and consider numerous prejudicial hearsay statements that were testified to by the codefendants which were admissible "only" on the basis of their being made in furtherance of a joint venture or conspiracy. The jury should not have been allowed to consider any of these statements in reaching its verdict. See United States v. Olano, 113 S.Ct. 1770, 1778 (1993)(If the Government fails to show the absence of prejudice, the reviewing court must automatically reverse the conviction)(Stevens, J., dissenting).

In Massachusetts, statements that are made by a co-

-95-

conspirator or participant in a joint venture are admis-
sible against the other conspirators or participants if
the statements are made during the conspiracy or joint
venture and in furtherance of that conspiracy or joint
venture. See Liacos, Handbook Mass. Evid., 475 (1994 ed.)
citing Commonwealth v. Colon-Cruz, 408 Mass. 533, 543,
562 N.E.2d 797 (1990); Commonwealth v. Borans, 379
Mass. 117, 145-148, 393 N.E.2d 911 (1979); Commonwealth
v. Beckett, 373 Mass. 329, 366 N.E.2d 1252 (1977).

Further:

> [T]he existence of the conspiracy or joint
> venture must be proved by means other than
> the extrajudicial statement in question,
> as a condition of the statments admissibility
> . . . .[H]owever, the judge need not make
> a preliminary finding that the joint crimi-
> nal enterprise existed before admitting the
> evidence; it may be admitted subject to a
> later motion  to strike if the prosecution
> fails to prove the defendant was part of a
> conspiracy. [W]hen statements of a conspirator
> have been admitted, the court should instruct
> the jury that they can consider the statement
> against the defendant only if they determine
> on the basis of other evidence that a con-
> spiracy or joint venture existed and the
> defendant was a member of it." (emphasis added).

Liacos, Handbook on Evidence, supra at 476.

The record in the instant case clearly indicates that
the Commonwealth did not meet its burden of proving
that a joint venture existed. (Tr. 4:16-17).  Accordingly,
the jurors should not have been allowed to hear and consider
any of the statements made by the codefendants, which
were admissible only if a joint venture had been proven

-96-

to exist. See, e.g., United States v. Ellis, 547 F.2d
863 (1977); United States v. Hedman, 630 F.2d 1184
(1980); United States v. Creamer, 555 F.2d 612 (1977);
United States v. LeFevour, 798 F.2d 977 (7th Cir. 1986);
Commonwealth v. Podlaski, 377 Mass. 339, 385 N.E.2d 1379
(1979); Commonwealth v. Salemme, 395 Mass. 594, 481
N.E.2d 471 (1985); Commonwealth v. Funches, 379 Mass.
283, 295, 397 N.E.2d 1097 (1979).  Defense counsel
should have moved for a mistrial on the basis that his
client's rights were substantially prejudiced when the
jurors were allowed to hear and consider these numerous
prejudicial and inadmissible hearsay statements.  Because
no instruction was requested, the jury was free to infer
that Gaskins shared the same mental state as codefendants
Womack and Coffill.  This inference is constitutionally
impermissible. Id.

    In the alternative, defense counsel should have moved
to strike the statements so that the jury would not have
been able to consider them in reaching a fair and just
verdict.  Failure to move for a mistrial, or alternatively,
to strike the statements rendered defense attorney's
performance deficient because "the record establishes that
counsel had reason to know, from an objective standpoint,
that a possible defense...[was] available." Sullivan
v. Fairman, 819 F.2d at 1389.  The hearsay testimony

-97-

that the jurors were allowed to consider was extremely
prejudicial to Mr. Gaskins' interests.  Specifically,
the defendant was convicted of felony murder because the
statement allowed the jury to infer that Gaskins shared
the same mental state as his codefendants with respect
to the underlining attempted robbery as well as the mur-
der.  This inference is constitutionally impermissible.
See United States v. Creamer, 555 F.2d 612 (1972);
United States v. Ellis, 547 F.2d 863 (1977), and cases
cited therein.

