UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


Tony B. Gaskins,

     Petitioner,                Civil Action
                              No. 04-CV-12255-WGY

v.

Ronald T. Duval,

     Respondent.


PETITIONER'S SUPPLEMENTAL MEMORANDUM OF LAW IN
SUPPORT OF HIS PETITION FOR WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2254 _____ ___ _____

## I.  Procedural History

### A.  Background

The Petitioner was convicted of the first degree murder of David Clark in the Essex County Superior Court on February 28, 1992. That conviction was affirmed by this Court on March 31, 1995. Commonwealth v. Gaskins, 419 Mass. 809 (1995). Exhibit D. Subsequent pro se motions for new trial were denied in memoranda of the Superior Court dated May 8, 1997 and June 16, 1998. Exhibit E.[1] A Petition for Writ of Habeas Corpus was filed in the United States District Court for the District of Massachusetts. See Gaskins v. Duval, U.S.D.C, No. 97-11540-WGY. Then Chief Justice William G. Young issued a decision noting that all state court issues had not been exhausted. Judge Young noted, inter alia, that the affidavit

---

[1]  Some of the Exhibits referred to herein were originally attached to the original petition as filed prior to these pleadings. The Exhibits are reproduced in the Appendix of Exhibits, submitted herewith. The pages of the Appendix to Exhibits have been sequentially numbered, and are sometimes referenced herein as "AE" followed by the page number. The entire record is not reproduced at this stage of the proceedings. Transcripts of the trial proceedings, transcripts of post-conviction hearings are referred to herein.

of Leo Womack, Jr., "casts doubt on the fairness of Gaskins'
trial." Memorandum and Order dated March 28, 2000, at p.
6.  That Order is Exhibit F, and the Affidavit of Leo Womack
is Exhibit G.  Judge Young also noted that the Womack Affi-
davit constituted evidence on "the issue of perjury and
raises serious questions regarding prosecutorial misconduct."
Id.

The Memorandum and Order in the habeas  corpus proceed-
ing concludes that the petition for a writ of habeas corpus
raised certain issues that had not previously been addressed
in the state court system.  After the federal habeas corpus
proceedings Mr. Gaskins sought to raise issues which had
not previously been addressed in the state court system
by filing a pro se Motion for New Trial on April 1, 2000.
Attorney John J. Barter was subsequently assigned to represent
Mr. Gaskins.  Supplemental pleadings were filed by counsel
to underscore the issues raised by Mr. Gaskins and to present
supplemental issues as well.  The issues raised therein
and in post conviction proceedings include newly discovered
evidence including the recantation of an important Common-
wealth witness, failure to preserve evidence, prosecutorial
misconduct, issues relating to jury instructions which were
not raised at the time of trial and which are based upon
more recently developed law, discovery issues, and issues

regarding evidentiary hearings including whether the prose-
cuting Assistant District Attorney should have been required
to testify in post-conviction proceedings. See Exhibits
H, I, J, and K.

The trial court issued a Memorandum of Decision on
July 12, 2002, which addressed certain issues, and ordered
an evidentiary hearing "only on the prosecutorial miscon-
duct issue, with argument allowed on the petitioner's claim
that there was an erroneous third prong malice instruction."
Exhibit L.  When Mr. Womack was called to the witness stand
in these post-conviction proceedings he refused to testify
asserting a claim against self incrimination under the
Fifth Amendment.  As a result hearings were hedl that focused
primarily on whether Mr. Womack had waived his privilege
against self incrimination.  In a Memorandum of Decision
dated February 13, 2003, the trial court found that Mr.
Womack had waived any Fifth Amendment privilege and he was
ordered to testify. Exhibit M.  In that same Memorandum
of Decision, the trial court also addressed the third prong
malice jury instruction issue. Id.

Mr. Womack appealed the ruling that required him to
testify in a petition under M.G.L.c. 211 § 3. See
Womack v. Gaskins, Single Justice No. SJ-2004-0456.  On

September 9, 2005, a Single Justice of the Massachusetts
Supreme Judicial Court denied Womack's petition.  In light
of the finding that Mr. Womack had waived his Fifth
Amendment privilege, and in light of the SJC's determination
that such ruling would not be changed pursuant to M.G.L.c.
211 § 3.  Mr. Gaskins again sought to compel Mr. Womack
to testify in the Superior Court.