The underlying felony to be proven by the Commonwealth
was attempted armed robbery.  In its case in chief,
the Commonwealth presented the two codefendants as its
primary witnesses.  The Commonwealth used a substantial
portion of the testimony provided by each of these witnes-
ses to establish that there was an attempted armed robbery
and that it was committed as a joint venture by each of
the coparticipants.  This was supported by numerous
hearsay statements which were admissible only if made during
the joint venture and in furtherance of its goal.
However, the Commonwealth never proved that a joint venture
existed.  Specifically, codefendant Coffill testified
1) That Coffill and Womack had planned to rob the drug
house prior to meeting Gaskins;  2) That Coffill and
Womack, along with Gaskins and Reid agreed to pool their
money to buy cocaine (Tr. 3:104);  3) That Coffill, Womack,

-98-

Reid and Gaskins smoked the cocaine (Tr. 3:104);  4)
That <u>Coffill, Womack, Reid and Gaskins decided to return</u>
<u>to the drug house and rob it</u> (Tr. 3:113); 5) That Reid
may have had a gun;  6) That Womack hit the victim and
fought with the victim (Tr. 3:127);  7) That Womack
ordered the victim to "kick it in." Id.

Further, codefendant Womack testified that 1) He hit
Clark in  the face (Tr. 3:209);  2) That "they" planned
to rob the drug house;  3) That "they" returned with the
intent of robbing the drug house (Tr. 3:206).

Here it is apparent that the jurors were allowed to
consider these statements and view the defendant as a
joint venturer in the attempted armed robbery and sub-
sequent murder even though the Commonwealth never proved
a joint venture existed.  Clearly, defense counsel
should have either moved for a mistrial or moved to strike
this inadmissible testimony on the basis that these wit-
nesses statements were highly prejudicial to the defendant.
Failure to do so deprived him of his right to a fair
trial as guaranteed by the Sixth and Fourteenth Amendments
to the United States Constitution. <u>See</u>, e.g., <u>McGarty</u>
v. <u>O'Brien</u>, 188 F.2d 151, 96 F.Supp. 704 (Mass. 1951);
<u>Moore</u> v. <u>United states</u>, 432 F.2d 730 (1970).

Further, there could have been no tactical advantage
to defense counsel's failure to move to either strike the
testimony or move for a mistrial, or request limiting

instructions.  A significant part of Mr. Gaskins' defense
was that he was not engaged in a joint venture with the
other participants in this incident.  In fact, trial
counsel recognized this continued problem of the joint
venture and possible inference from codefendants state-
ments when he requested that the court instruct the jury
to exclude the possibility of a joint venture.  Trial
counsel commented after the judge's charge:

> MR. HICKEY: Was the court going to mention some-
> thing about the acts of this gentleman in terms
> of excluding a joint venture theory? In other
> words, it is alleged that he is the one that
> inflicted the wound.

> THE COURT: No. I said to them that we are only
> concerned about the indictment for murder against
> him. I am not going to talk about joint venture
> because they will be talking about that for two
> hours and then we will get a question, what the
> heck is joint venture?

> MR. HICKEY: I didn't want you to instruct on
> joint venture, but that they have to find from
> the Government's theory that he was the one,
> actually the one.

> THE COURT: That is very clear. Anything else?

(Tr. 4:99)

Defense counsel allowed the jurors to infer from the
inadmissible testimony of the codefendants that the defen-
dant was, in fact, a joint venturer.  This completely
contradicted the defendant's theory of defense and sub-
stantially affected his right to a fair trial and deprived
him of an otherwise substantial ground of defense. See,
e.g, Kimmelman v. Morrison, 477 U.S. 366 (1986); Strickland

-100-

v. Washington, 466 U.S. 668 (1984); Sullivan v. Fairman,
849 F.2d 580 (7th Cir. 1987); Crisp v. Duckworth, 743
F.2d 580 (7th Cir. 1984), cert. denied, 469 U.S. 1226
(1985); Murray v. Carrier, 106 S.Ct. 2639, 2644 (1986).
This was "plain error" on attorney's part and requires
reversal. See, e.g., United States v. Houser, 804 F.2d
565, 570 (9th Cir. 1986); United States v. Hurt, 795
F.2d 765, 773 (9th Cir. 1986); United States v. Rogers,
769 F.2d 1418, 1426 (9th Cir. 1985); Reed v. Ross,
468 U.S. 1 (1984).