    Mr. Womack was called before the Superior Court to
testify on March 2, 2006, and again he refused to testify.
Mr. Gaskins sought relief from this refusal to testify,
and in connection therewith filed a Motion for Relief from
Refusal of Witness Leo ∶Womack to Testify, and a Renewed
Motion for Postconviction Discovery.  Those motions sought
relief including further hearings at which other witnesses,
including the prosecuting Assistant District Attorney could
be called as a witness. See Motion for Relief from Refusal
of Witness to Testify at Paragraph 5.  Mr. Womack again
refused to testify at a hearing on June 15, 2007.  Counsel
requested the opportunity to resume hearings and specifically
to call the former Assistant District Attorney on the case,
Howard Whitehead, to testify as to what transpired in his
contacts with Leo Womack. See Transcript of June 15, 2007
hearing at $21-22.^{2}$

2/ At that hearing counsel addressed this issue ". . .there is an
additional witness that we had sought to have brought into Court

At the conclusion of that hearing the Court scheduled a
subsequent hearing date of August 9, 2007, but shortly before
that hearing was to proceed counsel was advised that the
hearing would not be held as scheduled.  Counsel sought
to reschedule that hearing in telephone calls to the ses-
sion clerk as well as by letter and motion, but the hear-
ings were not resumed.

    While the Order dated February 5, 2008, and entered
on or about February 11, 2008, (Exhibit B) appeared to deny
the remaining issues in these postconviction proceedings,
the details of those rulings, including the Findings and
Rulings werre included in the Memorandum and Decision dated
February 25, 2008.  The trial court ordered that the earlier
rulings would not become final for purposes of determining
when appellate relief must be sought, until such time as
all issues in these post-cnviction proceedings were addressed
so as to avoid piecemeal appellate litigation. See
Transcript of Hearing May 24, 2007 at 8-9, and Procedural
Orders dated September 6, 2002 and May 24, 2007. Exhibit
O.  As a result, the findings and rulings of the trial
court as contained in three separate memoranda, dated July

---

and that person was the prosecutor in this case. And this Court has
considered that in the past and on one occasion arrangements were made
for that witness to appear and I believe there was a snowstorm and things
were called off. . ." (TR. 6/15/07 at 21). "So almost every percipient
witness has testified, only the prosecutor hasn't." Id at 22.  "Your
Honor, I would just like to follow up on one point. I thought it would
be inappropriate to issue a subpoena or a summons to this particular
witness and, in the past, with Mr. Mitchell, we had agreed that that
wouldn't be done, and if he were ordered to come, he would come with-
out need for that." Id at 27-28.  The trial court noted that issuance
of a summons was not necessary "because if I requested that he testify,
I'm sure he would. And if you issued a subpoena there would be a motion
-- a move to quash it anyway, and that would put the issue back in front
of me." Id at 28

12, 2002, February 13, 2003, and February 25, 2008, are

addressed in this supplemental memorandum and the related

petition.

## II.  SUPPLEMENTAL ARGUMENTS PRESENTED

I(A).  NEWLY DISCOVERED EVIDENCE ESTABLISHED THAT THE
       PETITIONER'S RIGHT TO A FAIR TRIAL, TO CONFRONT
       HIS ACCUSERS, TO EXCULPATORY EVIDENCE, TO
       EFFECTIVE ASISTANCE OF COUNSEL, AND TO DUE PROCESS
       OF LAW UNDER THE FIFTH, SIXTH, AND FOURTEENTH
       AMENDMENTS TO THE UNITED STATES CONSTITUTION
       WERE VIOLATED

At the core of the Petitioner's claim is the showing

that a witness, Leo Womack, whose testimony was central and

critical to this case recanted his testimony and swore that

he was coerced into providing such testimony at the time

of trial.  According to Mr. Womack, he was told that in

order to obtain a "deal" whereby the charges against him

would be reduced to manslaughter, he would have to "corro-

borate" the statement of a co-defendant, Raymond Coffill.

As Mr. Womack states in his Affidavit:

> 5.)  The prosecutor specifcallt told me that
> I must corroborate Raymond Coffil's testimony
> and statement by saying Tony Gaskins said, when
> he returned to the car: "I stuck that nigger.
> He didn't make the fence."

(Exhibit G).