The admission of this evidence violated Gaskins'
right to due process and a fair opportunity to meet the
charges against him pursuant to the Sixth and Fourteenth
Amendments to the United States Constitution and requires
reversal of his conviction. McGarty v. O'Brien, 96
F.Supp. 704, affirmed, 188 F.2d 151 (Mass. 1951);
United States v. Apollo, 476 F.2d 156 (1973).

**XII(L).    THE DEFENDANT WAS DENIED A FAIR TRIAL IN THE
SYSTEMATIC EXCLUSION AND UNDERREPRESENTATION
OF BLACKS AND HISPANICS IN THE ESSEX COUNTY
JURY POOL AND VENIRE**

Historically all white juries in this country have been

devastating when it comes to deciding the fates of racial

and sthnic minorities, and the same problem exists in

Massachusetts Courts.  If this was not the case, the

"Commission to Study Racial and Ethnic Bias in Massachusetts

Courts" would have never have been formulated by Chief

Justice Paul Liacos to investigate discrimination in

the courts amongst racial and ethnic minorities, and their

findings would have been different.  However, their report

concluded that "there is sufficient data to indicate

that communites with large numbers of ethnic and racial

minorities are experiencing low rates of participation

in the perspective jury pools."

Justice Lynch filed his report in which  he further

stated, "I regret to report that it is the perception

of many lawyers, community members, judges, and focus

groups that disparate treatment towards racial and ethnic

minorities exists within courts of the commonwealth."

Based on these findings, can one honestly say that this

all white jury, who tried and convicted the defendant

for first degree murder, did not harbor "any" bias or

prejudices against the defendant because of his race in

rendering their verdict? See Peters v. Kiff, 407 U.S.

493, 501 (1972)(the Due Process Clause protects a defendant

from jurors who are actually incapable of rendering an

impartial verdict).

-102-

The evidence presented in this case was far from overwhelm-
ing. As a matter of fact, the evidence was suspect at best. The
defendant proclaimed his innocence throughout the entire trial
process---and still does. That means it was entirely upon the
prosecution to prove guilt beyond a reasonable doubt. In re
Winship, 397 U.S. 358 (1970). Any reasonable juror who was
thinking clearly, and their minds free from harboring prejudic-
es, may have seen the evidence for what it was, and may have vot-
ed to acquit. In this case, "justice may have not been done"
because the jury was not impartial. And the defendant "does
possess the right to have his petit jury selected by proced-
ures that are impartial" Teague v. Lane, 109 S.Ct. 1079 at n.1
(1989)(Stevens, J. concurring).

It is of known and established fact that in this country
exists a great racial divide. Whites and Blacks have differ-
ent perspectives and perceptions on how life is perceived.
This cannot be denied.[15]   In this case, the defendant was faced
with the dilemma of being tried for first degree murder with
basically no physical evidence whatsoever linking him to the
crime alleged. The state relied heavily upon the testimony
of Raymond Coffill, who is caucasian, and Leo Womack, who is
Black. Raymond Coffill was the prosecution's "star witness"
who had received the least amount of time to serve for his

---

[15]/ For instance, the acquittal of the police by an all white
jury in the beating of Rodney King that caused riots in 1992,
and the O.J. Simpson trial which brought about new laws and
legislation and has basically polarized the country. This is
something that has existed and still remains to exist today.
That is why the Equal Protection Clause is so important. See
United States v. Price, 86 S.Ct. 1152, 1163-1170 (1966).

cooperation. Based upon this, the perception of the jurors could have been as such believing that, "Raymond Coffill may have been influenced by them Black guys to get into trouble because he looks like a good kid. And besides, he received the least amount of time. He must be telling the truth." Another way to look at it is that Blacks are stereotyped everyday in the media to be bad people always involved in some type of gang activity or trouble with the law.