Mr. Womack goes on to say that he "really didn't want

to lie like this but if I didn't I wouldn't have gotten

the deal I did." Exhibit G.  Mr. Womack states that his
testimony was "coerced."  The Affidavit of Mr. Womack
was not the only evidence that he had recanted his trial
testimony.  He made statements to at least two individuals
expressing his regret for having given false testimony
based upon his perception that he was required to do so
to secure a favorable disposition on charges against him.
Sindey Hayes supplied an Affidavit, AE at 109, and testified
in postconviction proceedings that she was the older sister
of Tony Gaskins. Transcript of 12/10/2002 hearing. ("TR.
II") 136.  Mrs. Hayes met with Leo Womack some time in the
Fall of 1999 at the Concord Farm. (Tr. II, at 136-140).
Mrs. Hayes went to the corrections facility, filled out
a visitor form, and a guard told her which person Leo Wo-
mack was. (Tr. II, at 140).[3]  When Mrs. Hayes met Mr. Wo-
mack he told her that "he feels bad about what he did" that
he was "sorry" and that he was "going to make it right."
(Tr. II, at 142).  Mr. Womack told Mrs. Hayes "he was sorry
for lying on Tony and saying what he said.  And that he
was going to fix it, to make it right.  He was going to
write it down [on] paper and send it to me." (Tr. II, at
143).  Mrs. Hayes testified that at some point she received

---

3/ Mr. Womack testified in his own postconviction testimony
that he met with a woman who identified herself as the sister
of Mr. Gaskins. Transcript of 12/9/2002 hearing ("TR. I (Impounded)"
) at 6, 27.

a signed and notarized document in the mail in an envelope
that appeared to be from Mr. Womack. (Tr. II at 144). Mrs.
Hayes did not convey any threats to Mr. Womack. (Tr. II
at 144). Mrs. Hayes described Mr. Womack as being "open,
nice and very humble, you know, and caring like he felt,
he had that look like he was really sorry." (Tr. II at 145).
From the perspective of Mrs. Hayes, Mr. Womack did not appear
to be threatened by her, or by her appearing unannounced
to speak with him. (Tr. II at 145, 222). Nothing in the
testimony of Mr. Womack suggested that the visit from Mrs.
Hayes was threatening in any way. (Tr. I(Impounded) at 6,
27).

        Susan Manning testified that she first met Leo Womack
when he was an inmate at the South Eastern Correctional
Center (S.E.C.C.). Transcript of 12/9/2002 hearing ("Tr.
I") at 80. Ms. Manning knew Mr. Gaskins, had read the tran-
scripts of his trial, and was interested to speak to Mr.
Womack about his testimony. (Tr. I, at 80-81). Ms. Manning
asked Mr. Womack if the things he said in the affidavit
were true, and Mr. Womack "took a long deep gulp and exhaled,
looked me straight in the eyes and he said absolutely one
hundred percent true. . ." (Tr. I at 86). Mr. Womack told
Ms. Manning about the circumstances of his testifying in
the case. Mr. Womack told Ms. Manning that he was nineteen

years old when this happened, and he was "scared." (Tr.
I at 86). Ms. Manning testified that Mr. Womack told her
"I have cried many a night over the consequences, the results
of what I have done to that man." (Tr. I at 87). Ms.
Manning testified that Mr. Womack told her "he was  scared
and he was coerced into lying, and led to believe that if
he told that lie he was going home that day." (Tr. I at
88). Ms Manning testified that in the two meetings that
she had with Mr. Womack in April and June of 2000, they
discussed the contents of Mr. Womack's affidavit.

> Mr. Womack continuously said to me about his
> awesome guilt that he had felt about putting
> Mr. Gaskins away for life. And he made refer-
> ences to all the time that he has done un-
> necessarily along the terms of his life sentence.
> And that he was now in the position and he felt
> it was time to make it right.

(TR. I at 89).

Mr. Womack never said anything to Ms Manning about
being pressured into signing the affidavit. (Tr. I at 89-
90). The substance of the Womack Affidavit was thus supported
by testimony of two witnesses who confirmed that he had
recanted the trial tesimony and that he described his trial
testimony as being coerced.

In these post conviction proceedings Mr. Gaskins sought
evidentairy hearings, post conviction discovery, and funds
for a post conviction investigation. The trial court, in

the Memorandum of Decision and Order on Defendant's Motion

For A New Trial dated July 12, 2002, concluded as follows:

> The defendant's claim of prosecutorial misconduct
> stands on different grounds, based on the newly
> filed Womack affidavit. <u>This argument has not
> been previously raised nor -- it appears -- could
> it have been earlier.</u> The inquiry shifts to a
> determination as to the necessity of an evidentiary
> hearing. . . . <u>The defendant has raised a substantial
> issue which is supported by affidavits, and therefore
> it is in the interest of justice to have this matter
> decided after an evidentiary hearing.</u> At this stage
> it is in the interest of justice to have this matter
> decided after an evidentiary hearing. At this stage
> this court cannot, and it is not reaching a conclu-
> sion as to the merits of these claims; rather,
> Gaskins' allegation that the testimony used to
> convict him was coerced is serious and if true could
> warrant a new trial. His allegation is supported
> by an affidavit from Womack, which states that his
> testimony was coerced and that the prosecutor told
> him what testimony he must give to corroborate
> Coffill's testimony. The affidavit also states
> that the prosecutor told the witness that this was
> required in order to secure a plea agreement. An
> evidentiary hearing is necessary to determine whether
> the testimony upon which the defendant was convicted,
> was in fact coerced.