> "As a matter of first impression,
> therefore, I would conclude that
> a guilty verdict delivered by a
> jury whose impartiality might
> have been eroded by racial prejudice
> is fundamentally unfair."
> Teague v. Lane, 109 S.Ct. at 1081.

The all white jury who resided over the defendant's trial were told to bring their personal life experience into the deliberating room. According to the jury list, all of the assigned jurors came from the "white suburban" area of Essex County. Meaning, their lifestyle and experiences were contrary to the defendant's. There is no way of knowing if this constitutionally composed jury could be fair in deciding the defendant's case. It is, however, clear by their questions presented to the judge that they were very unsure of the case and who actually, if anybody, could have been the murderer. Their questions were as follows:

> What was the angle of the cut?
> Was it an upward thrust?
> They are all playing murder she wrote
> Was it straight in ?
> Was it downward?
> Could blood have been washed off Coffill's knife?

-104-

<u>Why is Leo looking at a longer sentence than Ray for his crime</u>?
How far into the abdomen must the knife go to cause the intes-
tine to come out? (Tr.4:104).

These questions presented by the jurors show that they
were unsure and that reasonable doubt existed in their minds
as to the defendant's actual guilt. And that doubt was to be
given to the defendant. <u>In re Winship</u>,397 U.S. 358. To allow
this conviction to stand based upon a verdict that may be
questionable will cause a "grave injury" to the fabric of our
judicial system. And,the injury is not limited to the defendant
--there is injury to the jury system,to the community at large,
and to the democratic ideal reflected in the process of our
courts. <u>Teague</u>,supra,109 S.Ct. at 1093. The trial jury hears
the evidence of both sides and chooses what it will believe.
In so deciding,it is influenced by imponderables--unconscious
and conscious prejudices and prefernces--a thousand things
we cannot weigh. Id.

Here,the record shows that the defendant was prejudiced
when he was denied his Sixth and Fourteenth Amendment rights
to be tried by a jury representative of a fair cross-section
of the community. To prove a jury selection process infringes
upon this constitutionally protected right,the defendant must
show (1) The group allegedly discriminated against is a "dis-
tinctive group" in the community; (2) The group is not fairly
and reasonably represented in the venire in relation to its
proportion of the community,and (3) That underrepresentation
is due to the systematic exclusion of the group in the jury
process. <u>Duren</u> v. <u>Missouri</u>,434 U.S. 357,365 (1979).

-105-

First, the defendant is Black and a minority, and Hispanics are minorities. They are clearly part of a "distinctive group" in the community.

Second, the groups were not fairly and reasonably represented in the venire in relation to its proportion of the community.

As indicated by the discussion between the judge and defense counsel, there were no Black or Hispanic in the venire. (Tr. 1:9-12). Furthermore, there were seemingly no minorities represented in the venire at all.

The trial took place in Essex County. At the time of trial there were approximately 670,080 persons in that county. Approximately 15,809(2.4%) of those persons were Black and 69,562(10.04%) were minorities.[16]

The voter-age population consisted of 511,503 persons in Essex County. Approximately 10,049( 1.9% ) of those persons were Black and 28,047( 5.8% ) of those persons were of Hispanic origin.[17]  Despite these percentages of Blacks and Hispanics in the community at large and, in the voter-age population, these "distinctive groups" were "non-existent" in the venire. Minorities as a whole made up 7.7%  of the Essex County voter-age population.

---

16/ All figures are taken from the <u>1990 Census of Population and Housing for Massachusetts</u>, U.S. Department of Commerce, Economics and Statistics Administration, Bureau of the Census (Issued August, 1991). This figure includes Blacks, American Indians, Asians of Pacific Islanders, persons of Hispanic origin and those persons of "other" race.

17/ All figures are taken from the <u>1990 Census of Population and General Population Characteristics of Massachusetts</u>. Voter-age is from 18 years thru 65 years and over.