Memorandum of Decision July 12, 2002, Exhibit L at 5-6.

The trial court, like the United States District Court,

recognized the significance of the Womack affidavit. The

trial court found that the issue was new, and that it "has

not been previously raised . . . nor could it have been."

In addition, the trial court found that ". . .the defendant

has raised a substantial issue. . ." The trial court has

now denied the motion for new trial on the grounds of newly

discovered evidence, including the Womack Affidavit. In

the February 25, 2008, Memorandum and Decision, the trial

court states "[i]n January 2003, the court found that Wo-

mack's allegations of prosecutorial misconduct were not

credible, and that he was not coerced into testifying

falsely at Gaskins' trial." Exhibit N at $7.^4$  However, the

record does not show that the trial court made such a

finding at that time.  The trial court's Memorandum of

Decision dated February 13, 2003, did not reach or address

the issue of whether Womack's allegations of prosecutorial

misconduct were credible or not credible.  The issue at

that stage of the proceedings was whether or not Leo Womack's

assertion of a Fifth Amendment privilege was valid.  He

sought to avoid testifying by claiming that when he recanted

his trial testimony it was because he was approached by

several inmates, when there was no Notary Public nearby,

and coerced him into signing the affidavit.$^5$  On this subject,

the February 13, 2003 Memorandum of Decision states, in

part, as follows:

> On the Circumstances surrounding the preparation
> and signing of the affidavit, I find Womack's

---

4/ The trial court indicates that "[o]n January 30, 2003, the court
(Borenstein, J.) found that Womack signed his affidavit freely,
voluntarily, and under no duress, and found that he was not a credible
witness." Exhibit N.  It appears that the trial court's reference
to "January 30, 2003" is intended to be a reference to the Memorandum
of Decision dated February 13, 2003. Exhibit M.  The docket sheet does
not show any memorandum dated January 30, 2003, or any hearing being
held on that date.

5/ After Mr. Womack recanted his trial testimony he was subject to being
prosecuted for perjury for having given false testimony in the jury trial.
See Exhibit M at 7.

    testimony not credible or believable.  In his
    testimony before me on the claim of coercion
    in signing the affidavit, Womack did not appear,
    and I find he was not, truthful.  In light of
    the circumstances and evidence, Womack's expla-
    nations were not plausible and I do not accept
    them, partially, though not solely, in light
    of the later credible testimony of Susan Lynch
    ("Lynch") Notary Public at the Northeast
    Correctional Center.

(Exhibit N at p. 4).[6]

Regardless of the trial court's determination on whether

the Womack Affidavit should be credited, it was sufficient

to raise important issues and to warrant evidentiary hearings

at which witnesses, including Howard Whitehead would be

called to testify.  In additiion, the facts and circum-

stances as revealed by this record establish that the state

court's findings was contrary to clearly established federal

law as determined by the United States Supreme Court, and

that the lower state court's ruling, and involved an un-

reasonable application of clearly established federal

law as determined by the United States Supreme Court.

---

6/ The trial court made reference to this same quoted passage in the
February 25, 2008, Memorandum and Decision, stating that it had pre-
viously stated that "Womack's explanations [regarding the prosecution's
alleged actions] were not plausible" and that the court "[did] not
accept them." Exhibit N at p. 4 n. 4.  The trial court's characteri-
zation of the language of the February 13, 2003, Memorandum of Decision
is quite different from the language of that was actually employed,
and the context in which the earlier decision was made.  If the trial
court had decided by February 13, 2003, that the Womack Affidavit, in
its substance was not credible, then there would have been no need for
several more years of proceedings in this case.  To the contrary, the
trial court found only that Mr. Womack's assertion of the Fifth Amend-
ment Privilege to avoid testifying was not credible, and the trial court
went on to direct Mr. Womack to testify.  Mr. Womack should have been