Individually, Blacks constituted a 1.9% underrepresenta-
tion, and Hispanics 5.8% underrepresentation. Together this
population of an all white jury venire constituted an imper-
missible 7.7% underrepresentation of minorities. Clearly,
these distinctive groups were not fairly and reasonably repre-
sented in the venire in relation to its proportion of the
community and voter-age population. The defendant similarly
meets the third prong of <u>Duren</u> test regarding systematic un-
derrepresentation. "[T]he Sixth Amendment requires a showing
that the underrepresentation is due to systematic exclusion
in the selection process." <u>Duncan</u> v. <u>Louisiana</u>, 88 S.Ct. 1444,
1451 (1968) (Providing an accused with the right to be tried
by a jury of his peers gave him an inestimable safeguard against
the corrupt or overzealous prosecutor and against the complaint,
biased or eccentric judge.) (Emphasis in original).

Here, it is evident that Blacks and Hispanics are system-
atically underrepresented in Essex County and the City of New-
buryport, in particular. Defense counsel indicated to the judge
that "[h]e had been coming to Newburyport for many, many years
and he has <u>never</u> even found a Black person in the venire." (Tr.
1:11).[18]    To this, the judge responded, "[W]e had one last week."
Id. It is clear from defense counsel's statement, and more im-
portantly, from the judge's response on the record, that Black
persons are systematically underrepresented in the venire. It
also evident that there is an impermissible and systematic

---

18/ Attorney, Hugh Samson, in a letter, told the defendant that he
would give testimony at his evidentiary hearing on the issue of
Blacks being excluded in the jury selection process in Newbury-
port. See Exhibit E, at p. 60.

-107-

7.7% underrepresentation of minortities that is "contrary
to clearly established federal law" as determined by the
United States Supreme Court and which violates the Sixth
and Fourteenth Amendments to the United States Constitution.
Accord: <u>Preston</u> v. <u>Manderville</u>, 428 F.2d 1392, 1393-
94 (5th Cir. 1970)(13.3% underrepresentation of minorities
constitutes a prima facie case); <u>Amadeo</u> v. <u>Zant</u>, 108
S.Ct. 171, 174 (1980)(A systematic underrepresentation
ranging from 5% to 11% sufficient to sustain relief).
Compare: <u>Commonwealth</u> v. <u>Fryar</u>, 414 Mass. 732, 741, 610
N.E.2d 903 (1993), appeal after remand, 680 N.E.2d
901, cert. denied, 118 S.Ct. 636 (1997)("diffuse imparti-
ality" that comes from a diverse jury is invaluable").
Id. 414 Mass. at 741.

The discriminatory petit jury venire selection pro-
cess is a constant in Newburyport. <u>See</u> Letter of Hugh
Samson, Esq., and the conversation of trial counsel.
(Tr. 1:9-12). Attorney Samson's letter speaks on how
Blacks never make it to be actual jurors in the selection
process. The defendant has shown on the record that
Blacks were 1.9% of the voter-age population pertaining
to their number; and that Hispanics were 5.8% of the
voter-age population pertaining to their number. <u>See</u>
<u>U.S.</u> v. <u>Osorio</u>, 801 F.Supp. 966 (D.Conn 1992)(explaining
what must be done to bring forth proper systematic
exclusion argument). This establishes a 7.7% underrepre-
sentation as a whole and should not be accepted by this

-108-

court.  The facts are clear and the numbers do not lie.

Federal review of this claim is necessary to prevent a fundamental miscarriage of justice, <u>Reed v. Ross</u>, 468 U.S. 1 (1984), by the defendant being tried by this unconstitutionally selected jury denied him equal protection of the law and constitutes reversible error.

The defendant asks this Court for nothing more than what he believes he is entitled to constitutionally, and that is to be tried by a fair and impartial jury. He has demonstrated that "justice was not done," and the only remedy is to order that the writ be granted.

### CONCLUSION

The defendant request that the judgment affirming his conviction be reversed and that this Court grant the writ requiring a new trial or release from unlawful restraint.

Respectfully Submitted,

Dated: 6/18/08

Tony B. Gaskins, Pro se
MCI-Cedar Junction
P.O. Box 100
South Walpole, Ma. 02071

-109-