According to the Womack Affidavit his testimony was coerced by the Commonwealth. Mr. Gaskins was unconstitutionally denied access to this exculpatory evidence. See Brady v. Maryland, 373 U.S. 83, 87; Kyles v. Whitley, 514 U.S. 419 (1995). The Womack Affidavit, and his recantation to Sindey Hayes and Susan Manning as describe above, also support the conclusion that the Commonwealth coerced Mr. Womack into providing false  testimony. Mr. Womack's earlier statements to the police were intentionally destroyed, apparently as part of an interrogation technique. According to trial testimony the Commonwealth destroyed previous versions of Mr. Womack's statements.  These were statements of an alleged witness and participant in a murder, and the various versions of his statement should have been preserved as part of the investigation rather than being destroyed as a police technique of getting version of evidence that was satisfactory to them.  Even under Massachusetts law, the Commonwealth had a duty to preserve exculpatory evidence. See Commonwealth v. Harwood, 432 Mass. 290, 295 (2000); Commonwealth v. Neal, 392 Mass. 1, 10-12 (1984). This duty extends to "material and information in the possession or control of members of [the prosecutor's] staff and of any others who have participated in the investigation

---

compelled to testify, and Mr. Gaskins should have been permitted to call the former Assistant District attorney, Howard Whitehead, to have this factual matter considered based upon a full evidentiary record.

or evaluation of the case." Commonwealth v. St. Germain,
381 Mass. 256, 261 n. 8 (1980).  The failure to preserve
the earlier versions of Mr. Womack's statements are at
the very core of the category of evidence that must be pre-
served.

    At trial there was reason to question the method by
which Mr. Womack's statements were obtained, and the techniques
used to obtain such statements is even more suspect in light
of the newly discovered evidence.  The Commonwealth has
never denied using this technique whereby police took several
statements from Mr. Womack, and: then destroyed them, in
series, until he finally gave a version of the statement
that was accepted as satisfactory by the Commonwealth.
All such prior versions of the statement should have been
preserved as "prior inconsistent statements" of Mr. Womack,
and should have been made available to the defense at the
time of trial.  Mr. Womack learned that his fate was linked
to his ability to provide the Commonwealth with the evidence
that the Commonwealth wanted  to hear.  While he provided
such evidence at trial, the record now shows that he has
knowingly, willingly and voluntarily retracted that testimony
through his affidavit.  In post-conviction proceedings under
Massachusetts law, the trial court noted that "failure to
disclose exculpatory evidence must be evaluated in the con-

text of the entire record. Commonwealth v. Collins, 386
Mass. 1, 10 (1982)." See Exhibit N at p. 6.  It is the con-
text of this entire record that illustrates the pattern
whereby Mr. Womack was encouraged, cajoled, and coerced,
into providing testimony satisfactory to the Commonwealth,
which he subsequently recanted.

    The trial court concludes that since the jury was aware
that several of Womack's statements were torn up, that having
the statements would not have "created reasonable doubt
in the minds of the jury." Exhibit N at 6.  When it comes
to the Commonwealth's intentional destruction of evidence
a defendant need not establish that the evidence would have
resulted in an acquittal.  "To require the defendant at
this stage to prove that the [evidence was] in fact excul-
patory would, however, convert the disclosure duty established
by Brady [v. Maryland, 373 U.S. 83 (1963)] and  its progeny
into 'an empty promise, easily circumvented by suppression
ofn evidence by means of destruction rather than mere fail-
ure to reveal.' United States v. Bryant, [439 F.3d 642,
648 (D.C. Cir. 1971)]. Commonwealth v. Neal, 392 Mass. 1,
12 (1984)."

    The manner by which his "original" statement was obtained
suggest that from the start the Commonwealth sought to elicit

specific statements from Mr. Womack that would be inculpatory
of Mr. Gaskins.  At trial Mr. Womack did testify to an
alleged "admission" by Mr. Gaskins.  This testimony did
"corroborate" the testimony of Raymond Coffill which was
as follows:

    ADA:     What did he say?

    COFFILL:    He said he stuck him.

    ADA:     Were those his exact words?

    COFFILL:    No.  He said I stuck that nigger.  He
                didn't make the fence.

(Tr. 3:142).

    Mr. Womack's words, relating the "admission" of Mr.
Gaskins, certainly did "corroborate" the words of Mr. Coffill.
The quoted language is nearly identical from both witnesses.

    The  record now shows that even Mr. Womack's trial
counsel had no recollection of his client ever giving such
a statement in writing, or in his trial preparation with
the Assistant District Attorney. See Transcript of Testimony
of Attorney Lawrence McGuire. (Tr. II, 12/10/2002 at 123-
124).  This critical statement made by Mr. Womack at trial
was not part of any prior statement of which his counsel
was aware, nor was it part of the written statement given
by Mr. Womack to the police, but it fit in perfectly to
support the Commonwealth's case.  The Assistant District
Attorney confirms that Mr. Womack had not previously given

this version of the purported Gaskins statement prior to trial.  "To the extent that Womack, in his trial testimony, amplified on the conversation in the automobile by attributing to Gaskins the statement, '[Clark] never made it to the fence,' he did so on his own initiative and contrary to my expectation."  See Affidavit of Howard Whitehead, AE 224-225.  In short, the record in this case  shows that the statement of Mr. Womack evolved over time, commencing with the now-destroyed versions of his statements made to the  police, continuing to his being questioned by the Assistant District Attorney in the presence of his attorney Mr. McGuire, and ultimately, to the version of testimony given at the time of trial.  That final version was most supportive of the Commonwealth's position, to the degree that it supported the statements of Mr. Coffill and notably, that version contained a purported direct quote from Mr. Gaskins that counsel for Mr. Womack, and the Assistant District Attorney state they had not heard Mr. Womack give on any prior occasion.

While the Assistant District Attorney noted in his affidavit that this statement by Mr. Womack was "contrary to my expectation" the statement was nevertheless used to its maximum advantage at trial. AE 224-225.  In its opening

statement the Commonwealth argued that there would be testi-
mony that once Tony Gaskins got in the car he said: "I got
that nigger. I stabbed him. I think in the stomach. He
didn't make the fence." (Tr. 2:27). In fact, the written
statement of Mr. Coffil suggested that the statement would
be that Mr. Clark was stabbed "in the leg," AE 231, not
"in the stomach" as suggested by the opening statement,
and there was no acknowledged pre-trial statement from Mr.
Womack regarding this quoted statement.[7]  In the closing
argument the parallel testimony of Coffill and Womack was
highlighted by the Commonwealth.

> So the question isn't whether you like Raymond
> Coffill and Leo Womack. The question is whether
> Raymond Coffill and Leo Womack are telling the
> truth when they say that it was Tony Gaskins
> who pulled the knife on David Clark during the
> early morning of February 16th, 1991, and who
> after chasing David Clark down Boston Street
> and into a driveway, got into the car and said:
> "I stabbed that nigger. He didn't make the
> fence."

(Tr. 4:48).

> Now, they drove around for awhile. Then, at that
> point, Coffill said -- I think Womack said the
> same words -- that Gaskins said to him: "I stabbed
> that nigger. He didn't make the fence."

(Tr. 4:53).

___

7/ While Mr. Coffill did testify that he saw Mr. Gaskins and Mr. Womack
chase Clark following a confrontation in front of the house on Boston
Street, Mr. Coffill testified that he saw Mr. Clark climb over a fence
when the pursuit had stopped. (Tr. 3:136-137, 138). Since Mr. Coffill
saw Mr. Clark get over the fence, the statement, later attributed to
Mr. Gaskins, that Mr. Clark "didn't make the fence" would appear to
be contrary to Mr. Coffill's pwn personal observations. Id.

> . . . Raymond Coffill said that Tony Gaskins
> had come to the car and said: "I stabbed that
> nigger.  He didn't make the fence."

(Tr. 4:57-58).

> And when he emerged, he apparently had accom-
> plished his purpose, because he said "I stabbed
> that nigger.  He didn't make the fence."

(Tr. 4:65-66).

The record thus shows that the Commonwealth relied

heavily upon this alleged admission of Mr. Gaskins, to the

point that it became the cornerstone of the Commonwealth's

theory of the case, and was mentioned four times in the

closing argument.  There is no question that the testimony

in this case was material, and indeed central, to this case.

The false testimony of Leo Womack at trial was highly pre-

judicial to the defense, and in the absence of such testi-

mony the result of the trial would in all likelihood have

been different. See Napue v. Illinois, 360 U.S. 264, 266

(1959).

The closing argument based upon false evidence violated

the defendant's rights to a fair trial and to due process

of law as guaranteed by the Fifth, Sixth, and Fourteenth

Amendments to the United States Constitution. Donnelly

v. DeChristoforo, 416 U.S. 637, 642-643 (1974); Miller

v. Pate, 386 U.S. 1, 6 (1967).

VI(F).   IN LIGHT OF THE NEWLY DISCOVERED EVIDENCE THERE
         IS REASON TO BELIEVE NOT ONLY THAT THE PETI-
         TIONER IS ACTUALLY INNOCENT, BUT THAT THERE
         MAY HAVE BEEN NO "HOMICIDE" AT ALL, AND THAT
         COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE

Mr. Gaskins has argued that he was denied a fair trial,
effective assistance fo counsel, and due process of law,
because the statements of Mr. Clark, which indicate that
his injuries were sustained by accident, were never presented
to the jury.  The Massachusetts Supreme Judicial Court con-
sidered an earlier form of this argument. See Commonwealth
v. Gaskins, 419 Mass. 809 (1995). Exhibit D.  Judge Welch
of the Essex County Superior Court also denied previous
Motions For New Trial which alluded to this "dying declara-
tion" issue. Exhibit E.  In each instance, however, the
Courts appear to have concluded that Mr. Gaskins did not
provide adequate support for the argument that such state-
ments were made by the decedent and that such statements
would have been admissible if properly pursued.  The de-
fendant sought to address these underlying issues in these
post-conviction proceedings by obtaining further factual
support that such statements were made and were admissible
in evidence.

In post-conviction proceedings the trial court addres-
sed the "dying declaration" issue in the Memorandum of
Decision and Order dated July 12, 2002, concluding that

the issue was waived[8] and previously raised and adjudicated.
To the extent that the issue was not sufficiently raised
trial counsel and appellate counsel were ineffective.
This issue goes to the heart of whether or not a crime was
committed and whether Mr. Clark died from a stab wound in-
flicted by another person.  Where Mr. Clark told others,
including health care providers, that he sustained his
injury through an accident, that evidence should have been
offered in competent form and admitted into evidence. See
Harris By and Through Ramseyer v. Wood, 64 F.3d 1432 (9th
Cir. 1995)(Trial counsel's failure to investigate and pre-
pare for trial amounted to ineffective assistance);
United States v. Tucker, 716 F.2d 576 (9th Cir. 1983)
(Trial counsel's overall performance, failure to prepare
for trial, properly cross-examine government witnesses,
impeach government witnesses with inconsistent prior state-
ments, failed to call corroborating witnesses to support
defendant's testimony, deprived defendant of a fair trial
and constitutes ineffective assistance of counsel).

    As shown in a police report dated February 16, 1991,
which was offered in postconviction proceedings, Mr. Clark
told several people that he sustained his injury in an
accident where he fell on his broken bed.  "D. Clark

---

8/ This matter was never waived because it was adjudicated on its
merits by the SJC, however, Mr. Gaskins sought to have the issue
re-opened due to the newly discovered evidence that places an even
higher emphasis on the question of accident evidence, and that the
deceased met his end not due to the defendant, but by other means.

related to Officer Monahan while in the ambulance at Boston
Street that he received the wound when he fell on his
broken bed." AE at 121. The police also questioned Daniel
Harper, a cousin of Mr. Clark who helped to assist him to
the hospital. Mr Harper told the police "D. Harper relates
that D. Clark told him he fell on the bed." Id. A "nursing
assessment" indicates that when Mr. Clark was admitted
to the emergency room he said "he fell off a bed and got
stabbed." AE at 123. There is no doubt at this point that
these statements were made by Mr. Clark to (1) Police
Officer Monahan, (2) to his cousin Daniel Harper, and (3)
medical care providers at the Atlanticare Medical Center.
AE at 121 and 123. The question is whether or not such
statements were admissible. Other alleged statements of
Mr. Clark were admitted into evidence, but the statements
indicating that he had suffered the puncture wound in an
accident was excluded. It violates due process to allow
only inculpatory , but not exculpatory statements of the
same deceased witness to be admitted into evidence. The
question of whether the statements should have been admitted
as a dying declaration was previously addressed by the
SJC. See Exhibit D. If the statements were not admissible
under the "dying declaration" exception to the hearsy rule
counsel should have pursued other avenues to address why

the statements should be admissible.

"It is well established that exculpatory information must be disclosed under Brady even if the information would not be admissible at trial, at least as long as there is good reason to believe that disclosure of the exculpatory information would have led to the discovery of admissible evidence." Watkins v. Miller, 92 F.Supp.2d 824, 844 {S.D. Ind. 2000). A Brady caim has three components: "The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Watkins v. Miller, 92 F.Supp.2d at 832, citing Strickler v. Greene, 527 U.S. 263, 280 (1999).

The defendant meets all three prongs outline in Strickler. First, the evidence was favorable to Mr. Gaskins, and it was exculpatory because it exonerates him from any wrongdoing. The evidence was suppressed by the State because when defense counsel tried to raise the issue during cross-examination of Officer Monahan, ADA Whitehead objected on hearsay grounds and his objection was sustained. And, lastly the prejudice that ensued was the fact that Mr. Gaskins was not permitted to present evidence to the jury straight from the alleged victim's mouth that he sustained his in-

jury due to an accident, and not at the hands of the defendant
or any other human being.  If this information would have
been available during the defendant's trial and presented
to the jury, there is a "'fair probability,'" that "'the
trier of the facts would have entertained a reasonable doubt
of his guilt.'" Schlup v. Delo, 513 U.S. 298, 322 (1995).

Under Massachusetts law the statements would be admis-
sible as "spontaneous declarations" or "excited utterances"
as they were made shortly following the events whereby this
injury was sustained while Mr. Clark was still under the
excitement of the shock of the events. See Commonwealth
v. Williams, 399 Mass. 60 (1987); Commonwealth v. Crawford,
417 Mass. 358 (1994).  While such excited utterances are
frequently offered by the Commonwealth to establish guilt
or identity, there is no basis to exclude such statements
because they are exculpatory or offer a non-criminal alter-
native explanation.

To the extent that some of the statements of Mr. Clark
were in police records, such records under state law would
have been admissible as business records. M.G.L.c. 233
§ 78. Commonwealth v. Sellon, 380 Mass. 220 (1980).  To
the extent that some of the statements were in health care
provider records they should have been admissible. See

M.G.L. c. 233 § 79 (hospital records admissible as they re-
late to "treatment and medical history"). See also
Commonwealth v. Gogan, 389 Mass. 255 (1983). Medical
records offered pursuant to M.G.L. c. 233 § 79G, are
admissible in both civil and criminal cases. Commonwealth
v. Schutte, 53 Mass. App. Ct. 796 (2001).

Statements made to health care providers in the con-
text of diagnosis and treatment are admissible as an ex-
ception to the hearsay rule. See Commonwealth v. Comtois,
399 Mass. 668, 675 (1987). The limited records that were
available to the defendant in these postconviction pro-
ceedings indicated that Mr. Clark advised health care
providers that his injury was suffered when he fell off
a bed.  Since such statements were made to assist the medical
providers in providing care they have indicia of reliability
and should be admissible. Id.

It is submitted that in light of the newly discovered
evidence pertaining to the trial testimony in this case,
that the issue of the statements of Mr. Clark are placed
in a new light, providing evidence of actual innocence,
and should be considered substantively by this Court.  The
statements of the decedent, Mr. Clark, indicated that the
wound to his abdomen was sustained due to an accident.
Where confidence in the trial testimony has been shaken

in this case, the fact that there was an accident defense
that was not sufficiently pursued, and an alternative
explanation for the injury, looms heavily in determining
whether justice was done.   The failure of trial counsel
to press this issue, and to produce witnesses at trial
to testify about the statements of Mr. Clark, and to argue
appropriate reasons why such statements were admissible,
deprived Mr. Gaskins of effective assistance of counsel.
Any lawyer worth his or  her salt would have offered such
evidence. Strickland v. Washington, 466 U.S. 668 (1984).
Under Massachusetts law where there is evidence of "accident"
a defendant would be entitled to an instruction on that
defense, and failure to provide such a defense would be
grounds for reversal. See Commonwealth v. Zezima, 387
Mass. 748, 756-757 (1982).

      Based on the record as it currently stands, it is more
likely than not that "no reasonable juror" would have
convicted Mr. Gaskins.

III. Further Evidentiary Hearings Should Be Permitted.

      The trial court initially determined that evidentiary
hearings/proceedings were appropriate and necessary to re-
solve the prosecutorial misconduct issues in this case.
Exhibit L at 6.  In this case, the affidavits and supporting

documents, including transcripts of trial and post convic-
tion proceedings presented new and substantial issues
supporting an evidentiary hearing. While such hearings
were sought, the underlying motions, which raised important
constitutional issues, were denied before such hearings
could be completed. Most specifically, the defendant was
not permitted to call the prosecuting attorney as a witness,
or to develop the record regarding the circumstances under
which the decedent described his injuries as being caused
by an accident. If medical providers could have been called
as witnesses, the specific content of the statements could
have been expanded upon, as well as the circumstances under
which the statements were made, which could have provided
the evidentiary basis to establish that the statements were
in fact, a "dying declaration" made at a time that Mr.
Clark was in anticipation of his death. The defense should
have been allowed access to records of his hospital stay,
which lasted several days, and the opportunity to question
witnesses who spoke to Mr. Clatk during that period of time.

This Court should hold further evidentiary hearings
where the State Court failed provide the defendant with
full and fair hearings.

## CONCLUSION

In conclusion, the defendant incorporates Argument
I(A) herein fully with Argument I(A) in his original §

2254 petition, and incorporates Argument VI(F) herein fully

2254 petition, and incorporates Argument VI(F) herein fully
with Argument VI(F) in his original § 2254 petition.

                              Respectfully Submitted,

Dated: 6/12/08                Tony B. Gaskins, Pro se
                              MCI-Cedar Junction
                              P.O. Box 100
                              South Walpole, Ma. 02071